Lakamoke, Judge,
delivered the opinion of the court:
This is a suit against the United States by the Tlingit and Haida Indians of Alaska.[1] The jurisdictional act[2] under which this suit is brought is set forth in full in finding 1. The act authorizes the court to “hear, examine, adjudicate, and enter judgment upon any and all claims which said Indians may have, or claim to have, against the United States.” Section 1 of the act defines the Tlingit and Haida Indians of Alaska as “all those Indians of the whole or mixed blood of the Tlingit and Haida Tribes who are residing in Russian America, now called the Territory of *318 Alaska, in the region known and described as southeastern Alaska, lying east of the one hundred and forty-first meridian.” Section 2 of the act describes and defines the claims which are authorized to be submitted to the court for “settlement and determination of the amount equitably and justly due to said Indians from the United States,” as (1) all claims, legal or equitable for lands or other tribal or community property rights taken from the Tlingit and Haida Indians by the United States without compensation therefor, or (2) for the failure or refusal of the United States to compensate the claimant Indians for lands or other tribal or community property rights claimed to be owned by the claimant Indians and which property or property rights the United States appropriated to its own uses without the consent of the Indians, or (3) for the failure or refusal of the United States to protect the interest of the claimant Indians in their lands or in other tribal or community property, and for the loss of the same (a) at the time of the purchase of Alaska from Eussia in 1867, or (b) at some later date prior to the passage of the jurisdictional act. The same section provides that the loss to the claimant Indians of “their right, title, or interest, arising from occupancy and use, in the lands or other tribal or community property, without just compensation therefor, shall be held sufficient ground for relief hereunder.” Section 4 of the act provides, among other things, that it shall be no bar to the suit that the Indians may have been made citizens of the United States or that they may have severed their tribal relations with the Tlingit and Haida Tribes. Section 7 sets forth those Tlingit and Haida Indians who are entitled to share in any judgment of the court and provides for the making of Tlingit and Haida rolls. Section 8 of the act provides for the deposit of the judgment in the Treasury to the credit of each community of Tlingit and Haida Indians, and for the use of such money for the benefit of all the Indians. It also provides that none of the funds recovered or interest thereon may be used for per capita payments.
On February 29, 1956, the court, under Eule 38(b), ordered a separate trial be held of the issues relating to the *319 liability of the defendant with respect to (1) whether the claimant Indians had Indian title to the lands and waters claimed in Alaska at the time in 1867 when Alaska was purchased by the United States from the Russians, and if so, the extent of land and waters so owned; (2) whether the plaintiffs’ Indian title rights in the land and waters were taken or impaired by the United States in 1867, or (3) assuming plaintiffs had Indian title to lands and waters in Alaska in 1867 and thereafter, and such rights survived and were not later abandoned, whether plaintiffs are entitled to recover under the act. The issue of abandonment of any property or rights therein and the amount of recovery and the amount of offsets, if any, were matters reserved for further proceedings.
After extensive hearings held pursuant to the above order, the Commissioner of the Court made detailed findings of fact concerning the culture and characteristics of the Tlingit and Haida Indians, the manner in which they used and occupied the claimed lands, and the extent and location of the land so used and occupied in 1867 and long prior thereto. Findings 7 through 57.
The Commissioner found that the Tlingit Indians were a homogeneous and interrelated group of Indians speaking a single language different from that of their neighbors; that they were a nonagricultural people who were noted primarily for their use of marine products and wood; that their social structure emphasized formalistic family groups or clans, each clan having rights, respected by other clans, to the use of particular land and water areas of economic importance such as ocean waterfronts, bays, rivers, streams, or inland hunting areas; that the clans were acutely aware of their identity as Tlingit Indians in general and as members of households and clans in particular; that they had no central political body to govern the entire Tlingit people, although collectively they occupied a contiguous stretch of coast on the mainland and adjoining islands and were closely unified by common customs, language, family ties, trade, ceremonials, and a consciousness of their oneness as a homogeneous group. The Haida Indians were also a homogeneous group having customs and modes of life *320 closely resembling those of the Tlingits. The Haidas spoke a different language and did not use the interior of their islands to the same extent that the Tlingits did. Neither the Tlingits nor the Haidas were organized politically in a manner resembling the tribal organizations of the Indians of the United States, and the relatively large subgroups within each group were not organized politically as are Indian tribes usually. These subgroups, sometimes called “tribes” or “kons” by the Indians themselves, took names which had geographical significance, being the name of the river, bay, or island which the particular clan used and occupied. A map introduced in evidence as plaintiffs’ exhibit 169 is reproduced herein to show the location of the principal villages of the Tlingit and Haida Indians between 1867 and 1884 and also in modern times, and the areas occupied by the various kons. The somewhat complex social structure of the various divisions and subdivisions of the Tlingit and Haida Indians is described in finding 24.
In general', the Tlingits and Haidas were each divided into two groups or moieties, and each moiety was divided into a number of clans. Membership in a clan descended through the mother, and marriage within the clan or within the moiety was forbidden so that a clan was often distributed or divided among several villages, some of the larger clans or families being widely scattered throughout southeastern Alaska. Since no one in a clan could marry anyone else from that clan and had to associate with another clan from the opposite moiety, two local[1] clans from opposite moieties settling in a village constituted the closest thing to a “tribe” as that term is known in its usual sense. Usually, however, several local clans would settle in a single village. The villages consisted of large houses in each of which one or more families belonging to the local clans would live, and each house had a local clan designation. Each local clan in a village owned and used, in accordance with the Tlingit and Haida manner, large land and water areas adjacent to the village. The several larger Tlingit and Haida subdivisions which took the names of their principal winter villages are listed in finding 25.

*0

*321 The land and water owned and claimed by each local clan division in a village was usually well-defined as to area and use. Clan property included fishing streams, coastal waters and shores, hunting grounds, berrying areas, sealing rocks, house sites in the villages, and the rights to passes into the interior. Tracts of local clan territory were parceled out or assigned to the individual house groups for use and exploitation and the chief of the local clan, assisted by other house chief elders of the clan, formed a sort of council which controlled the clan’s affairs. Smaller areas belonging to a house within a clan remained clan property whenever a house ceased to exist. The modes of living and of dealing with property among these Indians were regulated by rigidly enforced tradition and custom, and, except under special circumstances, there was no authority in a clan or clan division to sell, transfer or otherwise dispose of, in whole or in part, any claimed area of land or water. Land was transferred from one clan to another only as compensation for damages, as gifts in connection with marriages and the like, and such transfers were infrequent. In addition to the areas which were claimed and used exclusively by individual houses, there were certain common areas which could be used by all the clans comprising a particular group of clans residing in a single geographical area. Certain designated offshore fishing and sea mammal hunting areas in larger bodies of water, channels and bays and stretches of open sea could also be used in common by all members of the various clans residing in a particular geographical area, but Indians residing in other geographical areas had no right to such use.
The Tlingit and Haida Indians made extensive use of most of the natural resources of their country, both of the land and sea, including the fish, sea mammals, shellfish, kelp and seaweed, animals, birds, timber, berry bushes, plants and minerals. Finding 33. Prior to our acquisition of Alaska, these Indians enjoyed a relatively high degree of civilization, were industrious and prosperous, and the accumulation of surplus wealth was a basic feature of their economy. From their earliest history these Indians carried on extensive trade with each other, with neighboring tribes and later with the Russians and the Americans. Large surpluses of materials *322 were necessary to these people and were regularly accumulated to carry on their trading and also to make possible the yearly traditional ceremonial activities and potlach important to their prestige. The clans and groups which used the mainland were, on the whole, better off materially than the Indians who lived on the islands because the mainlanders controlled the valuable trade carried on with the interior Indians. During the winter months the Tlingit and Haida Indians lived in their permanent villages. In the summer, the Indians went, by family and clan, to their customary summer camps to make use of the fishing, hunting and gathering areas belonging to the house or clan. The riverine clans along the mainland coast were able to secure great quantities of their staple foods for the long winter seasons close to their permanent villages and thus spent longer periods in their winter or permanent villages than did the other groups. The Indians residing along the coast did more inland hunting and overland traveling than did the groups living on the islands. The mainland Indians hunted large and small land mammals and traded extensively with the Athabaskan Indians, their neighbors to the east. For this purpose they traveled through well defined trails and passes inland for long distances beyond the coastal range of mountains.
The Tlingit and Haida Indians made intensive use of all accessible and usable shore areas within their claimed territories. Closely related to and integrated with their use of the shores, was their use of the waters of southeastern Alaska. In addition to the oceans, bays, inlets, rivers and streams fronting on the shores, and the inland lakes accessible from the shores, the Indians used the inland streams and rivers as means of travel. Even the nonnavigable portions of the streams were useful for access by portage to navigable inland lakes. The waters of southeastern Alaska formed a network of routes for travel by canoe used by the Indians to make their seasonal rounds of fishing, hunting, gathering and trading expeditions, and in the winter months, these routes were used when the clans exchanged visits with each other on occasions of ceremonial feasts. These routes of travel cut deep into the forests and inland reaches of *323 Tlingit and Haida territory and gave the Indians access by water to the greater part of southeastern Alaska.
The Indians used the accessible forests and inland areas of southeastern Alaska for hunting and trapping as well as for gathering roots, berries and other vegetable products. These Indians made extensive use of wood and bark for their houses, canoes and totem poles. Some items, such as lichens used for dye, took the Indians into very high and otherwise barren areas inland.
The social organization, the propensity for trade, and the industrious character of the Tlingit and Haida Indians, impelled them to use to the fullest the many resources available and accessible to them in the claimed areas of southeastern Alaska. The peculiar social structure of their groups rendered their society a highly competitive one in which rank depended in large part on the accumulation, display and disposal of great material wealth. This wealth was secured by fishing, hunting, gathering, and by trade with each other, with neighboring Indians of the interior, and later with the Russian and American traders. The increasing demand by American and European markets, especially for furs, made these Indians exert themselves even more to make heavy use of all of the accessible portions of their territory.
The Commissioner has estimated from all the evidence that the population of the Tlingit and Haida Indians in early historic times was approximately 10,000; that in 1867, it was approximately 6,000, and that at the present time the population is approximately 7,000.
From early times until 1867, and for a number of years thereafter, the Tlingit and Haida Indians made intensive and exclusive use of their territory to the exclusion of other Indians and of white explorers, traders, miners and settlers. There is no evidence of any other native people pressing to move into Tlingit or Haida territory in 1867 or prior thereto. For a number of years subsequent to the purchase of Alaska by the United States in 1867, there were only minor and limited intrusions into this territory by way of a few trading posts established along the coast and the settlement at Sitka.
The record as a whole establishes, and the Commissioner has found, that as of 1867 the Tlingit and Haida Indians *324 exclusively used and occupied all of that area of southeastern Alaska claimed by those Indians and shown on a map introduced in evidence as plaintiffs’ exhibit 168 and reproduced herein. In finding 57 the Commissioner described the area so used and occupied from time immemorial and in 1867. In the same finding the Commissioner pointed out certain areas that were not actually used for any productive purpose by the claimant Indians and this aspect of finding 57 has given rise to exceptions by both parties and to a dispute as to the significance of the exclusions or limitations thus made by the Commissioner.
The areas of territory which the Commissioner found were not put to any productive use by the claimant Indians consist generally of inaccessible or useless areas of land located within and completely surrounded by the larger area which was intensively used for productive purposes by the Indians, and also certain inaccessible mountain crests which were useful only as marking the borders of the claimed and used territory and forming a barrier between the claimant Indians and their neighbors to the east. The Commissioner pointed to nonnavigable waters not used by the Indians, glacier areas having no resources of value for the Indians, barren rocky slopes and inaccessible gorges which at places formed impassable barriers to the interior, and high mountain peaks covered by deep snows the year around. The Commissioner did not attempt to estimate the acreage of these barren and inaccessible areas inasmuch as the record does not now afford a basis for making such estimates.
The Government has excepted to finding 57 for the reason that it does not give the precise location or areal estimates of barren, inaccessible land or of inaccessible or unusable waterways, and that, as a result, it is impossible to ascertain from the findings the amount of land and water which was actually used and occupied by the Tlingit and Haida Indians and for which the Government will be liable in the event the court decides that defendant took or failed to protect the interest of the Indians in such land and water. In support of its contention that the findings on the location and extent of land and water used and occupied by the Indians are inadequate, defendant relies on United States v. Seminole *325 Nation, 299 U.S. 417, Causby v. United States, 328 U.S. 256, and United States v. Penn Manufacturing Co., 337 U.S. 198.
Plaintiffs except to the exclusions contained in finding 57 on the ground that where the record established use and occupancy by Indians of contiguous areas which together form a single contiguous territory containing some non-exploitable or inaccessible land and water within the outer-boundaries of exploitable and exploited land and water, and where it is obvious, as here, that the Indian occupants of the overall territory exercised dominion and control over the barren and inaccessible areas within their lands to the exclusion of all other Indians, it has been the established practice of this court to consider the entire area as being owned by the Indian claimants. Put another way, plaintiffs urge that the use and occupancy test applied to determine the amount of land used and occupied by a claimant Indian group has never been applied to require a showing of actual exploitation for material resources of each unusable internal tract found to be encompassed within the outerboundaries of an Indian title territory.
Insofar as the past practice in this court and at the Indian Claims Commission is concerned, the accessibility or exploit-ability test has not been applied to determine the extent of Indian title ownership where the inaccessible or useless areas were encompassed within an overall area found to be actively used and occupied by the claimant Indians. These useless (to the Indians) and sometimes inaccessible areas become important, however, at the valuation stage of proceedings in Indian litigation involving land, and it is at this stage that the land is classified and the barren and inaccessible areas are measured and eliminated from valuation.
In the case of the Uintah and White River Bands of Ute Indians, 139 C. Cls. 1, the Indians sued the United States under a special jurisdictional act for just compensation for the taking of nearly a million acres of land in the State of Utah. The land was described in the findings as a horseshoe shaped tract surrounded on three sides by mountains “the crest of which was the reservation boundary.” The findings of fact noted that some of the mountain crests exceeded 13,000 feet in elevation and that about 90 percent of *326 the lands in suit lay at elevations above 8,000 feet. The upper reaches of the north arm of the horseshoe were rocky barren ridges and peaks rising abruptly from large glaciated basins located high in the Uintah Mountains and much of the land in that north arm was barren and inaccessible. The reservation containing such land had been carved out of a larger territory which the Utes had held by aboriginal use and occupancy title, i.e., Indian title. Uintah Utes of Utah v. United States, 5 Ind. Cls. Comm. 1 (1957). In creating this reservation and defining its boundaries, the parties to the treaty were following a well known custom of giving the area some visible and familiar boundaries such as mountain crests. Obviously the Indians had never used and occupied these high, barren peaks for any productive purpose when the land was held by them under Indian title and they would not use those inaccessible crests in the sense of exploiting them for any productive use once the mountains were included within or as a boundary of the reservation.
Indian lands, prior to the extinguishment of Indian title, were not surveyed. They were not fenced to shut out trespassers or to mark boundaries. But the land which Indian groups claimed and used did have boundaries which were known to them and to their neighbors, and those boundaries were frequently stretches of land useless for any purpose except for serving as markers to define the limits of their land ownership.
In the Uintah case, sufra, as in numerous other Indian cases, it is apparent that within the confines of an area of land found to have been used and occupied to the exclusion of all others, there were smaller areas of land or water which were not used for any productive purpose because such areas were not capable of use by the Indians. Such areas might be stretches of desert land or swamps. Furthermore, rivers and streams which criscrossed Indian lands might be used extensively for fishing or travel in those portions which could be used for those purposes, and be largely neglected in those portions not so usable. It has never been supposed that those interior areas of land or those portions of streams and rivers did not “belong” to the tribe which used and occupied in a *327 more active sense the areas completely surrounding them. In the case of Alcea Band of Tillamooks v. United States, 103 C. Cls. 494, aff'd. 329 U.S. 40, the Indians used the streams which rose in the mountains forming the eastern boundary of their lands only so far as those streams were productive of fish. The crest or summit of the Coast Range of Mountains was “used” by the Alcea only as a boundary marker. The useless portions of their streams were not used by the Alceas but the Alceas saw to it that no other Indians trespassed in their vicinity, and the summit of the Coast Range was recognized and respected by neighboring tribes as the boundary of the Alcea lands.
Obviously some account must be taken of the amount of barren, useless and inaccessible lands and waters which are encompassed within the area of land exploited exclusively by an Indian claimant group, or which form the borders of their lands. Such account is taken in connection with the valuation of their lands for the purpose of making an award if the court decides that there is liability on the part of the Government. In the past it has been at the valuation stage of the proceedings (where the case has been tried in two stages as here) that the land to be valued has been classified as to types, the amount of acreage of each type estimated as nearly as possible, and no value assigned to land classified as barren and inaccessible. See finding 69 in the Uintah case, supra.
While, in the event of a judgment, the net monetary award would be the same whether land classification and acreage determination of barren and inaccessible land is undertaken at the liability stage or at the later valuation stage, it seems to us that there are compelling practical reasons for postponing such classification and acreage determination of inaccessible and barren land until the valuation stage of the proceedings. Classification of land types and determination of exact acreage of each type so classified is a matter for experts. It is an expensive and time-consuming matter for both the Indian claimants and for the Government. If the Government is held to be not liable in the suit brought, such classification and acreage proof would be useless since the precise extent and location of usable and nonusable land is *328 not essential to the overall issue of liability. If the Government is held to be liable to the Indians then the proof on valuation will have to include land classification and the elimination from valuation of all areas of barren and inaccessible land and waters which were of no use or value to the Indians.
We do not mean to depart in any sense from the rule of long standing that Indian title to lands must be shown by proof of actual use and occupancy from time immemorial. But it is obvious from a study of the many cases involving proof of Indian title to lands both in this court and at the Indian Claims Commission that where the Indians have proved that they used and occupied a definable area of land, the barren, inaccessible or useless areas encompassed within such overall tract and controlled and dominated by the owners of that surrounding land, as well as the barren mountain peaks recognized by all as the borders of the area of land, have not been eliminated from the area of total ownership but rather have been assigned no value in the making of an award, if any, to the Indians.
Because of the established practice of this court and the Commissiou,[3] and also because of the practical considerations mentioned above and the fact that the ultimate monetary result will not be affected by postponing proof of land *329 classification and measuring until the valuation stage of the proceedings, we conclude that failure to prove the precise extent of inaccessible, barren or unused land at this stage is not fatal to the claimants on the issue of liability. We hold that the Tlingit Indians owned by Indian title the area shown on plaintiff’s exhibit 168, reproduced herein, and that the Haida Indians owned by Indian title the area indicated on the same map, as of 1867 when the United States acquired Alaska, and for several years thereafter.

*0

*329 Before passing to the matter of whether or not the Government took the property of the Indian claimants or refused or failed to protect their rights in such property, we consider the Government’s contention that under a proper interpretation of the special jurisdictional act these Indians may not recover in any event. Defendant urges that because neither the Tlingit nor Haida Indians were organized politically as a “tribe,” they could not have owned any “tribal or community property” within the meaning of the jurisdictional act[4] which uses those precise terms to describe the property which may be made the basis of suit. Defendant does not contend that these Indians are not authorized to bring suit under the act because they did not constitute a tribe or tribes, but merely that they cannot recover because they were not a tribe or tribes and therefore did not own land and property as tribes. Defendant relies on the rule of statutory construction which requires that special jurisdictional acts permitting suit against the sovereign be strictly construed against the party so authorized to sue. Schillinger v. United States, 155 U.S. 163. It is true that the jurisdictional act refers to “lands or other tribal or community property rights” and neither the Tlingit nor Haida Indians were organized politically as tribes for the purpose of owning land or for any other purpose.
A similar argument concerning statutory construction of a statute enlarging the Government’s consent to be sued was *330 made by defendant in the case of Otoe and Missouria Indians v. United States, 131 C. Cls. 593, cert. den. 350 U.S. 848. The subject matter of some of the claims sued on in that case was Indian title land and the Government argued that because section 2 of the Indian Claims Commission Act did not specifically mention Indian title land as a basis for a claim under the act, such land could not be made the subject matter of a suit brought under that act, citing the Schillinger case, supra. The claimant Indians in that case argued that because the Indian Claims Commission Act was remedial legislation it should be liberally construed in favor of the class it was intended to benefit and in the light of the injustices it was intended by Congress to correct. The court discussed the various rules of statutory construction and interpretation urged by the parties and noted that the Act was in the nature of a special' jurisdictional act in that it broadened the Government’s consent to suit and was thus in derogation of its sovereignty; that it conferred special privileges upon Indian claimants apart from the rest of the community and was to some extent in derogation of the common law; that, on the other hand, it was remedial legislation in that it was intended to remedy defects in the common law and in preexisting statutory law affecting Indians, and was designed to correct certain injustices of long standing which were well known to Congress, such injustices having to do, among other things, with the manner in which the Government dealt with the Indians concerning land they held by Indian title. The court then stated at page 602:
Fortunately, under these circumstances, rules of interpretation and construction are subordinate to the principle that the object of all construction and interpretation is the just and reasonable operation of the particular statute, and accordingly it should be possible to construe the statute liberally to effect its remedial purposes and intent, and strictly to limit undue abrogation of fundamental rights or to prevent undue extension of extraordinary remedies.
Eesorting to the legislative history of the Indian Claims Commission Act, the court concluded that Congress had intended that Indian title lands should be the basis of claims brought under the Act.
*331 In the instant case the special jurisdictional act, read as a whole and in the light of its legislative history, reveals that Congress was fully aware of the fact that the Tlingit and Haida Indians did not have the sort of tribal organization which the Indians of the United States had. Congress knew that despite this fact, each was a homogeneous group of Indians having its own language and customs. Congress knew that these Indians did not own land as the Indians of the United States owned lands, that is, as a tribe, but rather that land was held by them more as white people own land, although even in the case of the Tlingits and Haidas, land was not owned by individuals but by family groups and clans. The fact that the United States never attempted to make treaties with these Indians is not significant since shortly after the acquisition of Alaska from Russia in 1867, Congress enacted the Act of March 3,1871,16 Stat. 544, 566, prohibiting any further dealings with Indians by treaty.[5]
When Congress was considering the special jurisdictional act under which this suit was brought it knew that the claimants were urging that land, fishing, hunting and timber rights, which were claimed or owned by individual families or clans of the Tlingit and Haida Indians had been taken from them leaving these people with barely sufficient resources on which to exist. One of the early bills considered by Congress (S. 1196,72d Cong., 1st Sess.) provided that not only could tribal and community claims be adjudicated by the court, but also individual claims for the loss of property and property rights, and it also provided that any award should be distributed per capita. In a report on this legislation prepared by the Department of the Interior it was suggested that these two provisions be eliminated and the claims be treated as though they were tribal claims despite the lack of a true tribal political organization in either group of Indians and despite the fact that the land was owned by smaller family or clan groups. It was also suggested that any award should be made for the benefit of each group as a whole and apportioned to the several Tlingit and Haida *332 communities, rather than for the individual members or families in the groups. The report[6] gave the following reasons for the suggested amendments:
* * * the resources treated in the bill are capital resources, serving at a former time to maintain the entire native population and, before the advent of the white man were available for the use of successive generations. Therefore, I argue that the equivalent of these resources if and when restored to the natives should be in the form of capital for the permanent benefit of the natives concerned. * * * I therefore suggest that an amendment be submitted providing for a “tribal” fund to be used to secure such permanent productive “tribal” assets as may be decided upon by the Indians concerned and by the Commissioner of Indian Affairs.
In accordance with the above suggestions Congress eliminated individual claims from the act and prohibited the making of any per capita payments from the award, if any, granted by the court.[7]
Thus it is clear from the legislative history of the special jurisdictional act that when Congress used the terms “tribal or community property rights” in the act it intended to refer to property and property rights which belonged to the claimants as they were defined in the act which claimants Congress understood were not organized as a tribe or tribes and did not own property as a tribe or tribes. To say *333 that Congress authorized nontribal Indians to sue in connection with a type of property right which Congress knew they did not have, i.e., tribal property, is to say that Congress knowingly performed an absurd and useless act in enacting the special jurisdictional legislation. And this brings us to another well known rule of statutory construction which is that it is the duty of courts to give to acts of Congress an intent which does not result in an absurdity if that is at all possible. Lloyd Lester Jennings, et al. v. United States, 144 C. Cls. 28, and cases cited therein. We have no difficulty in concluding that in enacting the special jurisdictional act under which this suit is brought, Congress intended that the Indians identified in section 1 should be allowed to sue for and recover judgment for the loss of property or rights in property which belonged to them in the manner in which they owned land and property; and that when Congress employed the word “tribal” to describe the property which should be the basis of suit under the act, it did not use the word in its usual sense. Holy Trinity Church v. United States, 143 U.S. 457.
Defendant nest contends that if the court should hold that the act permits local clans or families to sue and recover for land or property lost because of the acts of the Government, then the plaintiffs may not recover because the Commissioner has not found the well defined hunting, fishing and gathering areas used by each clan. Inasmuch as the judgment, if any, is not to be paid to individuals or families or clans but rather is to be deposited in the Treasury for the benefit of the several communities of Tlingits and Haidas listed on the roll provided for in section 7 of the jurisdictional act, and since the Commissioner has found that in the case of each group the clan holdings formed one contiguous and well defined area, the extent of individual or family or clan holdings of land and water areas is not a matter of importance. The map introduced in evidence as plaintiffs’ exhibit 169 and reproduced herein shows the locations of the various communities and the areas of land and water claimed and used by each.
The Commissioner has found and we have adopted his findings that the use and occupancy title of the Tlingit and *334 Haida Indians to the area shown on the map reproduced herein was not extinguished by the Treaty of 1867 between the United States and Russia, nor were any rights held by these Indians arising out of their occupancy and use extinguished by the treaty. The negotiations leading up to the treaty and the language of the treaty itself show that it was not intended to have any effect on the rights of the Indians in Alaska and it was left to the United States to decide how it was going to deal with the native Indian population of the newly acquired territory.
We next turn to the question whether, subsequent to 1867, the United States did or failed to do anything that interfered with or deprived the Indians of their property or any interests which they had in such property, giving rise to an action which the jurisdictional act has authorized this court to hear and adjudicate.
For approximately 17 years after the United States acquired Alaska, the Tlingit and Haida Indians continued to use and occupy their traditional areas without molestation or restriction. Between 1867 and 1877 the Army of the United States was in charge of the administration of Alaska and Army posts were established at Tongass, Wrangell and Sitka. When the Indians first learned that Alaska had been sold to the United States they objected and advised the United States officials that the Russians had lived in Alaska territory only with the permission of the natives. The behavior of the Government officials and the few white traders and settlers during the early years gave the Indians no cause for alarm and the trade which developed between the Indians and the whites was greatly to the material advantage of the Indians. On rare occasions Army officers found it necessary to call together influential members of clans in order to keep peace within the Indian groups and between the Indians and the whites. During the Indian wars in Idaho, Alaska was virtually without a government. In 1879 the United States Navy took over the civil and military government of southeastern Alaska with headquarters at Sitka.
In 1877 the first fish cannery was built at Klawak. Soon another cannery was built at Sitka and miners began working Schuck Creek at the head of Wyndham Bay. In 1879 *335 a factory for the extraction of oil and the manufacture of fertilizer was built at Killisnoo. American traders came in boats to trade with the Indians of southeast Alaska during the summer months, the fur trade being the principal intercourse between the Indians and white people. In 1880 the Chilkat chiefs agreed to allow white miners to pass through their lands in order to prospect for gold and in that same year gold was discovered in considerable quantities at Rockwell, now known as Juneau, in Tlingit territory. In 1881 Commander Henry Glass persuaded the Indians living in the vicinity of Rockwell to move out of the town and the miners and white men who had settled there raised a sum of money to pay the Indians compensation for their land and for damages.
In 1883 a number of new fisheries were started by white settlers and a large fishing station was opened at Pyramid Harbor. At about this time the timber resources of the area were beginning to attract attention. Although the Indians were beginning to be concerned about the increasing number of white people settling in their lands, the actual interference with their way of life was not considerable and they were reluctant to antagonize the Navy which had burned two or three native winter villages as punishment for Indian crimes against the white settlers.
Hp to 1884 the land laws of the United States had not been extended to the territory of Alaska and although settlers and miners filed claims to the land they had preempted in the Customhouse in Sitka, they were unable to secure legal title to the land. On May 17, 1884, Congress passed the Organic Act of Alaska, 23 Stat. 24. Section 8 of that Act provided that Alaska should be a land district and that a land office for the district should be located at Sitka; that the laws of the United States relating to miming claims should be in full force and effect in the district which would be administered under regulations to be made by the Secretary of the Interior. It provided that persons who had already located mines or mineral privileges or who had occupied and improved claims should not be disturbed in such claims but should be allowed to perfect their titles to the claims by payment; that land, up to 640 acres in each instance *336 which had been occupied as missionary stations among the Indians should be continued in such occupancy until Congress should take further action. The act provided that the general land laws of the United States were not being put in general effect in Alaska.
With respect to the Indians inhabiting Alaska, the Organic Act provided, in Section 8, as follows:
* * * That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now- claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: * * *. [Italics supplied.]
Section 12 of the Organic Act provided that the Secretary of the Interior should arrange for an investigation into the condition of the Indians of the Territory and for the making of a report on them and what lands, if any, were to be reserved for their use, what provision' should be made for their education, and what rights by occupation of settlers recognized, for the purpose of helping Congress to decide what limitations or conditions to impose when the land laws of the United States were extended to Alaska.
Thereafter, in the subsequent administration of the Organic Act of 1884 and in the rulings of the United States Land Office, miners were permitted to locate, work, perfect and patent mining claims in areas which the Tlingits and Haida Indians had aboriginally used and occupied. The saving provision of the act relating to Indian rights in the land they occupied and claimed was applied only to protect them from the extension of mining claims in areas where the Indian permanent villages existed Or other areas which were actually and visually occupied and improved by individual Indians. Other areas of Indian use and exploitation were not protected.
In 1885 the Eeport authorized by the Organic Act was made concerning the Indians of Alaska. The Eeport recommended that they should have deeds to the land they actually used and occupied and that they should be secured in the use of their fishing sites. The Eeport also recommended that the Indians be given the same right to acquire land as *337 the white people had. It was recommended that the timber lands of Alaska which were largely inaccessible at that time be opened for sale in large tracts for a small price. Nothing was said about any possible Indian claim to these timber areas. It was recommended that coal lands also be sold at low prices. The Keport did not recommend the preserving to the Indians of areas traditionally used for hunting, fishing and gathering, it being assumed that these areas would be opened for white settlement and exploitation.
Between 1884 and 1891 patents and legal title could only be secured to cover mineral claims and there was much agitation on the part of settlers to have the land laws of the United States extended to Alaska so that fishing claims and home sites as well as town and industrial sites might be legally patented to the squatters who had taken them over. Such claims were filed in Sitka and they did have some effect since, after filing, most settlers and the Indians felt the claims were good against all but the Government and that at any time the land laws would be extended to Alaska and such claims would then be validated.
By 1889, 11 sawmills and 36 salmon canneries were in operation in southeastern Alaska. Fishing stations were located by whites at every point affording a good supply of fish. As a result of this activity, the Indians were having a difficult time securing enough fish for their own use, game was largely frightened away, and there was little work for Indians in the canneries which imported Chinese workmen. In 1890 the Indians of southeastern Alaska secured the services of an attorney who wrote to the President concerning their problems. From then on the Indians made claims and protests over their treatment and the rapidly diminishing state of their land and water holdings. They finally asked that they be given a reservation and the protection of the Government. There was little official response to repeated protests and requests for help and the official policy of the Government seemed to have been to ignore the claims of these Indians arising from the aboriginal use and occupancy of southeastern Alaska and instead to create a situation in which the Indians would be forced to assimilate into the white man’s society and system of property ownership.
*338 On March 3,1891, Congress enacted a law (26 Stat. 1095) which dealt a severe blow to any hopes the Tlingits and Haidas might have had of regaining their lands. The Act permitted Alaskan lands to be entered for townsite and industrial site purposes and it exempted from the operation of the law only Indian lands to which the Indians had prior rights by virtue of “actual occupation.” The Act gave the United States the power to regulate the taking of salmon from Alaskan waters. It provided that the cutting of timber, which had previously been prohibited, might be done for agricultural, mining, manufacturing and domestic purposes under Department of Interior regulation. No mention was made of any rights claimed by the Indians in land bearing timber. Section 15 of the Act set apart and reserved the Annette Islands in Tlingit territory as a reservation for the use of a group of Christian Tsimshian Indians who had formerly resided in British Columbia and had squatted on the Islands with their British leader, William Duncan. The reservation, known thereafter as the Metlakahtla Indian reservation, was administered by the Secretary of the Interior and became very prosperous. It was probably the success of this reservation which prompted the Tlingits and Haidas to ask that.they be given a reservation where they could develop their own fishing, mining and timber industries unmolested by the white settlers and used under the protection of the Government.
The Act of May 14,1898, 30 Stat. 409, extended the homestead laws of the United States to Alaska. Homesteaders were allowed to take up 80 acre tracts and the Secretary of the Interior was authorized to reserve for the use of the Indians suitable tracts of land along the waterfront of any stream, inlet, bay or seashore for “landing places for canoes and other craft used by such natives,” thus giving some sort of recognition to the fact that the Tlingit and Haidas were still living on the land bordering the waters mentioned. No provision was made, however, to protect the land holdings or water rights of these Indians.
By the Act of June 6,1900, 31 Stat. 321, the United States laws relating to mining claims and mineral locations were extended to Alaska. Again the Indians were to be pro *339 tected only in lands “actually in their use and occupation” and by that time it must have been apparent to Congress that the administrative interpretation of such language, which had appeared in prior acts, meant only village and home sites in intensive daily use, excluding hunting, fishing and gathering areas which these Indians had once used to the exclusion of all others.
Section 24 of the Act of March 3, 1891, supra, authorized the President to set apart and reserve public lands bearing forests as public reservations. By presidential proclamations issued on August 20, 1902, on September 10, 1907, and on February 16, 1909, some 16,000,000 acres of Tlingit and Haida lands were set apart and reserved as the Tongass National Forest, exempting from such reservation only lands which had already been patented or disposed of pursuant to public land laws applicable to Alaska. Pursuant to the Act of June 8,1906, 34 Stat. 225, some 2,297,598 acres of Tlingit land in the northern part of southeastern Alaska was, by Presidential proclamation of February 26,1925, set apart as Glacier Bay National Monument.
The special jurisdictional act now before us authorizes these Indians to bring suit against the United States on all claims, legal or equitable, which they may have for lands or other tribal or community property rights “taken from them by the United States without compensation therefor,” and that the loss to the Indians of their right, title, or interest, “arising from occupancy and use,” in such lands or other tribal or community property without just compensation therefor, shall be held by this court to be sufficient ground for relief under the act. The act also authorizes the claimant Indians to bring suit on all claims which they may have arising out of the failure or refusal of the United States to protect their interests in land or other tribal or community property in Alaska and for the loss of the use of such property.
The events described above as taking place between 1884 and 1900 do not, except for the setting apart of the reservation on the Annette Islands, represent any outright takings by the United States of Tlingit and Haida land or property rights. However, the manner in which the Government *340 officials administered the Organic Act of 1884, and the actual provisions of subsequent legislation relative to land in Alaska, made it possible for white settlers, miners, traders and businessmen, to legally deprive the Tlingit and Haida Indians of their use of the fishing areas, their hunting and gathering grounds and their timber lands and that is precisely what was done. . These Indians protested to the Government and their protests went unheeded. They had no weapons with which to combat Navy gunboats which had burned their villages when they attempted to take the law into their own hands. Although these Indians were relatively civilized, were excellent fishermen and hunters and were noted for their industry, they had no conception of how to start a modern fishing industry, to build canneries, to harvest lumber on a large scale, or to file claims in Sitka for town and industrial sites. Whenever white settlers and businessmen entered their lands for the purpose of settlement or exploitation, the Indians were forced to move out. The new industries in their lands did not employ them, preferring imported Chinese labor. The game which had been abundant in the area was driven off by the large settlements and industrial enterprises. The amount of salmon and other fish taken from the streams and waters by the new white fishing industries and canneries left hardly enough fish to afford bare subsistence for the Tlingits and Haidas and nothing for trade or accumulation of wealth. Thus it seems clear that the United States both failed and refused to protect the interests of these Indians in their lands and other property in southeastern Alaska within the meaning of section 2 of the special jurisdictional act and that the United States is liable under such act to compensate the Indians for the losses so sustained.
The major part of the lands aboriginally used and occupied by the Tlingit and Haida Indians in southeastern Alaska was actually taken from them by the United States without the payment of any compensation therefor. The land so taken was, first, some 86,740 acres comprising the Annette Islands in the southern part of Tlingit territory taken as a reservation for the Tsimshian (Metlakahtla) Indians pursuant to the Act of March 3, 1891; next, some *341 16,000,000 acres of Tlingit and Haida lands set aside by the Government in 1902,1907 and 1909 as the Tongass National Forest; and finally, approximately 2,297,598 acres of Tlingit lands set apart by the Government as the Glacier Bay National Monument in 1925, pursuant to the Act of June 8, 1906, 34 Stat. 225. See Confederated Bands of Ute Indians v. United States, 100 C. Cls. 413. In none of the acts authorizing the setting apart of these lands as public reservations was there any recognition of the Tlingit or Haida rights of use and occupancy although the rights of white settlers in the areas were protected. These acts on the part of the Government represent takings of land and water aboriginally used and occupied by the Tlingit and Haida Indians for which they are entitled to compensation under the terms of the jurisdictional act.
The record indicates that part of the land set aside as the Glacier Bay National Monument may have been previously included in the Tongass National Forest, but that matter as well as the extent and location of all the lands which these Indians lost, as well as their value at the time of loss or taking, will be determined in further proceedings.
The most valuable asset lost to these Indians was their fishing rights in the area they once used and occupied to the exclusion of all others. The plaintiffs have suggested that since the effective exploitation of their fisheries was dependent upon their continued occupancy and use of the shore lands, the fishing rights might be considered in the nature of easements fixed in such lands. Viewed in this way, they could be considered as having been lost or taken as of the dates on which the shore areas were lost or appropriated, and the value of the fishing rights can be considered in determining the value of the land areas to which they were attached as of the date of the taking or loss of the land areas. The same will be true of lands which were valuable to the Indians for hunting and gathering, or from which they took limited amounts of minerals or timber.
In addition to the amount of recovery and offsets which have been reserved for further proceedings, the order of the court issued February 29, 1956, reserves also the issue of voluntary abandonment of lands included in the area found *342 to have been aboriginally used and occupied by the claimant Indians in 1867 and thereafter. The plaintiffs contend that the findings of the Commissioner are sufficient at this stage to establish the fact that there was no abandonment of any part of the area claimed. Inasmuch as this issue was reserved for further proceedings and the Government has indicated that it intends to offer proof on the issue, we will not pass on plaintiffs’ arguments'at this time.
In conclusion, we hold that the plaintiffs have established their use and occupancy, i.e., Indian title, of the lands and waters in southeastern Alaska shown on the map, marked plaintiffs’ exhibit 168 and reproduced as a part of this opinion ; that they were using and occupying that land according to their native manner of use and occupancy in 1867 when the United States acquired Alaska from Eussia; that following the purchase of Alaska in 1867 these Indians continued to exclusively use and occupy the same areas of land and water as previously, and that such use and occupancy was not interfered with by the United States or its citizens until 1884; that beginning in 1884 and continuing thereafter, these Indians lost most of their land in southeastern Alaska through the Government’s failure and refusal to protect the rights of the Indians in such lands and waters, through the administration of its laws and through the provisions of the laws themselves; that a large area of land and water in southeastern Alaska was actually taken without compensation and without the consent of the Indians, through Presidential proclamations issued pursuant to law, and through reservation of part of the land for Canadian Indians under the Act of March 3, 1891. The plaintiffs are entitled to recover for all usable and accessible land which they used and occupied, and the amount of such recovery and the amount of offsets, if any, and the issue of voluntary abandonment or relinquishment of any areas are reserved for further proceedings in accordance with the order of the court issued February 29,1956.
It is so ordered.
Wilbur K. Miller, Circuit Judge, sitting by designation; MaddeN, Judge, Whitaker, Judge, and Jokes, Chief Judge, concur.
*343 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner S. E. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. The petition herein was filed on October 1, 1947, under and pursuant to the following acts of Congress:
AN ACT
Authorizing the Tlingit and Haida Indians of Alaska to bring suit in the United States Court of Claims, and conferring jurisdiction upon said court to hear, examine, adjudicate, and enter judgment upon any and all claims which said Indians may have, or claim to have, against the United States, and for other purposes.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That for the purposes of this Act the Tlingit and Haida Indians of Alaska shall be defined to be all those Indians of the whole or mixed blood of the Tlingit and Haida Tribes who are residing in Eussian America, now called the Territory of Alaska, in the region known and described as southeastern Alaska, lying east of the one hundred and forty-first meridian.
sec. 2. All claims of whatever nature, legal or equitable, which the said Tlingit and Haida Indians of Alaska may have, or claim to have, against the United States, for lands or other tribal or community property rights, taken from them by the United States without compensation therefor, or for the failure or refusal of the United States to compensate them for said lands or other tribal or community property rights, claimed to be owned by said Indians, and which the United States appropriated to its own uses 'and purposes without the consent of said Indians, or for the failure or refusal of the United States to protect their interests in lands or other tribal or community property in Alaska, and for loss of use of the same, at the time of the purchase of the said Eussian America, now Alaska, from Eussia, or at any time since that date and prior to the passage and approval of this Act., shall be submitted to the said Court of Claims by said Tlingit and Haida Indians of Alaska for the settlement and determination of the equitable and just value thereof, and the amount equitably and justly due to said Indians from the United States therefor; and the loss to said *344 Indians of their right, title, or interest, arising from occupancy and use, in lands or other tribal or community property, without just compensation therefor, shall be held sufficient ground for relief hereunder; and jurisdiction is hereby conferred upon said Court to hear such claims and to render judgment and decree thereon for such sum as said court shall find to be equitable and just for the reasonable value of their said property, if any was so taken by the United States without the consent of the said Indians and without compensation therefor; that from the decision of the Court of Claims in any suit or suits prosecuted under the authority of this Act an appeal may be taken by either party, as in other cases, to the Supreme Court of the United States.
seo. 3. That the claim or claims of said Tlingit and Haid'a Indians of Alaska may be presented and prosecuted separately or jointly in one or more suits, by petition or petitions setting out the facts upon which they base their demands for relief and judgment or decree; the petition or petitions may be amended when necessary more fully or specifically to set forth their said claim or claims, and said suit or suits shall be filed in said Court of Claims within seven years after the date of the passage of this Act; such suit or suits shall make the said Indians parties plaintiff and the United States party defendant, and the final judgment or decree shall conclude and forever settle the claim or claims so presented; the Court of Claims shall have full authority by proper orders and process to bring in and make parties to such suit or suits any and all parties deemed by it necessary or proper to the final determination of the matters in controversy; such petition or petitions may be verified by any attorney or attorneys employed by said Indians, under contract approved by the Commissioner of Indian Affairs and the Secretary of the Interior, and said contract shall be executed in behalf of said Indians by a committee chosen by them under the direction and approval of the Commissioner of Indian Affairs and the Secretary of the Interior; verification may be upon information and belief as to the facts alleged; a true copy of the written contract or contracts by which such attorney or attorneys are employed by said Indians to represent them in such suit or suits shall be filed in said Court of Claims, as their authority by the said attorney or attorneys to so appear in said suit or suits for said Indians and to prosecute their said claim or claims in said Court of Claims.
*345 sec. 4. That if any claim or claims shall be submitted to said court it shall hear and settle the equitable and just rights therein, notwithstanding lapse of time, or statutes of limitations, or the fact that the said claim or claims have not been presented to any other tribunal, or the fact that said Tlingit and Haida Indians of Alaska may have been made citizens of the United States by the Act of Congress of June 2, 1924 (43 Stat. L. 253), or by any other law of the United States, or the fact that the said Indians, or any of them, collectively, prior to the passage and approval of this Act, may have severed their tribal relations with the said Tlingit and Haida Tribes. Any payment which may have been made by the United States or moneys heretofore or hereafter expended to date of award for the benefit of the said Tlingit and Haida Indians of Alaska, made under specific appropriations for the support, education, health, and civilization of said Indians, including purchase of lands, shall not be pleaded as an estoppel but may be pleaded by way of set-off.
sec. 5. Official letters, papers, documents, and public records, or certified copies thereof, from the files and records of the United States, or the Territory of Alaska, and Kussian documents and similar records, and historical data and books prepared by American or other standard historians or authors, relating to the subject matter in controversy in said suit or suits, may be used in evidence by either party, and the departments of the United States Government shall give the attorneys for both parties access to such papers, correspondence, and documents as are in the files.
sec. 6. The Court of Claims shall appoint at the proper time a commissioner or commissioners under the provisions of the Act of February 24, 1925 (43 Stat. L. 964), and Acts supplemental thereto, who shall have the aid of a stenographer to take the testimony to be used in the investigation of such claims. In addition to the present powers of such commissioner to take such testimony, he is hereby authorized to take the testimony of said Alaska Indians and their witnesses at such place or places in Alaska as are most convenient for said Indians and their witnesses; that the said Alaska Indians shall produce their witnesses in Alaska at such times and places as said commissioner shall direct, at their own expense, but the expenses of said commissioner and stenographer shall be paid by the United States out of the funds provided for such pur *346 poses in the said Act of February 24, 1925, and said Supplemental Acts.
seo. 7. That Tlingit and Haida Indians of Alaska who are entitled to share in any judgment or appropriation made to pay said claim or claims shall consist of all persons of Tlingit or Haida blood, living in or belonging to any local commnunity of these tribes in the territory described in section 1 of this Act. Each tribal community shall prepare a roll of its tribal membership, which roll shall be submitted to a Tlingit and Haida central council for its approval. The said central council shall prepare a combined roll of all communities and submit it to the Secretary of the Interior for approval. Approval of the roll by the said Secretary of the Interior shall operate as final proof of the right of such Indian communities to share in the benefits of this Act as set forth in section 8.
seo. 8. The amount of any judgment in favor of said Tlingit and Haida Indians of Alaska, after payment of attorneys fees, shall be apportioned to the different Tlingit and Haida communities listed in the roll provided for in section 1 in direct proportion to the number of names on each roll, and shall become an asset thereof, and shall be deposited in the Treasury of the United States to the credit of each community, and such funds shall bear interest at the rate of 4 per centum per annum, and shall be expended from time to time upon requisition by the said communities by and with advice and consent of the Secretary of the Interior, and under regulations as he may prescribe, for the future economic security and stability of said Indian groups, through the acquisition or creation of productive economic instruments and resources of public benefit to such Indian communities: Provided, however, That the interest on such funds may be used for beneficial purposes such as the relief of distress, emergency relief and health: Provided further, That none of the funds above indicated or the interest thereon shall ever be used for per capita payments.
seo. 9. That upon the final determination of any suit or suits instituted under this Act, if there is judgment for the plaintiff Indians, the Court of Claims shall inquire into the agreement or contract which said Indians have made with their attorneys for compensation for their services in said suit or suits, and if said Court of Claims shall find that such services have been faithfully performed by said attorneys, it shall make a finding to that effect and adjudge that said attorneys’ *347 compensation shall be paid as agreed upon in said contract out of the appropriation made for the payment of the sum found due to said Indians, but in no case to exceed 10 per centum of the amount of the total recovery, and said sum[1] so found to be due to said attorneys shall be paid in full out of the sums so found due to said Indians and the remainder of said total sum due to said Indians shall be expended as provided in section 8 of this Act.
seo. io. A copy of the petition and other pleadings and briefs in said suit or suits brought under this Act shall be served upon the Attorney General of the United States, and he, or some attorney from the Department of Justice to be designated by him, is hereby directed to appear and defend the interests of the United States in such case or cases.
(Act of June 19, 1935, 49 Stat. 388, Ch. 275)
* $ # $ *
AN ACT
For the relief of the Tlingit and Haida Indians of Alaska.
Be it emoted by the Senate and House of Representatives of the United States of America m Congress assembled, That the time within which suit or suits may be filed by the Tlingit and Haida Indians of Alaska under the terms of the Act of Congress of June 19,1935 (ch. 275,49 Stat. L. 388), is hereby extended for a period of three years from and after the date of the approval of this Act.
(Act of June 5,1942, 56 Stat. 323, Ch. 347)
AN ACT
To amend the Act of Congress entitled “An Act for the relief of the Tlingit and Haida Indians of Alaska”, approved June 5,1942.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That an Act entitled “An Act for the relief of the Tlingit and Haida Indians of Alaska”, approved June 5, 1942 (56 Stat. 323), is amended to read as follows:
“That the time within which suit or suits may be filed by the Tlingit and Haida Indians of Alaska under the *348 terms of the Act of Congress of June 19, 1935 (ch. 275, 49 Stat. L. 388), is hereby extended- for a period of six years from and after the date of the approval of this
(Act of June 4,1945,59 Stat. 231, Ch. 173)
2. On April 8, 1954, Harry Douglas and 18 others, who were described in their motion papers as chiefs or active leaders of various clans of the Tlingit Indians, were permitted to intervene as parties plaintiff.
3. On February 29,1956, the court, under Rule 38 (b), ordered that a separate trial of the issues relating to the following should be had:
1. The issues of law and fact relating to the plaintiffs’ use and occupancy of, or Indian title to, the lands and waters in Alaska, and the extent thereof, as of the time of the purchase of Alaska by the United States from Russia in 1867.
2'. The issues of law and fact relating to the right of the plaintiffs to recover herein for any taking or loss of, or failure of the United States to protect, their use and occupancy of, or Indian title to, lands or waters in Alaska that occurred in the year 1867, reserving the determination of the amount of recovery and the amount of offsets, if any, for further proceedings.
3. The issues of law and fact relating to the right of the plaintiffs to recover assuming the plaintiffs’ use, occupancy and Indian title to lands and waters in Alaska as determined for the year 1867 survived the defendant’s 1867 acquisition of sovereignty over Alaska and were in no part thereafter voluntarily abandoned or relinquished by the plaintiffs, reserving for further proceedings the determination of any such abandonment or relinquishment, and the amount of recovery and the amount of offsets, if any.
THE AREA CLAIMED
4. In this suit the Tlingit and Haida Indians are asserting claims arising out of their use and occupancy of certain areas in southeastern Alaska east of the 141st meridian. Adjoining areas in Canada and in Alaska west of the 141st meridian that were or may have been used or occupied by such Indians are not claimed in this suit.
*349 5. The boundaries of the area for which the Tlingit and Haida Indians claim a right to recover compensation on the alleged basis of their aboriginal use and occupancy, including the bays, inlets, islands, streams, lakes, and tidelands embraced therein, are set forth on a map introduced in evidence as plaintiffs’ exhibit. 168, which map is reproduced in finding 57. In most regions, these Tlingit and Haida boundaries, as so mapped, correspond closely to the boundaries of southeastern Alaska. However, in a number of places, the claimed boundaries fall within the boundaries of southeastern Alaska, thereby excluding a portion of that region from the claim. For instance, the western watershed of Portland Canal northward from the divide south of Halibut Bay is not included within the claimed area. The eastern boundary of the claimed Tlingit and Haida territory follows the curvatures of the high ridges of the coastal mountain range which forms the Alaskan-Canadian boundary, and generally runs in straight lines from peak to peak along this coastal range. In the northwestern part of southeastern Alaska, the map includes within the claimed Tlingit and Haida territory only a narrow strip of land and water along the west shore of Yakutat Bay and westward to the 141st meridian. Accordingly, for the purposes of this suit, the area for which use and occupancy as of 1867 is claimed by the Tlingit and Haida Indians of Alaska may be taken to be the area bounded in red and black on plaintiffs’ exhibit 168.
6. The area to which the Tlingit and Haida Indians claim aboriginal Indian title as of 1867 is approximately 350 miles long and 120 miles wide. It contains in land area over 20 million of the 22,738,000 acres which comprise the so-called “panhandle” or southeastern Alaska. It includes the entire Tongass National Forest, which covers over 16,000,000 acres, the entire Glacier Bay National Monument, which embraces 2,297,598 acres, and the entire Annette Island Indian Beser-vation, comprising 86,740 acres. The area claimed extends from latitude 54° 30' on the south to 60° on the north and from the 130th meridian on the east to the 141st on the west. It comprises approximately the First Judicial District of Alaska. It includes the archipelago of islands, large and small, that shields the coast from Dixon Entrance on the *350 south, to Cross Sound on the north, together with the stretch of coast extending inland to the mountain ridges that form the coastal watershed. The entire area, both coastal and island, is laced with numerous bays, inlets, channels, and fiords, and with myriads of inland lakes and precipitous streams. The islands and coast are largely mountainous, frequently rising to elevations over 4,000 feet. In many places, the mountains rise sharply from the water’s edge,, Among the mountains are numerous valleys. At their feet there are comparatively narrow areas of level or gently rising lands. Most of the land area from tidewater to about 2,000 feet altitude is densely covered with underbrush and trees, principally spruce, hemlock, and cedar. Throughout many of the mountain regions glaciers are numerous, especially around Glacier Bay and the Fairweather and Mount St. Elias Banges. The temperature, because of the warming Japanese Current, is generally mild both in the summer and winter. However, along the northern coastal region and up the inlets back from the coast, there are areas characterized by extremes of heat in summer and cold in winter. The entire region is one of heavy precipitation which contributes to the luxuriant growth of timber and other vegetation. The forests form one of the prominent features of the country.
TLINGIT AND HAIDA USE AND OCCUPANCY IN 1867 AND EARLIER

First Contacts Between White Men and the Tlingit amd Haida Indians.

7. The Tlingit Indians or their ancestors first migrated into southeastern Alaska many generations before the first arrival of a white man. The movement of the Haida Indians into this territory did not take place until years later. The Haida Indians pressed in upon the Tlingit, coming north from their home on Queen Charlotte Island and wresting from the Tlingit the southern shores of Prince of Wales Island. This migration of the Haida Indians occurred about the middle of the 18th century and before any part of this territory had been visited by any white man.
8. The first visits by white men to southeastern Alaska were by European explorers and traders in the 18th century. The Bussians came first. In 1741, Chirikof, a commander *351 in Bering’s expedition, sent two small boats ashore in the neighborhood of the southern end of Chatham Straits. Neither boat returned, and, over 30 years later, when the Spaniard Juan Perez landed in 1774 on the south point of Prince of Wales Island, he found that the natives possessed some iron implements and Eussian bayonets. During the last quarter of the 18th century, Spanish, French, Eussian, English and American explorers and traders visited this region in increasing numbers and made numerous accounts of native life. Such voyages were made by Bodega y Cuadra in 1775, Ignacio Arteaga in 1776, Cook in 1778, LaPerouse in 1786, Lowrie and Meares in 1786, Dixon and Portlock in 1786 and 1787, Ismailof and Bocharof in 1788, Marchand, Gray and Kendrick in 1790, Malaspina and In-graham in 1791, Caamano in 1792, Vancouver in 1793 and 1794, and Cleveland in 1799. The natives described in these narratives were unquestionably Tlingit and Haida Indians. These narratives evidence that the extensive portions of the territory visited were regions well-populated by Tlingit and Plaida Indians in the terms of the native cultures then existing along this coast and that these Indians were skilled traders, eager to exchange the furs, foods, and implements of their culture for firearms, clothes, ornaments and tools. They also show that the Tlingit and Haida Indians at these early dates had a highly developed sense of their proprietorship over the lands and waters of the areas they occupied and the resources that could be obtained from them.

The Fur Trade Prior to 1867.

9. In the last decades of the 18th century and through the first half of the 19th century, trade" for furs was the principal attraction that drew Europeans and Americans to the northwest coast of America. In 1778 Captain Cook’s expedition left Tlingit and Haida territory with a great quantity of furs obtained in trade with the Indians. Later this expedition landed at Macao, China. Here the crew found that its furs, especially the sea otter furs, were highly prized. Thereafter, the opportunity thus opened for a profitable trade became widely known.
*352 10. Over the years that followed, three means for exploiting the fur trade developed. First, sailing ships, largely from England and America, went through the channels, bays and inlets of Tlingit-Haida territory exchanging European and American wares for cargoes of furs. Second, the Russian American Company, under the leadership of Bar-anof, established a number of settlements in Tlingit and Haida territory. The principal settlement was established at Sitka in 1799. A few years later, Nikolayevsk was founded at Yakutat Bay and Simeyonosk on the Cape of St. Elias, and again some years later a post was established at Wrangell. Each of these posts was set up primarily to gather furs through trade with the Tlingit Indians. Third, beginning in the third decade of the 19th century, the Hudson’s Bay Company, moving north and west from British Columbia, attempted to establish trading posts along the coastal strip in Tlingit and Haida territory. In 1839, the Company secured from the Russians a right to establish its trading posts in this area by a lease made with the Russian American Company. However, by this time the supply of sea otter furs had been considerably depleted, the Chinese market had been depressed, and the long voyages of the sailing ships were no longer profitable. Consequently, the fur trade with the Tlingit and Haida Indians that had earlier been done in largest measure with sailing ships shifted to the trading posts of the Hudson’s Bay Company and the Russian American Company.
11. The fur trade changed and enriched the material culture of the Tlingit and Haida Indians. By this trade the Indians were supplied with firearms and steel traps to the point where former weapons and trapping methods were largely abandoned. Flour, molasses, rice, tobacco, whiskey, knives, and shirts became staples of the new material culture. Trapping and hunting became a major economic activity and a principal avenue to the material wealth important to the power and prestige of the Tlingit and Haida clans, as hereinafter more particularly described. This fur trade also tended to concentrate the Indians into larger villages and sometimes to reduce the number of these villages to one for each tribe, also as that term is hereinafter defined. *353 However, before 1850, the intensive trapping and hunting of the Tlingit and Haida Indians had begun to reduce the total annual product of furs from their territory.
12. The fur trade hereinabove described did not impinge in any material respect upon the Tlingit and Haida Indians’ concept of their proprietorship over their lands and waters. The Europeans and Americans, with only insignificant exceptions, did not send hunting or trapping expeditions into Tlingit-Haida territory. They did not come into the territory with intent to cultivate the land or even with intent to make permanent settlements beyond the minimal needs of trading posts. Even the few posts that were established by the Russians and British were secured from the Indians either by conquest, followed by a grudging consent, or by an initial purchase or trade in accordance with the Indian concept of their right to their land. The incentive that the fur trade gave these Indians to hunt and trap succeeded in securing to the white man the fur product of the area without doing violence to the Indians’ concept of proprietorship over the territory.

Russian Sovereignty Prior to Sale of Alasita m 1867.

13. The Russians explored the shores of the northern basin of the Pacific in the first decades of the 18th century. Yevreinov and Luzhin in 1719 and Bering in 1728 sought to learn whether Asia and America were joined. In 1732, Russian navigators crossed Bering Straits and first visited American shores near the Cape of Prince of Wales. As set forth in finding 8, in 1741 and 1742, Bering and Chirikof explored parts of the American coast, reaching east to Tlingit and Haida territory. Russia’s title to Russian America is considered as dating from 1741. Thereafter, year by year, Russian traders, largely through barter with the natives, took valuable cargoes of furs, first from the Aleutian Islands and later penetrating farther into the Alaskan peninsula. In the last quarter of the 18th century, five settlements were made on islands that enclosed the Bering Sea. About 1784, a settlement was established on Kodiak Island. By 1793-1794, when Vancouver explored the waterways of southeastern Alaska, the Russians still had *354 not discovered whether the outside shores along Tlingit and Haida territory were island or mainland.
14. Commencing about 1795, the Eussians made their first settlements in Tlingit and Haida territory, one at Sitka, one in Yakutat Bay, and one on Cape St. Elias. These three settlements were the last of the Eussian settlements to he established in the area of Alaska. Thereafter, the Eussians secured from time to time a few additional trading posts or forts, but the period of Eussian expansion into the Alaska area had been substantially concluded by the end of the first decade of the 19 th century. With the demonstration by Vancouver of the nonexistence of a satisfactory strait to Hudson’s Bay, the interest of the English in the northwest coast of America dwindled. The Spaniards also gave up their claims to the area. Thus, the enterprises of the Eussians led to their permanent possession of the coast.
15. From 1799 to 1867, the Eussian Government exercised its rule over Alaska through the Eussian American Company. This Company was originally chartered in 1799 and granted a monopoly to “all profits 'and advantages” to be derived from hunting and trading on the coast of America from latitude 55° to Bering Strait and beyond. The charter recited that the Government was exercising its right to grant it “By the right of discovery in past times by Eus-sian navigators of the northeastern [sic] part of America, be ginning from the fifty-fifth degree of north latitude * * * and by right of possession of the same by Eussia * * It further permitted the Company “to make new discoveries not only north of the fifty-fifth degree of north latitude, but farther to the south, and to occupy the new lands discovered, as Eussian possessions * * The Company was rechartered in 1821 'and 1844. The 1844 charter was to expire January 1, 1862, but by Imperial decree of May 29, 1861, was continued effective until the sale of Alaska in 1867. From the organization of this Company until the sale of Alaska, the Eussian American Company remained the only body granted authority by the Eussian Government to use, trade in, or otherwise to exploit Alaska and its resources.
*355 16. The charter issued by the Russian Government in 1799 to govern the hunting and trading monopoly granted to the Russian American Company contained no provisions to govern the status of the natives of Alaska or of the land used and inhabited by these natives. The years 1799-1821 under this first charter were marked by a number of hostilities between the Russian American Company and the Tlingit Indians, by a number of partially successful efforts on the part of the Company to establish peaceful relations with these Indians, and by the ultimate recognition on the part of the Company that the Indians had maintained, and would continue to maintain, a measure of independence from the Company’s authority. Thereafter, by the 1821 and 1844 charters of the Company, the Russian Government limited by regulation the authority of the Company to deal with those natives of Alaska that inhabited regions not “administered by the Company” or that held themselves “not wholly dependent” upon the Company. By these regulations the Government also limited the use to be made by the Company of regions inhabited by such natives. These regulations were considered by the Russians as being applicable to the Tlingit and Haida Indians, who were considered as being “independent” and even hostile. In this respect, the 1821 charter provided as follows:
sec. 57. The principal object of the Company being catching of the sea animals and wild beasts, the Company has no need to spread its rule from the coast where it practices such catchings, into the interior of the country, and it should not make effort to conquer tribes inhabiting these coasts; therefore, if the Company should think it in its interest to establish posts in some localities of the American continent in order to secure its commerce, it shall do so with the consent of the aboriginal inhabitants of such localities and shall use all possible means in order to maintain a good relationship with them, avoiding anything which might create in these people suspicion of the intention to violate their independence.
Article II of this charter provided that the Company shall have the privilege of carrying on, to the exclusion of all other Russians, and of the subjects of foreign States, all industries connected with the capture of wild animals and all fishing industries, on the shores of *356 North-western America which have from time immemorial belonged to Eussia, * * *.
The 1844 charter provided:
seo. 280. The tribes dwelling within the boundaries of the Eussian colonies, but not wholly dependent, shall enjoy the protection of the colonial administration only on m n.bin g a request therefor, and when such request is deemed worthy of consideration.
sec. 28i. The colonial government shall not forcibly extend the possessions of the Company in regions inhabited by tribes not dependent on the colonial authorities.
sec. 282. If the colonial government deems it useful to open, for the safety of its trade operations, factories, redoubts, or so-called single posts in some places of the American continent, it shall proceed by the consent of the natives of these places, and apply all possible means to obtain their favor, trying to avoid anything which might arouse their suspicion of any intention to violate their independence.
sec. 283. The Company shall be prohibited from demanding from these people tributes, taxes, or donations of any kind whatever and in times of peace, shall not forcibly take any of them away from their own race, save only the hostages given under the usage heretofore existing. The hostages shall be kept in comfort, and the authorities shall exercise special vigilance that no insult be offered them.
sec. 284. In the event of any of these people desiring to move into localities occupied by the settled tribes, the colonial administration may permit such migration, if it shall appear that the colonies will not thereby be endangered. Such immigrants shall be received into the number of the settled tribes and shall enjoy the rights and immunities granted to that class of persons.
sec. 285. The relations of the colonial administration with the independent tribes shall be limited to the exchange, by mutual consent, of European wares for furs and native products.
This third charter also provided:
in. * * * there is granted to the Company the right to carry on the fur and fishing industries to the exclusion of all Eussian subjects.
iv. The Company is permitted to hold and use all things heretofore found and hereafter to be found * * * *357 without regard for any claim thereto on the part of others.
v. The Company is allowed in future according to necessity and its best judgment * * * wherever it may be found necessary to establish new settlements and fortifications for safe habitation; and those formerly established may be extended and improved, the Company being allowed to send to those regions vessels carrying merchandise and laborers without any let or hindrance.
17. Under the Treaty of 1824 between the United States and Russia, the privilege of trading with the natives was given to Americans for 10 years, by the following provision:
aetiole iv. It is, nevertheless, understood, that during a term of ten years * * * the ships of the two powers, or which belong to their citizens or subjects, respectively, may reciprocally frequent, without any hindrance whatever, the interior seas, gulfs, harbors, and creeks upon the coast mentioned in the preceding article, for the purpose of fishing and trading with the natives of the country.
Upon the expiration of this treaty the United States sought a renewal of this privilege of trading with the natives but this privilege was refused by Russia.
18. Russia claimed sovereignty and dominion over Alaska by reason of first discovery. By the Imperial decree of March 2, 1766, the Russian Government expressly declared the natives of the Aleutian Islands and the Alaskan Peninsula to be Russian subjects. However, Sitka was established in 1799 only after vigorous resistance from the Indians and following a final negotiation of purchase. Nevertheless, it was captured and destroyed by the natives in 1802. In 1805, the natives destroyed the settlement at Yakutat. Sitka was reestablished in 1805, but no new stations were ever established in Yakutat Bay. Other Russian posts established in Tlingit and Haida territory were secured only by force or after first obtaining the consent of the Indians. In some instances, authority was attempted to be exercised over the Tlingit and Haida Indians through the native chiefs. However, the Tlingit and Haida Indians for the most part continued to live under their own customs and the Russians avoided doing violence to their native rules *358 and customs. Tbe Russians generally did not burnt or fish or otherwise exploit by their own actions the resources of the Tlingit and Haida territory. Instead, they obtained most of their food, fuel, furs and other products of the region by purchases made from the Tlingit and Haida Indians. Even in this matter of trading with the Indians, the Russians depended largely upon the Indians to bring their products into Sitka or other Russian posts rather than undertaking themselves to visit the Tlingit and Haida villages. Only a few of the native tribes of the mainland and in the vicinity of the trading posts were in permanent contact with the Company. The Russians did not distinguish between the native tribes of southeastern Alaska. They applied the Russian word “Koloshes” to all the Indians in this territory.[1]
19. Extending up to 1867, when Russian sovereignty over Alaska terminated by sale of the territory to the United States, the only part of southeast Alaska upon which the Russians actually entered into physical possession was Sitka and a few other temporary settlements and trading posts. To accomplish its primary object of exploiting the fur resources of the region, the Russian Government never felt the need and never attempted to conquer the Tlingit and Haida Indians, or to introduce a system of land ownership which would replace the Indian manner of tenure. Instead the Russians largely confined their efforts to seeking peaceful trade with the Tlingit and Haida tribes and permitted the Indians to continue in the use and occupancy of their villages, hunting and fishing grounds, and wild food gathering areas. In 1839, the Russian American Company, with the approval of the Russian Government, leased to the Hudson’s Bay Company the exclusive right of trading on the coast of southeastern Alaska between 54°41' and the estuary of Cross Strait. This arrangement was continued until the sale of Alaska to the United States and under it the bulk of trade with the Indians was conducted by the Hudson’s Bay Company. In this trading that Company, like the Russian American *359 Company, left the natives’ habits and customs largely undisturbed and confined its activities to purchasing from the natives the furs and other products of the native culture.

Basie and Distinctive Tlmgit and Haida Culture Characteristics.

20. The Indians on the northwest coast of the American continent from Cape Mendocino in California and extending to and including the Indians in the Tlingit-Haida territory had in aboriginal times a culture distinct and separate from that of any other group of American Indians. Anthropologically, the Tlingit and Haida Indians, as is true of the northwest coast Indians generally, are classified as a fishing, hunting and gathering people. They were for the most part nonagricuitural and had no domestic animals other than the dog. They were distinctive for their predominant use of marine products, their use of wood, their social structure that emphasized the formalistic family group or clan, and their concepts of definite rights to the utilization of areas of economic importance. Among al'l these Indians the core to each such area consisted of some stretch of water’s edge, such as an ocean waterfront, a bay, a river, or a stream.
21. Among northwest coast Indians, the Tlingit and Haida Indians each formed distinct groups. Each represented a high level of development of northwest coast Indian culture. The Tlingit Indian had a consciousness or awareness of his identity as a Tlingit. He called himself a Tlingit. Under the social organization of his people, he knew himself to be a member of a particular Tlmgit family or dan and to belong to a particular house group which had its winter home in a particular Tlingit community or tribe. In the same manner, each Haida Indian knew himself to be a Haida. The Tlingit Indians spoke the Tlingit language and the Haida Indians, the Haida language. Neither was intelligible to the other, nor to any other people.
The Tlingit Indians were a homogeneous group. In addition to speaking a common language, they shared for the most part customs and habits common to all Tlingits. Such culture differences as existed are traceable to local differences in natural resources. For instance, on the mainland, the mopn- *360 tain goat was a resource. On the outer islands, the cod and halibut were resources of importance. These different resources naturally resulted in a number of different activities and customs as between the Tlingit on the islands and those on the mainland coast. These differences were few as compared with the predominant likeness of customs and habits throughout all the Tlingit Indians, which gave them a sense of unity. Intermarriage between Tlingits from different Tlingit tribes or villages was frequent. Trade throughout Tlingit territory between the several Tlingit tribes or villages was common. On ceremonial occasions, invitations were frequently extended to Tlingits from neighboring or even distant villages.
In the same manner, the Haida Indians of Alaska likewise formed a homogeneous group. However, the Tlingits have always been closely associated with the Haidas, with whom they had close trade relations, their modes of life, customs, and habits closely resembling each other. The principal differences between the two groups are the language and the almost exclusive degree of dependence of the Haidas for their support on the coast, since they gave the interior of their islands little attention. Certain similarities between the two languages have caused some anthropologists to conclude that the Tlingit and the Haida are remote branches of the same stock.
The Tlingit Indians as of 1867 had no chief or other political body to govern them as a group. The Russians on at least two occasions had appointed a head chief for all the Tlingit, but these appointments had not changed the established customs of the Indians, which featured many highly developed rights, such as rights to authority, possessions, and prestige. None of these rights encompassed any authority over the entire Tlingit people. However, any infringement of these rights that did exist in their culture demanded retribution in equal measure. From earliest times, the Tlingit Indians were noted for a strict application of the law of an eye for an eye and for the feuds that were waged among them. Accordingly, the Tlingit Indians as a whole, though occupying one contiguous stretch of coast on the mainland and the adjoining islands, and though unified *361 by common customs, family ties, trade, ceremonials, and the consciousness of their oneness, nevertheless had not established by 1867 any political body to govern the entire Tlingit people. In like manner, the Haida Indians had no political chief or body as of 1867.
22. The neighbors of the Tlingit and Haida Indians were the Athabaskan Indians on the east, inland from the coast, and the Tsimshian Indians on the southeast, in the region about Portland Canal. On the south, separated by Dixon Entrance, were the Queen Charlotte Island Haidas, constituting a different group of Haidas from those involved in this suit, who principally inhabited Prince of Wales and its adjoining islands. The culture of the Athabaskan Indians was not that of the northwest coast Indians. The Athabaskans were an inland people and were considered by the Tlingit, who dominated them in trade dealings, 'as an inferior people. In most areas the Athabaskans were effectively separated from the Tlmgit by the coastal mountain range which generally formed a practically impassable physical barrier. The Tsimshians, on the other hand, were northwest coast Indians with a culture similar to that of the Tlingit and Haida. The Tlingit and Haida Indians were the only Indians who inhabited, used, and occupied their portions of southeast Alaska.
The Tlmgit and Haida Social Structure — The Tribes.
23. The term “tribe” is frequently employed to describe the entire Tlingit people, as well as the Haidas as a whole. It is also used in connection with their various divisions and subdivisions, as hereinafter described. As so variously applied, it has been used loosely and in an inexact sense. There were no political divisions of these Indians to which the term “tribe” can be technically applied. However, in an anthropological sense, the term has been most frequently applied to specific groups of these Indians who were located in certain areas of southeast Alaska. The term, as applied to these Indians, has geographical, rather than any political or organizational significance. The tribes, called “kons” by the Indians themselves (the word meaning “people”), were named after the river, bay, or island upon which their villages were situated. For instance, the Indians who settled or *362 bad their villages in the Sitka area were in the earliest times, and ever since have always been, referred to as Indians of the Sitka “tribe” or “Sitka-kon.” Similarly, the Indians in the Yakutat area were referred to as the Yakutat “tribe,” or “Yakutat-kon.” It is only in this geographical sense that the term “tribe” is generally used by anthropologists and in these findings.
24. The social structure and various divisions and subdivisions of the Tlingit and Haida Indians are as follows:
As stated in finding 21, neither the Tlingit nor Haida, as such, was a political organization. Technically, these terms refer only to two separate, native languages, the Indians speaking these separate languages having come to be referred to as “Tlingit” or “Haida” Indians. The word “Tlingit” means “man” in their language.
All of these Indians were divided into two phratries or moieties. Among the Tlingit, one was called Wolf and the other Eaven, and among the Haida, one was called Eagle and the other likewise Eaven. Similarly, neither moiety had any social or political organization.
Each moiety was in turn divided into a number of clans, membership in which descended through the mother. Each clan had its own distinctive name, traditions, and crests. Marriage within the clan or moiety was forbidden. Originally there were approximately 55 of these clans, which, again, had no social or political structure. Indians of these various clans, however, settled throughout the Tlingit and Haida territory, and the division of a larger clan which settled at a certain site or permanent village became known as a local clan. Thus, a clan Was often distributed or divided among several villages, some of the larger clans being widely scattered throughout southeastern Alaska. However, other clans were wholly localized in a single community.
Since no one in the clan could marry anyone else from that clan, a local clan had to associate with another local clan from the opposite moiety. Thus the two local clans from the opposite moieties settling in a village would constitute a “tribe.” Usually, however, several local clans would settle in a village.
*363 The local clan divisions in a village were made up of house groups. A village consisted of a number of large houses of the local clans, each house sheltering a number of families. Some houses were large enough to shelter a dozen families.
Each house had a local clan designation. Its nucleus was the men of that clan, usually related to each other, such as brothers. The' house had its highest ranking man, or chief, usually the eldest member of the house. Also, each local clan in the village had its highest ranking house, the chief of which was recognized as the highest ranking local clan chief. Thus, it was the local clan subdivision and the house group of families which had any semblance of social or political organization.
As will be hereinafter more fully described, the local clans in the village owned or claimed, in accordance with the Indian manner, large areas adjacent to the village. In some of these areas so owned or claimed, there were two or more villages, sometimes not distantly separated, in which case the Indians of all these villages, comprising all their houses and local clans, were known as a “tribe.” While there was no head of a tribe as such, nevertheless there was a sense of tribal unity and a community feeling of belonging to a particular geographical unit, which was bound together by ties of intermarriage, as well as ceremonial relationships.
25. In 1867, the names of the Tlingit and Haida tribes, and the names of their principal winter villages, were as follows:

Name of Tribe Name of Villages as of 1867

TLINGITS

1. Yakutat Yakutat
2. Chilkat-Chilkoot (sometimes referred to merely as the Chilkats, the Chilkoots being considered as a subdivision)
1. Klukwan
2. Kalkwalt
3. Chilkoot
4. Yandestuka
5. Diea
3. Huna
1. Huna
2. Tuxugu
4. Auk
Aynskultu
5. Taku-Sumdum (sometimes referred to merely as the Takus, the Sumdums being considered as a subdivision)
1. Taku
2. Sumdum

*364
Name of Trite Name of Villages as of 1867

TLIN GITS — Continued
6. Hutsnuwu (sometimes referred to as the “Angoons”)
1. Basket Bay
2. Angoon
3. Killisnoo
4. Neltushkun
7. Sitka
Sitka
8. Kake
1. Kake Village
2. Kake
9.Kuiu
Kuiu
10.Stikine
Wrangell
11.Henya
1. Shakan
2. Tuxekon
3. Klawak
12. Sanya (sometimes referred to as the “Cape Fox” Indians, as well as the “Saxman” Indians)
1. Yes Bay
2. Cape Fox
3. Loring
13. Tongass (sometimes the Sanyas and the Tongass are grouped together as one tribe, the Tongass)
Tongass

RAIDAS

1. Kaigani
1. Kasaan
2. Sukkwan
3. Hawkan
4. Klinkwan
5. Koianglas
At the present time the Tlingit and Haida Indians live in a number of native villages which are almost entirely Indian, but some live in large communities in principal cities of Alaska. The following are the names of the modern communities where the Indians of the Tlingit tribes live: 1. Yakutat tribe: Yakutat (located at the same place as the original village); 2. CMlJcat-GMlhoot tribe: (a) Klukwan (located at the same place as the original village), (b) Haines; 3. Hwna> tribe: Hoonah (located at the same place as the original village of Huna); 4. Auk tribe: Juneau; 5. Taku-Sumdum tribe: Douglas; 6. Hutsnwwu tribe: Angoon (located at the same place as the original village); 7. Sitka tribe: Sitka (located at the same place as the original village) ; 8. Kake tribe: Kake (located at the same place as the original village); 9. Kuiu tribe: none; 10. Stikine tribe: Wrangell (located at the same place as the original village);

*0

*365 11. Henya tribe: Klawak (located at the same place as the original village); 12. Sanya tribe: Ketchikan; 13. Tongass tribe: Saxman.
The Haidas now live in Hydaburg.
Yakutat, Klukwan, Hoonah, Angoon, Kake, Klawak, Sax-man, and Hydaburg are the native villages.
A map introduced in evidence as plaintiffs’ exhibit 169 and showing the location of Tlingit and Haida villages from 1867 to 1884 and the location of their modern villages is reproduced herein.
26. The Kuiu is no longer in existence as a tribe. It disintegrated around 1890, some members of the tribe moving to Klawak, others to Kake, and others to Wrangell.

Tlingit and Haida Land Claiming and Using Croups.

27. The local clan division in a village was the important social unit among these Indians. It was the entity in which control and authority, in the political sense, existed. It was the primary property claiming or owning group or entity. It held claims to well-defined hunting, fishing and gathering areas. Clan property included the fishing streams, the coastal waters and shores, the hunting grounds, the berrying areas, the sealing rocks, the house sites in the villages, and the rights to passes into the interior. Hunting grounds usually consisted of the watersheds of the streams or rivers. The protection of these resources was a local clan matter.
Each house group of the local clan was vested with the right to exploit certain defined clan areas, the chief of the local clan being generally responsible for the administration of all of the property. Thus, tracts of local clan territory were parceled out or assigned to individual house groups for exploitation. It was the chief of the local clan, assisted by the other house chief elders of the clan, all of whom formed a “council”, who controlled the clan’s affairs.
Although each area claimed by a local clan was divided into smaller areas, each in turn claimed by a house belonging to that clan, whenever a house ceased for a period of time to make use of a part of its area, that part remained within the area claimed by the local clan to which that house belonged. Accordingly, the claims to these areas were basically *366 claims that belonged to and were administered by the local clan.
28. These local clan and house claims were meaningful in the culture of the Tlingit and Haida Indians to regulate the use of the claimed areas. The group of Indians privileged to use each claimed area was determined by long established and rigidly enforced customs of the people. While the claims were administered principally by the local clan chief, with the assistance of the house chiefs, yet these chiefs had only a measure of individual authority over the claimed areas because each in turn acted only by agreement with the leading men in his clan or house and only in accordance with the well-established customs of the people. For instance, except under special circumstances fixed by custom, authority to sell, transfer or otherwise alienate in whole or in part any claimed area did not exist. In essence, the local clan and house chiefs were responsible for enforcing the customs of the Indians that regulated who should use the areas claimed by a local clan or house. While the local clan chief was the general administrator of the clan’s property, nevertheless he did not have the power to dispose of any land, which could be disposed of only with the general consent of the clan members. Land was not commercially bartered. It was transferred from one clan to another only as compensation for damages, or as gifts in connection with marriages, but such transfers were infrequent. The members of a family in a house who occupied the assigned area were recognized as having permanently an inalienable right to the property, and these rights were inherited, the inheritance, however, being required to take place within the same clan.
29. The Tlingit and Haida house was the primary and regular user of each area claimed by a local clan. While it was the practical working unit for the exploitation of the local clan lands, its rights were secondary and derivative from the land rights of the local clan. Each Tlingit and Haida house formed an economic unit engaged in exploiting the resources of its claimed areas for the enrichment of the house and its leading families. The occupants of the house by both individual and cooperative enterprises used the various hunting, fishing, and gathering areas claimed by the house to *367 acquire the products needed to the Indian manner of living. These products were brought back to the house, where they were consumed or added to the accumulated wealth of the house and its families or moved into trade for other products needed or helpful to the survival or prestige of the house and its families.
The occupants of a Tlingit or Haida house consisted of the male Indians born to membership in the house and, if married, their wives and children (excepting sons over the age of ten, and daughters who had married outside of the house). The wives and children, including daughters married to men of the house and their children, were all bom to membership in another house in a clan of the opposite moiety. Accordingly, the house occupants who were the primary and regular users of the areas claimed by the house included in approximately equal number Indians of the local clan to which the house belonged and Indians of other clans in the opposite moiety. In this manner, the areas claimed by a local clan were used and exploited primarily and regularly by a group of Indians who were occupants of the several houses in the local clan and who were composed of members of the local clan that claimed the area and members of other clans in the opposite moiety, each in approximately equal number.
30. In addition to the occupants of the several houses that belonged to the local clan, other Indians were privileged to use the same area claimed by the local clan. Brothers-in-law of the male members of a house had an absolute right to use the area claimed by the house. The wives of these brothers-in-law were born to membership in the house and their children formed the next generation of members of the house. In addition, sons of male members of the house, though also necessarily members of a different house in a clan in the opposite moiety because of the theory of matrilineal descent, had an absolute right to use the areas claimed by their father’s house during the lifetime of the father. Finally, any member of the clan to which a house belonged and his or her spouse, upon making an appropriate request, had the privilege of free use of any area claimed by the local clan to which the house belonged. This group of additional Indians *368 privileged to use the areas claimed by a local clan, like the occupants of the several houses of the local clan, was composed both of members of the local clan and members of other clans of the opposite moiety, each in approximately equal number.
31. Since an overall clan frequently had local divisions in more than one village, and therefore, more than one tribe, a number of the Indians privileged to use the areas claimed by a local clan were members of tribes other than the tribe to which the local clan belonged. This resulted from the fact, as stated, that any member of the clan and his or her spouse, even though belonging to another tribe, had the privilege, upon request, to make free use of the areas claimed by a local division of that clan. Likewise, particularly among high rank families, marriages were made from time to time beyond the limits of a tribe. In such cases, kinship ties applied as between tribes to cause the occupants of a house privileged to use the areas claimed by a house to include members of one or more other tribes. The number of such Indians of other tribes that used the areas claimed by a local clan, however, was not large.
32. There were, in addition, certain areas that could be used by all the clans comprising a tribe. There were also areas as to which no local clan or house had any claim. These residual areas comprised primarily offshore fishing and sea-mammal hunting areas in the larger bodies of water, the channels, the bays and the open sea. The customs of these Indians gave to any member of the tribe the right to use any part of these areas. In this manner, these areas were used in common by all members of the tribe. Other Indians belonging to other tribes had no such right of use to such areas.

General Material Culture as Related to Territorial Use in 1867.

33. The native material culture of the Tlingit and Haida Indians generally made use of a great variety and number of natural resources of both land and sea. The major resources used included: Fish: salmon, halibut, cod, olachen, herring, trout and snapper; Sea mammals: sea otter, seal, sea lion, whale and porpoise; Shellfish: a variety of clams, *369 mussels, cockles and snails; Other resources of the teach and shoreline: a variety of kelps and seaweeds, some eaten and some used for other purposes; Animals: the deer, bear, fox, mountain goat and sheep, porcupine, marmot, otter, mink, beaver, squirrel, lynx, marten, rabbit, weasel, wolf, muskrat and coon; Birds: duck, geese, grouse, ptarmigan, gull, crane, crow, including the eggs of many; Trees: principally the red and yellow cedar, and, in addition, the hemlock, spruce, cottonwood, willow, birch, pine, alder, maple and mountain ash; Berry tushes: the cranberry, soapberry, huckleberry, blueberry, and many others; Plants: a variety of grasses weeds and roots useful both as foods and for fiber, and of herbs and lichens useful as dyes and for medicinal and ceremonial purposes; Minerals: a variety of hard stones and copper.
34. Fish was the principal food resource, of which salmon was the most important, and fishing was the most important economic activity of these Indians. Generally, land hunting and other land activities were of much less importance in their economy. While these Indians were expert fishermen, they were not considered as good hunters. The Tlingit and Haida Indians made from these natural resources of their territory their food, shelter, clothing, and the tools, fabricated articles and commodities used by them in their trade and other activities. Fish, animal meats, berries, roots, clams, fish oil, many grasses and other products were made into food both for immediate consumption and dried and stored for winter feasting and for use in trade. Wood, in the use of which they were highly skilled, was the primary material for most of their manufactures. Their houses, canoes, boxes in which they stored their foods and other articles of value, totem poles upon which they carved their crests, and most of the implements they used in day to day living, were fabricated from wood. They made a host of articles from bark, particularly the inner bark of the red and yellow cedar. The well-known Chilkat blankets were made in part of wool from the mountain goat and of bark, and sometimes lined with the fur of the sea otter. Other fibers were also woven. At the time of first contact with Europeans, furs provided the principal clothing for these *370 Indians. Later, as hereinabove set forth, the European and American markets greatly increased the demand for furs. In exchange for their furs, the Indians obtained European and, American clothing that replaced their native clothing. They also obtained firearms, traps and metal utensils that replaced their native weapons as well as many of the native utensils earlier made out of wood, copper, and stone. In addition to hunting, fishing, and gathering, these Indians devoted a great part of their time to trade and to their important ceremonial feasts, called “potlachs.” In addition to food products, the principal articles of trade, which were exchanged among the Indians themselves in great quantities, were furs, cedar logs and canoes, oil made from the olachen fish, bark, robes made of marmot skins, wool-bark blankets, carved utensils, shells, lichen for dyes, copper, and, after its introduction by white traders, the potato which the natives cultivated to some extent where they found suitable ground. At their winter ceremonial feasts or potlachs, these Indians consumed and gave gifts of great quantities of surplus food, blankets, furs, and other commodities. In this manner, the Tlingit and Haida Indians obtained from their territory an economy that, for a primitive people, was rich in the variety and extent of its material wealth.
35. The accumulation of surplus wealth was a basic feature of the Tlingit and Haida economy. The house group and its individual families maintained their rank and acquired higher rank by accumulating surplus materials. Trade, in which these Indians were deeply steeped from earliest historical times, demanded surplus materials. This need for trade articles was further intensified by contact with the Americans and Europeans. The winter season of ceremonial activities and potlachs, important to the prestige of these people, sometimes cost the Indians years of accumulated surpluses. Accordingly, the economy of the Tlingit and Haida Indians drew from the resources of their territory a volume of material wealth greatly in excess of that which would have supported these Indians had their customs and manner of living been different. There was, however, a marked difference in the wealth and condition of the various tribes. The mainland tribes were better off than the *371 islanders principally because the mainlanders controlled the valuable trade with the interior Indians.
36. Throughout the winter months of November through February, the Tlingit and Haida Indians generally lived in one or another of the permanent villages which composed their tribes. This was their real home and is sometimes referred to as the “winter village” to distinguish it from the temporary summer camps. The massive ceremonial houses of the local clans were located in these villages. The village ordinarily stretched along some sheltered beach near some especially fruitful fishing, hunting and gathering area. However, most of the time throughout the spring, summer and fall the Indians were scattered, each family generally taking by canoe some customary route of its own whereby, together with the other occupants of its house, they would use the various fishing, hunting and gathering areas of the house, each area being used in the season of its special productivity. At these times, the winter village was all but deserted. During these spring, summer and fall rounds, the Indians lived mostly in crude shelters, the permanence of each depending upon the time spent in the particular area. Where a family customarily stayed for several weeks, it would build a camp of substantial planks. However, where the family customarily stopped for days only, its shelter would consist of little more than a heap of boughs or a skin tent. These summer shelters, like the permanent villages, were ordinarily located close to some fruitful region of some sheltered beach where the canoes of the Indians could be safely landed. In this manner, the habitations of the Tlingit and Haida Indians were scattered along the waterfronts of their territory, such as the ocean, the bays and inlets, up the rivers, wherever the waters were navigable by canoe, and also, to a lesser extent, on the shores of fresh water inland lakes where salmon spawned. Because of their remaining in their fixed dwellings only in the winter, and roving throughout their territory by means of their waterways during the remaining seasons of the year, the term “marine nomads” has been applied to these Indians.
37. Among Tlingit and Haida Indians, the annual round differed somewhat between the various tribes. The riverine *372 Tlingit tribes along the mainland coast, such, as the Chilkat-Chilkoot tribe, were able to secure great quantities of their staple foods for long seasons close to their permanent villages. They spent longer periods of the year in their permanent villages than did the island tribes. On the other hand, the coastal tribes generally did more inland hunting, and more overland traveling than did the island tribes. The mountain goat and marmot were obtained along the mountain slopes of the coastal range on the mainland. In addition, the mainland Indians had access to various other animals that were not found on the islands, such as wolf and grizzly bear, as well as the larger land mammals, such as elk and moose. The coastal tribes jealously guarded their trade monopoly with their Athabaskan neighbors to the east, and for this purpose, through well-defined trails and passes, traveled inland long distances beyond the coastal range. In general, however, the Tlingit and Haida Indians scattered out from their winter villages early in March. On the islands, this was the time for halibut and cod fishing and gathering herring roe, and on the mainland, for trout fishing. Shellfish were then at their best and were gathered in great quantities, dried, smoked and packed in airtight boxes. The coastal tribes traded dried meats and hides for these island shellfish, and engaged in trapping and hunting. In particular, this was the month for hunting bears, sea otter and seal. Deep sea and trout fishing continued in April, at which time the women gathered seaweeds of various kinds. The hunters continued trapping on the mainland, but on the islands, since the hair of the fur-bearing animals became thin with the approaching warm weather, the hunters sought other animals,, such as rabbits and porcupines. On the mainland, marmots were dug out of their holes on the mountainsides. Ducks were hunted on the water and grouse on the hillsides. In May, the search for green plant foods began. Many varieties of roots were collected by the women, boiled, dried and packed away. In this month, immense quantities of fish oil were prepared, this being the season for catching the olachen, a small extremely oily fish spawned in the river mouths. The oil from this fish was eaten with most foods and was used *373 for preserving berries, roots and herbs. The end of May was a time for trading expeditions, the tribes at the river months exchanging their oil, the coastal tribes their blankets and marmot robes, the island tribes their cod and halibut, and the Haida their large canoes, for the commodities of other tribes. In June, berries began to ripen and many varieties of berries and roots, herbs, hemlock bark, and birds’ eggs were gathered by the women for immediate consumption, for storage, and for trade. This was also a time for feasts and building ceremonial houses, using timbers that had been prepared during the winter. Trading continued throughout June, and long voyages were undertaken. In late June or July, the first salmon runs began, and by August the storage of large quantities of food became the principal activity. Women gathered berries and men hunted for meat, which was dried and stored. In September, most of the Indians concentrated upon salmon, the men fishing, the women drying, smoking, and storing. In October, the emphasis shifted to hunting such animals as the deer and the mountain goat. In this month, the coastal tribes made their last trading trips inland before the winter closed the passes. Toward the end of October, plans were laid for the ceremonial potlachs that took place in November and December. In winter, the days were short, the weather wet, and the nights suited to the great feasts. During these months, the tribes lived largely on the supplies gathered in other months. However, trapping and some hunting were carried on throughout the winter months, the Indians tending traplines that generally extended several miles up a stream or along some waterfront. In November and December most of the productive activities took place in the winter villages. The women prepared fibers for weaving and the men, wood, stone and shell for toolmaking. The men also searched the forests for trees for canoes and house timbers. By January, most ceremonial feasts were past. The women made garments and wove baskets and the men made canvas, totem poles, ceremonial articles, and tools. In February, preparations started for the new seasons’ rounds of fishing, hunting and gathering. Canoes, fishing and hunting equipment were repaired. The men made short *374 fishing trips. Soon thereafter each family set out, as the year before, to fish, hunt, and gather in the various areas allotted to it by the customs of its house and local clan.

Uses of the Shores.

38. As shown, a substantial part of the native materials used by the Tlingit and Haida Indians in their economy was obtained from the accessible beaches and along the accessible shoreline of bays, inlets, streams, rivers and inland lakes. As noted in finding 20, each claim to a fishing, hunting, or gathering area had its core along some defined stretch of waterfront or shoreline. The portion of their territory most thoroughly known and used by these Indians lay along the waterfront. From this core, their fishing, hunting, and gathering activities spread out into the waters on the one side and, on the other, into the accessible portions of the forests 'and mountains which were exploited.
All the habitations of the Tlingit and Haida Indians, their winter villages, summer camps, and forts, were located on or near the waterfront, either on the coast, on flat, sandy, beaches or quiet inlets, or at the mouth or lower part of the rivers or streams. There is no evidence that any Tlingit or Haida village was ever located inland, either on the islands or on the mainland of southeast Alaska. Generally these habitations were located along some shore where canoes could be conveniently landed. The burial grounds, the garden plots, the fishing stations, the areas where birds’ eggs, seaweeds, kelp and edible algae were gathered, the flats and bars where the Indians found fish and shellfish, all lay for the most part along the shoreline. Most of the hunting and trapping of the animals that lived in the forests or out in the lakes and streams was accomplished by the Indians at the water’s edge or close by the shore, in broad, flat areas. In this manner, the Indians secured a major portion of the materials used in their economy from the shores within the Tlingit and Haida territory.
39. The 32 principal winter villages used by the Tlingit and Haida Indians as of 1867 are set forth in finding 25.[2] The locations of permanent villages were only rarely moved. *375 As indicated in said finding 25, most of the present nature communities are located on the sites of original winter villages. In these villages, the massive houses were lined up along the forest edge back from the beach. Near these village sites, the Indians had their burial grounds, which also stretched along the forest line back of the beach. As of 1867, a small amount of agricultural activities was taken up by these Indians, and some of the villages had garden plots where the Indians raised for their own use and for trade, potatoes, turnips, radishes, and tobacco-like plants. Sites of abandoned villages were also used by the Indians to provide additional garden plots. Even though the winter villages were almost completely deserted by the Indians from early March until late October, the accumulated material wealth of the Indians, their ceremonial treasures, and their traditions were centered in the winter villages.
40. Summer camps were the centers of the fishing, hunting, and gathering activities of the Indians during the spring, summer, and fall. Practically every bay and stream, insofar as it was navigable, and each stretch of beach and accessible inland lake, had its use or uses for the Indians. Each had its season of productivity, in accordance with the varied activities set forth above, some long, some short, and some more highly prized than others. As shown in finding 36, the most highly prized places had shelters built of substantial plank construction, but in other less favored places the Indians that used the area would stop only for a day or so, erect a rough shelter of boughs, and leave little, if any, permanent camp. In this manner the accessible shorelines within Tlingit and Haida territory had large numbers of summer campsites of the Indians.

Use of Waters.

41. The use of the waters of southeastern Alaska by these Indians was, of course, closely related to and integrated with the use of the shores. The oceans, bays, inlets, rivers, and streams fronting the shores, and the inland lakes accessible from the shores, provided the Indians with the major part of their food supply, as well as with furs and other materials important to their economy. Fish, principally salmon, halibut, cod, flounder, herring, trout and olachan, *376 formed their primary food and an important article of trade. The Indians used hook and line, spears, gill nets, and at strategic stations along the coast and rivers, weirs and traps. However, the hook and line could not be used to catch the most prized fish, the sockeye and humpback salmon, which could only be caught in the quiet waters of certain rivers and lakes during the spawning season. It was salmon that was of first importance in the native economy. Hunting for sea lions, sea otter, fur seals, and birds’ eggs, was done on rocks 'and reefs off the ocean shores. Whales, porpoises and hair seals followed the fish runs. All these large sea animals were hunted with harpoon, bow and arrow, and gun, the Indians sometimes working a single canoe and at other times joining in a mass hunt with 20 to 30 canoes. However, while the Indians occasionally went out some distance into the open sea, they did not normally range out great distances. They generally remained in the close inshore and the enclosed bodies of water. Birds also were hunted on the water with bow and arrow or gun. As set forth in finding 37, each of these activities had its time and place in the seasonal round of the Indians. In their pursuit, the Tlingit and Haida Indians intensively searched and used the accessible waters fronting and within their territory.
42. The waters within Tlingit and Haida territory also provided the Indians with their principal means of travel. The ocean reaches along the coast, as well as the straits, bays, inlets, and large rivers were all navigable by canoe. Fiords penetrate deep into the mainland and larger islands. However, the streams were for the most part swift and precipitous and were seldom navigable for more than short distances. Nevertheless, they frequently afforded access by portage to navigable inland lakes. All these waters formed a network of routes for travel by canoe. Over these routes, the Indians made their seasonal rounds for fishing, hunting, gathering, and trade expeditions, and exchanged their visits in the winter months of ceremonial feasts. Almost everywhere these routes of travel cut deep into the forests and inland reaches of Tlingit and Haida territory and in this manner gave the Indians 'access by water to a large part of *377 southeastern Alaska. Canoe voyages of hundreds of miles were sometimes made on their waterways.
The Tlingit and Haida Indians were so oriented to the water in their customs and habits that they are commonly referred to as “coast” Indians. The great bulk of their resources came from the beach, river or sea.

Use of Forests and Inland Areas.

43. Although the Tlingit Indians were principally oriented to the water in their economy and culture, nevertheless most of the clans in varying degrees made use of certain land areas. The controlling factor in the use they made of forests and inland areas was the nature of the terrain, i. e., whether it was accessible and of any economic utility. Most of the islands are covered with a dense forest growth. Some portions of southeast Alaska, especially on the coast, are extremely rugged and mountainous and in places virtually inaccessible to man. There were extensive glacier areas along the coast as well as inland, extending in some places to the Canadian border, which were inaccessible to the Indians, and offered no economic resources. Likewise, especially in the northern part of the territory, some of the mountain peaks rise to altitudes above 6,000 feet and embrace areas of permanent snow where no Indian would ordinarily go. While the southern coast and island area of southeast Alaska is less rugged and was, therefore, more accessible to the Indians in their search for the resources useful to their way of life, there were also mountainous areas in this part of the territory which were inaccessible and unused, since most of the inland streams were not wholly navigable by canoe. There was such an abundance of supply of food and other resources obtainable from the waters and the adjoining shores that the need to exploit the rugged inland areas was not pressing. Forested areas extending up to the timberline of approximately 2,500 feet were generally used for the hunting, trapping, berrying and other inland activities hereinbe-fore described. However, mountainous areas above the timberline, which was generally at a height of approximately 2,500 feet, were not used or occupied to any appreciable degree, as was also true of the extensive glacier areas found in southeastern Alaska.
*378 44. In most of their searches for resources, the Tlingit Indians did not go more than two or three miles inland from some stream, lake, river or branch of the ocean. However, by reason of the network of these waters that laces southeast Alaska, a large part of this territory lay within this distance from some waterway. Some of the mainland tribes regularly traveled many miles inland, both to obtain the resources for which their area was especially noted, in particular the mountain goat and marmot, and also to trade with their Athabaskan neighbors. Similarly, many of the tribes extended their searches for resources to distances that did not depend upon distance from water. For instance, in hunting and trapping small fur-bearing animals and the ptarmigan, and gathering high altitude blueberries, the Indian extended his searches inland to accessible, favored, locations without regard to distance from water, provided, as stated, that the altitude was not in excess of approximately 2,500 feet. Nevertheless, the portions of Tlingit territory most extensively searched and used lay largely within about three miles’ distance of some waterway.
45. The Tlingit Indians used the accessible forests and inland areas for hunting and trapping, which provided them with furs, food and other articles. Furs were consumed and traded in large quantities. Deer was hunted in large numbers, both for the hide and the meat. Usually, however, the Indians took deer and other game along the beaches and in areas near the water. This is where the great bulk of the hunting and trapping of these Indians took place. On occasion, particularly in the summer when the deer fed deep in the woods and on mountain slopes near the timberline, the hunt for deer took the Indians inland. Many of the small fur-bearing animals, in particular the otter, beaver, muskrat and mink, were trapped in the interiors on the water’s edge. Others of relatively less importance, such as rabbits, marmot, martens, squirrels, and porcupines, were trapped and hunted in wooded areas and along mountain slopes away from water. Still others, in particular foxes, wolves, raccoons and bears, ranged widely and were hunted and trapped by the Indians wherever they were found. Bears in particular were highly prized for their fur and their dens were sought after *379 widely. A few of the animals that the Indians hunted, in particular the mountain goat, mountain sheep, and marmot, could generally be found only at high altitudes. However, the mountain goat would descend quite low on the mountain slopes during the winter and was there more accessible to the Indians. A large number of birds were also hunted inland. The Indians frequently hunted the grouse in inland wooded areas. The ptarmigan was occasionally hunted high on mountainsides. In this manner, except for the areas not accessible to the Indians, and mountain areas generally in excess of 2,500 feet in height, the hunting and trapping done by the Tlingit Indians necessitated the use of forested and inland areas within the Tlingit territory.
46. The berries, roots and other vegetable products that the Tlingit Indians gathered were frequently found in many different kinds of forested and inland areas. As shown, a number of varieties of roots and vegetables were used. Berries were preserved by the Indians in fish oil and formed an important part of the Indians’ diet as well as an article of trade. In many wooded areas, the Indians found huckleberries and on the edge of the forests and on mountain slopes, they found currants, gooseberries, raspberries, and blackberries. In high altitudes at about the timberline of approximately 2,500 feet, the Indians gathered the most highly prized blueberries and dwarf huckleberries. Along the banks of streams they found soapberries, and in low-lying deep woody spots, strawberries. Though berries grew in great profusion throughout many parts of southeast Alaska, the places where berries were clustered in sufficient quantity to make for efficient picking were known to the Indians and each such place was customarily claimed by a house or local clan. They generally returned year after year to each such place at the time best suited to harvest the berries.
47. As shown in finding 34, these Indians generally made extensive use of wood, bark, and other vegetable fibers. The red and yellow cedar which provided the logs from which they fashioned their houses, canoes, and totem poles often grew some distance back in the dense woods where the trees rose straight and tall without branching. The felling and dragging of a log to the nearest water was arduous and time *380 consuming. Accordingly, the Indians searched the forests for trees best suited to their use and only those that presented the greatest promise were selected. As also set forth in finding 34, the bark of the cedar was consumed in great quantities. Its fiber was used in a great number of the household and other articles of the Indians. Cedar logs and bark were an important article of trade among the Indians. For bark, the Indians also needed the cedars that grew in the dense woods where no low branches prevented stripping a single length of bark high up the tree. Trees thus stripped ordinarily died. Accordingly, the gathering of bark consumed large areas of dense forest and in this search the Indians ranged throughout their areas, sometimes penetrating two to three miles from the nearest water. Other trees used by the Indians, chiefly for their wood, included the spruce, hemlock and cottonwood. The bark of the hemlock was gathered in the spring for food. In addition to its other uses, wood served the Indians as fuel. Also by 1867, the Indians cut and sold wood for fuel to traders, ships and other white persons in their country.
48. Other items, both vegetable and mineral, were taken by the Tlingit Indians from the forests and inland areas. Most of these items were found 'in the areas of most -intensive search within two or three miles of the water’s edge. However, lichens used for dye were found only at high altitudes and at about the timberline of approximately 2,500 feet.
49. The network of waterways throughout Tlingit territory gave the Indians an abundance of -routes of travel. However, the hunting and gathering activities of these Indians made them familiar with large areas of land as well as the water. -Some of the tribes, such as the Chilkat-Chilkoot, had detailed knowledge of various parts of the rugged and mountainous interior regions of their territory. The Indians of these tribes were extraordinarily strong in packing heavy loads up certain of the mountainous slopes. For the most part these Indians used the trails made by animals. They did have in some places, however, well-established Indian trails. The most notable of these trails were those that led from the mainland coast into the interior. Other 'Indian-made trails provided portages between f requently used waterways.
*381 Saturation of Indian Use of Their Territory — Population.
50. The social organization, the propensity for trade and the industrious character of these Indians, all as above-described, were factors that generally impelled them to use to the full the resources available to them in their claimed areas. The social gradation among them made for a competitive society in which rant in large part depended upon the accumulation, display and disposal of material wealth. Such wealth, in turn, naturally depended largely upon the extent and nature of the fishing, hunting, and gathering areas claimed by each local clan, house, or family in a tribe and upon the success with which the Indians using the claimed areas harvested the resources useful to their economy. In addition, as set forth above, trade afforded to these Indians another avenue to material wealth and another stimulant to the vigorous exploitation of the resources of their territory. The demand that was provided by the American and European markets, especially for furs, exceeded in substantial quantities the earlier demands of the trade that existed between the Indians themselves. In response to this new market, the Indians exerted great energies in hunting, trapping, and other pursuits that yielded articles for trade with the white man. These activities were substantial in 1867 and through the decades immediately following. Accordingly, the way of life of these Indians made, .in their manner, for an extensive use of the accessible portions of their territory.
51. The history of the movement and settlement of these tribes into southeastern Alaska confirms the completeness of Tlingit and Haida use of the entire usable shore and adjoining water area of this region. A tribe’s arrival into its area generally resulted from its departure from an area of overcrowding and feuding to move into a new region where resources were again plentiful. This migration continued until the shores and, generally, the accessible and usable areas adjacent thereto, were completely claimed and until further movements both to areas inside and outside the territory were blocked by adverse claims. Prior to the advent of the white man, these Tlingit and Haida areas were completely *382 claimed by the Tlingit and Haida tribes, local clans and bouses.
52. Generally, each of tbe tribes occupied an area adjoining the area occupied 'by its neighboring tribe or tribes, leaving no area of vacuum with respect to accessible and usable lands and waters. There were at times disputes as to the boundaries between adjoining tribes, clans, or houses, and there are at present some differences of opinion by authorities as to certain of such boundaries, some attributing an area to one tribe or clan, and others to another. However, for the purposes of this case, such differences are immaterial, since the dispute was only among Tlingit or Haida Indians themselves, in whose overall behalf this suit is brought. For the most part, however, there is even little dispute of importance concerning the boundary of each tribal area, there being substantial agreement and uniformity in the establishment for each tribe of an area defined both by the outer limits of the regions used and claimed by its members and also by the outer limits of the regions used and claimed by the members of its neighboring tribes.
Similarly, the boundaries of the local clan and house areas which were accessible and usable adjoined one another, leaving no such areas unclaimed except for the few areas specified in finding 32. Along the coast, each of the waterways, rocks, bays, headlands, and other physical features, had its Indian name.
53. The population of the Tlingit and Haida Indians prior to 1867 and as of that approximate year has been variously estimated. An actual count of these Indians was not obtained with any accuracy until long after 1867. The first census takers worked in Tlingit and Haida territory during the summer season when the Indians were scattered and the results were therefore uncertain. Earlier counts were made in a few communities, but not over the entire Tlingit and Haida territory. Moreover the population was drastically reduced by smallpox epidemics in 1787, 1836, and 1862, and typhoid in 1819, 1848, and 1855. On all the evidence, it is reasonable to conclude that the population of the Tlingit and Haida Indians in early historic times was approximately 10,000 and that in 1867 this population was approximately *383 6,000. This latter level of population, which reflects in part the changed conditions brought about by the advent of white civilization, has remained comparatively stable to the present time, being now approximately 7,000.

Exclusiveness of Tlingit and Haida Use of Their Territory'.

54. The concept that the tribes, the local clans in the tribal villages, the houses and even the families had their areas of material resources in respect of which only certain Indians had the right of use was basic to Tlingit and Haida culture. This feature of the culture of these Indians came early and forcibly to the attention of the first European and American explorers and traders in Tlingit and Haida territory. The sensitivity of the Tlingit and Haida Indians to defend against and secure compensation for any encroachment upon their concepts of the ownership of their territory and the rights to its use is clear from the relations of the Tlingit and Haida Indians among themselves, their relations with other Indians, and with Europeans and Americans who came into their territory. To the extent possible, consistent with their manner of life and their social and political organization, they maintained the exclusive use of their territory both as against other Indians and as against white explorers, traders, miners, and settlers.
55. As of 1867 and for many years earlier, no Indian nor native people other than the Tlingit and Haida Indians used or occupied, or made any claim to use or occupy, any part of their territory. The neighboring Indians that came into Tlingit and Haida territory came to trade, visit, or raid, the raids, however, not being for purposes of territorial expansion. There is no evidence of any native people pressing to move in upon any part of Tlingit and Haida territory in 1867 or for years earlier. When Indians from other regions came into Tlingit and Haida territory to visit or trade, they did not live off the land. They brought provisions with them or sought permission to use the land.
56. As of 1867, the Europeans and Americans had made only a few scattered intrusions into Tlingit and Haida territory. These intrusions consisted of the settlement at Sitka and a few trading posts along the coast. Excepting only these limited areas of actual white possession, the Tlingit *384 and Haida Indians as of 1867 still retained, in accordance with their native customs and concepts, the exclusive use and occupancy of their territory. The mainland tribes acted in the capacity of agents between the whites and the interior Indians. Access to the interior Indians was principally maintained by going up various rivers to the interior. The interior Indians supplied considerable furs, such as mink, marten, fox and bear, and the skin of the mountain sheep. The mainland Tlingit tribes did not allow the interior Indians to come to the white settlements to trade, nor did they permit the whites to pass into the upper country to trade with the interior Indians.

The Territory Used and. Occupied By the Tlingit a/nd Haida Indians as of 1867.

57. There is reproduced and shown opposite this finding, a map of southeastern Alaska in evidence as plaintiffs’ exhibit 168. On this map is shown the area claimed by the Tlingits and the area claimed by the Haidas. There is also reproduced and incorporated herein plaintiffs’ exhibit 169 which shows the same area and the inner boundaries of each part claimed by the individual groups of Indians enumerated in finding 25. See finding 25 for map.
These maps set forth as accurate a delineation of the territory actually used and occupied by the Tlingit and Haida Indians and the subdivisions or clan groups, as of 1867, as it is possible to determine at the present time. While these Indians did not have the modern man’s concept of precise areal boundaries in connection with their clan, house or overall claims to land and water, they did have, as previously shown, very definite concepts of proprietary rights in their territories extending to well known landmarks, such as rivers, rocks, reefs, mountain peaks, valleys or natural characteristics or points on the shores, bays, inlets or watersheds. In some instances, particularly in Haida territory, where there might be no natural landmark on the shore to serve as the dividing line between the territory of two clans or house groups, a stake would be driven on the shore to serve such purpose. Accordingly, lines drawn, as on these maps, to indicate the scope of the territories used and *385 occupied by these Indians and their clans and tribes do serve to depict the outer limits of such territories with reasonable accuracy. Therefore it is found that these maps, for the purposes herein involved, accurately delineate the territory used and occupied by these Indians as of 1867. This is particularly so insofar as concerns all the shores within the territory so delineated on these maps, and the waters adjoining them, both on the mainland and the innumerable islands of the Alexander Archipelago off the mainland, and including the shores and waters of the bays, inlets, straits, sounds, lakes, rivers, streams and tributaries in such territory and fronting on and connected with the coastline. Not only the streams and rivers themselves were used and occupied, but the entire watershed flowing into the stream or river was claimed as part of the clans’ possessions. Such shores and waters were used and occupied as detailed in findings 38, 39, 40, 41 and 42. While the fishing and sea animal hunting activities of these Indians did not extend far into the ocean, the western outer boundary on the maps portrays a fair and reasonable delineation of the extent of such activities into the Pacific Ocean.

*0

*385 UNITED STATES PURCHASE OP ALASKA

The Negotiations and Treaty.

58. In March 1867, William H. Seward, Secretary of State, and Edouard de Stoeckl, Eussian Minister at Washington, entered negotiations for the purchase of Alaska by the United States from Eussia. On March 15, and March 19, 1867, Seward laid before the President’s Cabinet drafts of treaties for the purchase of Alaska for $7,000,000 in gold. The draft of March 19 was approved by the Cabinet and it was then to be sent to Eussia for approval. This draft provided, in article VI, that: *386 Seward had included this provision because he was unwilling that the United States by the treaty should confirm the title of the Russian American Company or of any other company, such as the Hudson’s Bay Company, to properties in Alaska. Seward knew at that time that a convention made between the United States and Great Britain had resulted in the confirmation of the title of the Hudson’s Bay Company to properties in Oregon Territory. He was aware of difficulties that had thereafter ensued in that instance. He also knew that the Russian American Company had properties and privileges in Alaska; that, as hereinabove set forth in findings 10 and 19, it had leased its privileges in a portion of the Alaska mainland to the Hudson’s Bay Company, and that it had entered into other commercial arrangements with the American Russian Commercial Company. Accordingly, under date of March 23, 1867, Seward wrote de StoecH concerning this article:
*385 * * * The cession of territory and dominion herein made is hereby declared to be free and unincumbered by any reservations, privileges, franchises, grants or possessions, by any associated companies, whether corporate or incorporate, Eussian, or any other, or by any parties, except merely private individual property holders * * *.
*386 With reference to the proposed convention between our respective governments for a cession by Russia of her American territory to the United States, I have the honor to acquaint you that I must insist upon that clause in the sixth article of the draught which declares the cession, to be free and unincumbered by any reservations, privileges, franchises, grants, or possessions by any associated companies, whether corporate or incorporate, Russian or any other, etc., and must regard it as an ultimatum; with the President’s approval, however, I will add two hundred thousand dollars to the consideration money on that account.
Mr. de Stoeckl, under date of March 25, 1867, responded as follows:
I have had the honor to receive the note which you were pleased to address to me on the 23d March, 1867, to inform me that the federal government insists that the clause inserted in article sixth of the project of convention must be strictly maintained, and that the territory to be ceded to the United States must be free from any arrangement and privileges conceded either by government or by companies.
In answer, I believe myself authorized, Mr. Secretary of State, to accede literally to this request on the conditions indicated in your note.
*387 Thereupon the purchase price was increased from $7,000,000 to $7,200,000. The treaty was executed by Seward and de StoecM, on March 30, 1867. The ratifications of both governments were exchanged and the treaty proclaimed on June 20,1867.
59. The treaty by which the United States purchased Alaska from Russia provided, in part, as follows:
Article I. His Majesty the Emperor of all the Rus-sias agrees to cede to the United States, by this convention, immediately upon the exchange of the ratifications thereof, all the territory and dominion now possessed by his said Majesty on the continent of America and in the adjacent islands, the same being contained within the geographical limits herein set forth * * *.
Article II. In the cession of territory and dominion made by the preceding article are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices which are not private individual property. It is, however, understood and agreed, that the churches which have been built in the ceded territory by the Russian government shall remain the property of such members of the Greek Oriental Church resident in the territory as choose to therein. * * *
Article III. The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property and religion. The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country.
***** Article VI. * * * The cession of territory and dominion herein made is hereby declared to be free and unincumbered by any reservations, privileges, franchises, grants or possessions, by any associated companies, whether corporate or incorporate, Russian, or any other, or by any parties, except merely private individual property holders; and the cession hereby made conveys all the rights, franchises, and privileges now *388 belonging to Russia in the said territory or dominion, and appurtenances thereto.
60. An undated draft of the proposed treaty terms stated in part as follows:
Mr. Seward proposes that Russia cede and convey to US Her possessions on the North American continent and the adjacent Aleutian islands, the line to be drawn through the center of Bherings straits and include all the islands East of and including Attoo the dominion to be embraced of the Government and Company Russian Fur Company and all other the therein individual private titles which shall be confirmed. The White population remaining to be citizens U. S. the Indians to be on the footing of Indian [illegible word] in the U. S.
61. Subsequent to the ratification of the treaty but prior to the formal transfer of the territory, Secretary Seward sent a letter dated September 6, 1867, to the Secretary of War, stating as follows:
In relation to the despatch of Major General Halleck, of the 2d of September, instant, in which he requests that the President will by proclamation declare the newly acquired Russian territory an Indian territory in order to prevent the introduction of ardent spirits among the Indians there, I am instructed to say that the President will retain the same for further consideration. At the same time he desires that Major General Halleck will confer with General Rousseau upon that subject, to the end that the matured views of those officers may be submitted to the President as early as practicable.
For the information of the War Department, I communicate a copy of an opinion of E. Peshine Smith, esq., Examiner of Claims m this department, which sets forth a view of the laws of the United States bearing upon that question, which view is adopted by this department.
The opinion referred to in the letter read as follows:
bureau oe claims,
September 5, 1867
Proclamation that the territory ceded by Russia is Indian territory:
Such a proclamation is recommended by General Hal-leck in order to prevent the introduction of whiskey among the Indians.
*389 Tbe act of 1834, (4 Stat., 729) “to regulate trade and intercourse with the Indian tribes,” provides that, “all that part of the United States west of the Mississippi, and not within the States of Missouri and Louisiana or the Territory of Arkansas, * * * for the purposes of this act be deemed and taken to be the Indian country.”
The question is, whether the provisions of that act in respect to trade and intercourse with Indians are to.be restricted to their operation in the Indian country which was within the United States at the time of the passage of the act, or whether they take effect and apply to new territory acquired by conquest or treaty, without any further legislation giving them such extension.'
I think this question has been settled by the Supreme Court of the United States in the case of Cross vs. Harrison, (16 Howard’s B., 164, 199.) The question there was, whether upon the ratification of the treaty for the cession of California the existing several laws came into operation so as to regulate the rate of duties on imported goods without any act of Congress declaring their will in that respect, and creating collection districts. The court held that the ratification of the treaty made California a part of the United States, and that so soon as it became so the territory instantly became subject to the acts which were in force to regulate foreign commerce with the United States.
The argument was urged in that case that the revenue laws applied only to the territory under our jurisdiction when they were passed, until Congress, by creating collection districts m the new Territory, or some other act of the same nature, had manifested its will that the laws should be thus applied. That argument was overruled by the court, and it would, therefore, be overruled in respect to Alaska and commerce with the Indian tribes.
I think, therefore, that the new territory became a part of the Indian country on the 20th June last. A proclamation by the President is only necessary for the information of persons going into the territory of the restrictions to which they are subject in their intercourse with Indians. I think, however, the treaty itself may work some modification in the existing law. For instance, one of the provisions is that no license to trade with the Indians shall be granted to any persons except citizens of the United States. The third article of the treaty provides that the inhabitants of the ceded territory, reserving their natural allegiance, may return to Bussia within three years, but if they prefer to remain in the territory they (with the exception of native un *390 civilized tribes) shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States. While it may be that they cannot acquire the full rights of American citizenship until their election has been evidenced by remaining three years, it seems to me it would be a harsh construction, and one to be avoided, if possible, which should postpone for that period their right to receive a license to trade with the Indians. It can hardly be the intention of the treaty that they should lose any privileges by the incorporation of their territory with the United States. The provision should be deemed an enabling and not a restrictive one.
If doubt remain on this point, as it may, it should, I think, be removed by Congress.
E. PESHINE SMITH,

Examiner.

Official:
R. WILLIAMS, Assistant Adjutant General.
In another letter to the Secretary of War, dated January 30,1869, Secretary Seward stated:
I have the honor to acknowledge the receipt of your letter of the 27th instant, enclosing extracts from a communication from Mr. M. F. Smith, jr., concerning the alleged habitual encroachment of the agents of the Hudson’s Bay Company upon the trade and territory of Alaska, with a request for my views upon the subject.
By the sixth article of our treaty with Russia of March 30, 1867, the cession of territory and dominion therein made is “declared to be free and unincumbered by any reservations, privileges, franchises, grants, or possessions by any associated companies, whether corporate or incorporate, Russian or any other, or by any parties except merely private individual property holders.”
Article 5 of the treaty between Great Britain and Russia of February 28,1825, (3 Hertslet’s Treaties, 364,) which was revived and continued by the 19th article of the treaty between the same powers of January 12,1859, (10 Hertslet, 1063,) provides that “no establishment shall be formed by either of the two parties within the limits assigned by the two preceding articles to the possession of the other; consequently British subjects shall not form any establishment, either upon the coast or upon the border of the continent comprised within the limits of the Russian possessions.” The articles re *391 ferred to established the boundary lines between the British and Russian possessions on the northwest coast of America, the same adopted in our treaty of cession with Russia.
The provisions above cited are conclusive against the right of the Hudson’s Bay Company to establish or maintain such an establishment as Fort Youkon is described to be in the communication from Mr. M. F. Smith, jr. I understand the decision of the Supreme Court of the United States in the case of Harrison vs. Cross, (16 Howard, 164-202,) to declare its opinion that upon the addition to the United States of new territory, by conquest and cession, the acts regulating foreign commerce attach to and take effect within such territory ipso facto and without any fresh act of legislation expressly giving such extension to the pre-existing laws. I can see no reason for a discrimination in this respect between acts regulating foreign commerce and the laws regulating intercourse with the Indian tribes; there is, indeed, a strong analogy between the two subjects. The Indians, if not foreigners, are not citizens," and their tribes have the character of dependent nations under the protection of their government, as Chief Justice Marshall remarks, delivering the opinion of the Supreme Court in Worcester vs. The State of Georgia, (6 Peters, 557,) “The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the States, and provide that all intercourse with them shall be carried on exclusively by the government of the Union.” The same clause of the Constitution invests Congress with power “to regulate commerce with foreign nations, * * * and with the Indian tribes.”
The act of June 30, 1834, (4 Stat., 729,) defines the Indian country as, in part, “all that part of the United States west of the Mississippi and not within the States of Missouri and Louisiana, or the Territory of Arkansas.” This, by a happy elasticity of expression, widening as our dominion widens, includes the territory ceded by Russia.
That act provides that no person shall trade with any of the Indians (in the Indian country) without a license; that any person, other than an Indian, who shall attempt to reside in the Indian country as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession; and shall, moreover, forfeit the sum of $500; that no license to trade with *392 the Indians shall be granted to any persons except citizens of the United States; that a foreigner going into the Indian country without a passport from the War Department, the superintendent or 'agent of Indian affairs, or the officer commanding the nearest military post on the frontiers, shall be liable to a fine of $1,000; finally, that the superintendent of Indian affairs, and Indian agents, and sub-agents, shall 'have the authority to remove from the Indian country all persons found therein contrary to law, and the President is authorized to direct the military force to be employed in such removal.
These provisions seem to be all that can be necessary in the way of legislation to prevent the encroachments of the Hudson’s Bay Company, alleged by Mr. M. F. Smith, jr.
Of the practical difficulties in the execution of these provisions you have better means of judging than has this department.
62. In answer to an inquiry of August 6,1867, by the Secretary of State of the United States concerning various aspects of the Russian Imperial system in Russian America, the Russian Government, under date of October 8, 1867, formally replied with respect to the aborigines (other than those of the Aleutian Islands and of certain islands to the far north) by an explanatory memorandum which read in part:
* * * The Russian American Company hardly ever penetrated into the interior of the continent, and, owing to the wild character of its inhabitants, never established there any settlements; only for trading purposes, small factories, called redoubts * * * were established along the coast, preferably, near the bays and the mouths of large rivers. These factories generally consist of a roofed yard of moderate size, in which live the clerk of the company, with a few workmen out of the pacified natives, and where is stored a small supply of dried fish and some manufactured goods, wanted for the use of savages. * * * From all, what we said, it clearly appears, that in this region no attempts were ever made, and no necessity ever occurred to introduce any system of land-ownership, the country occupied by savages is too vast; they use to camp in certain fit places, generally marked by mountains, rivers, and streams, each having its name, but no fixed boundaries whatever, and their migrations are guided by wild instinct and unbounded *393 will. All tbis region has neither past nor present, and it may be confidently said of the future, that it is far and impenetrable. Every attempt of civilizing that country will stumble against unconquerable obstacles: the complete absence of local topography, the wild character of the savages, and no less wild character of nature; but, above all, the rigor and inconstancy of climate. * * *
63. General Rousseau was appointed commissioner on behalf of the United States to receive from the Russian commissioner the territory ceded by the treaty. Among the duties assigned to these treaty commissioners by their respective governments was that of drawing up an inventory distinguishing between the property to be transferred to the United States and that to be retained by individuals under article II of the treaty. Pursuant thereto, the Russian Government at Sitka provided the commissioners with a certificate stating the interest of each occupant in the premises occupied, on the back of which the commissioners placed their approval. This certificate was then delivered to the occupant. In order to be accurate, and to prevent disputes about the titles to houses and lots, the commissioners made a map of Sitka on which every house and dwelling in the town was located and numbered, and, as between the claimant and the United States, on which was indicated the title, as defined and settled in the inventories. The accompanying inventories listed the names of 21 persons holding property in fee simple in Sitka, and who were furnished with certificates. These 21 titles, a few titles to land held by the Greco-Russian Church, and some titles to houses and improvements on the land in and about Sitka, constituted the entire private individual property secured to former settlers by the Treaty of Cession and under its administration. The total number of titles and the total quantity of property so secured to settlers was negligible.
Under date of December 5, 1867, General Rousseau officially reported to the Secretary of State concerning the accomplishment of his commission. He stated in pertinent part:
I found that by the charter of the Russian American Company, it had authority to vest in its employes, oc *394 cupants of land in the Territory, the title thereto. This was on condition, however, that the possessions of the Indians should not be interfered with.
Acting under this charter, the company from the first caused dwellings to be erected for the use of its employes, on lots of ground set apart for that purpose. The title in fee to such premises was often vested in the employe in possession, when he had faithfully served out his term with the company; or having died before it ended, and having a widow or children in the Territory, the title was frequently vested in them.
This was one mode adopted by the company of taking care of its employes when, by old age or other disability, they were unable to maintain themselves, and of their widows or children after their death. So the employe generally occupied such dwelling while he lived, and at his death it passed to his widow or children, if any in the Territory; and if none, then it reverted to the company.
* * ❖ # #
Finding in its charter this authority of the company to vest title to land in its employes, and that very many of the dwellings erected by the company were occupied by its employes, or their widows and children, who claimed the property in fee, the commissioners called on the governor, Prince Maksontoff, to define and certify to the interest of each individual thus occupying such dwellings and lots, in order that we might distinguish between those who owned the property in fee, and those who claimed a less interest, and in compliance with your instructions give certificates to the claimants accordingly.
The inventories respectively marked C and D, (forming part of the protocol,) which are forwarded with this report, will show, in part, the action of the governor in the premises; for the rest he gave a certificate stating the interest of each occupant in the premises occupied, on the back of which the commissioners placed their approval, and it was left to be delivered to the occupant.
In order to be accurate, and to prevent disputes hereafter about the title to houses and lots, we made a map of New Archangel, (forwarded with this report,) on which every house and dwelling in the town is located and numbered, and, as between the claimant and the United States, the title to it defined and settled in the inventories. This was thought necessary in order to give, in accordance with your instructions, to each man *395 of property wlio desired to dispose of it, a certificate of title.
Tbe town of New Archangel was built in the main by the Russian American Company, and, except the dwellings _ transferred by them to their employes, and the public buildings transferred to the United States, is owned by that company still; yet it has but a possessory interest in the land, as it only had permission to erect buildings_upon it; for, although it had authority to vest the title of lands in its employes, it had no power to vest such title in itself. The commissioners left the matter as they found it, and the company in possession of its buildings.
% Jfc % % i>i
All the buildings in anywise used for public purposes were delivered to the United States commissioner, taken possession of, and turned over to General .Davis, as were also the public archives of the Territory; and in a spirit of liberality the wharf and several valuable warehouses belonging to the Russian American Company were included in the transfer by the Russian commissioner. Both the wharf and the warehouses were very much needed by our people.
* $ * $ $
The people of Sitka seemed to be quiet, orderly, and law-abiding; of the Russians proper there were about 500 on the island. If kindly treated by our people, most of them will remain as citizens of the United States. Many of them had already made their election to remain under the stipulations of the treaty by which the Territory was ceded to our government. Generally they were satisfied with the transfer of the Territory, as were also most of the Indians. The latter received from Americans since the transfer exorbitant prices for fish and game and whatever they had to sell, and were generally pleased with the change. A Kollo-sian chief, however, angrily remarked that, “True, we allowed the Russians to possess the island, but we did not intend to give it to any and every fellow that came along.”
UNITED STATES SURVEILLANCE OVER SOUTHEAST ALASKA 1867 — 1884
The United States Army — 1867-1877.
64. From 1867 to 1877, the administration of the Territory of Alaska, in the absence of the establishment by Congress *396 of any civil governing authority in the Territory, was entrusted to the War Department, except as to the control of trade and revenue, which were under the jurisdiction of the Treasury Department. Upon the formal transfer of Alaska to the United States in October 1867, United States troops garrisoned the former Russian post at Sitka. Shortly thereafter Army posts were established at Tongass and Wrangell, but these two posts were abandoned in 1870. However, in 1874, with the passage of gold miners into British Columbia up the Stikine River, the post at Wrangell was re-established. In June 1877, the troops were withdrawn from Alaska.
65. The commander of the military district of Alaska, which included all the Russian-American territory ceded to the United States, was instructed to protect the former Russian subjects who elected to remain in Alaska and the citizens of the United States who would extend their enterprises into Alaska. The commander was also instructed as follows:
17. In regard to the aboriginal and uncivilized tribes of your district, you will, in the absence of any organized civil territorial government, and so far as our laws authorize or permit, act as their general superintendent, protecting them from abuse and regulating their trade and intercourse with our own people. Military officers have no authority to make Indian treaties. You will, therefore, enter into no negotiations of that kind, or attempt to bind our government to any contracts or agreements, without special authority and under special instructions.
$ ‡ ‡ ‡
22. You will endeavor to impress upon the tribal and uncivilized inhabitants of the ceded territory which constitutes your military district, and especially upon their chiefs, that our government will regard them as subject to its laws and entitled to its protection; that while they are protected by our government they will be required to respect the rights of all citizens of the republic; and that if any member of a tribe maltreat a citizen of the United States the whole tribe, and especially its chief, will be held responsible for the offence or crime committed by one of its members, unless they expel such criminal or deliver him to us for punishment.
*397 66. Shortly following the transfer of Alaska to the United States, several councils of certain tribal chiefs were held at which objections were voiced to the transfer. As officially reported in 1869 by a special agent of the Treasury Department, who was ordered to examine into the resources of the territory and the character and habits of its various tribes:
The dissatisfaction among the tribes on account of the sale of the Territory did not arise from any special feeling of hostility, but from the fact that it was sold without their consent, they arguing that their fathers originally owned all the country, but allowed the Russians to occupy it for their mutual benefit, in that articles desired by them could be obtained from the Russians in exchange for furs; but the right of the Russians to sell the Territory, except with the intention of giving them the proceeds, is denied.
Some of the chiefs were in favor of waging war to drive the Americans out. However, the chief of the Chilkats, who were the most hostile of all the Indians, pointed out the weakness of the defense of the Indian villages against attacks of United States war vessels and advised delay to await further developments. This advice prevailed, the special agent reporting:
When the Territory was transferred to the United States, the natives had no knowledge of the people with whom they were to deal; and, having been prejudiced by the parties then residing among them, some of the more warlike chiefs were in favor of driving out the “Boston men,” as they termed us. They held several councils to discuss the matter, and were mainly dissuaded from the measure by Shawkuthk, chief of the Tchilkat tribe, and one of the best traders and most influential and active chiefs on the coast. His tribe is the most powerful among the Koloshians, and is located beyond the reach of war vessels, the water being shallow for some distance from the village. This chief represented to the dissatisfied tribes that the new people had many gunboats, and would easily drive them out of their villages; and all would have to come up to his country, where, for want of provisions, they would soon starve. He advised them to wait and see what the “Boston men” would do. This course they adopted, and soon learned, in the increase of the value of their furs and the greater variety of products received, that the change was to *398 their advantage; and in coming to Sitka in small parties to trade with the increased privileges enjoyed by that tribe, all saw additional reasons for peace.
67. Excepting isolated disturbances, peace was maintained in Alaska during this 10-year period of Army rule. General Jeff C. Davis, the initial commander of the military district of Alaska, held meetings with the tribes in their villages and warned them against molesting the white men, as well as against carrying out the idea of some tribal chiefs that whites settling in their midst were subject to their jurisdiction and, therefore, to tribute for the privilege of trading with the Indians. However, aside from the settlements of Sitka and Wrangell, where Army posts were located, the actual movement of white settlers and prospectors into the natives’ territory in this period scarcely began. In February 1869, the Kake tribe, as punishment for the killing of two white traders, suffered almost complete destruction of its winter village by United States troops. This event confirmed the extreme vulnerability of the Indian villages to attacks from the water by United States forces. From that time forward, the superiority of the United States military power was at no time challenged by any Indian group in southeast Alaska. However, excepting the retaliatory destruction of the Kake village, the Army commanders did not, from 1867-1877, seek to dispossess or remove the Tlingit and Haida Indians from their villages, their hunting, fishing, or food-gathering lands, nor did they ever attempt to restrict the exploitation by the Tlingit and Haida of the lands and waters of their territory.
68. As a result of the policies of the Army commanders referred to in finding 67, the Indians were neither molested nor governed in their intertribal relations, and their manner of living and customs underwent little change. The Indians continued their dealings with British and American traders in much the same manner as under the Russian regime. Though the Army officers did not make treaties or agreements with any tribes, they did give some increased stature to the tribes and tribal chiefs in their efforts to impress each tribe and its chiefs with the importance of being at peace with the white man. Chiefs who cooperated were made *399 much of and given papers to evidence their authority and their good will. Moreover, throughout this first ten years of United States rule over Alaska, the new intrusions made by white men into Tlingit and Haida territory for purposes of use or occupancy were negligible. As a consequence, the Indians, insofar as they felt capable of so doing, continued to assert their dominion and control over their territories. For example, the Chilkat Indians did not permit anyone to pass through their territory to enter the interior. Although gold was known to exist along the Taku River, the Takus likewise refused to permit its development. The consent of the Sitka Indians was obtained to a grant of land near Sitka for the erection of a new market.
69. By the act of July 27,1868 (15 Stat. 240), the United States extended to Alaska its laws relating to commerce and navigation and created Alaska a customs district. Sitka was designated as the port of entry. A customhouse and a collector of customs were established at Sitka. This office, being the first United States office of civil government in Alaska, became the depository of the records of the certificates of title given by the treaty commissioners to holders of private property, as set forth in finding 63. In like manner, the customhouse became also the office of record for other and newly acquired interests in property. In due course, the people in southeast Alaska came to look upon the records in the customs office as their evidence of their title to lands. When new locations were claimed and used for homes or for business purposes, or as mining claims, these locations were recorded in the customs house by the collector of customs. The procedures followed were simple. The plots selected were staked and in some cases fenced. Notices were put up stating the nature and owner of the claim. Thereafter, copies of these notices, together with a statement and a metes and bounds description of the claim, were recorded by the collector of customs in a record book kept for this purpose. In this manner, during the years prior to 1884, the custom office at Sitka, and later at other locations in southeast Alaska, served as the office of records for filing and evidencing squatters’ claims. However, until the mineral and fish resources in southeast Alaska attracted new *400 enterprises to Alaska, the use made of this office for filing squatters’ claims was negligible.
Absence of Any Military or Other Authority — 1877-1879.
70. In June 1877, the troops were withdrawn from Alaska to assist in quelling an Indian uprising in Idaho. As a result, no military authority remained for the protection of the whites, and there was great alarm in Sitka, aggravated by the actions of the Indians located thereabouts, that a similar uprising might take place in Alaska. The sole Federal official with any legal authority left in Alaska was the collector of customs. By a dispatch of July 13,1877, to the Treasury Department, he appealed for protection against a possible slaughter of the whites by the Indians. The Treasury Department’s agent at Port Townsend, Washington, after discussing the situation in Alaska with the officers of the mail steamer who had brought the collector’s dispatch, wrote to the Secretary of the Treasury on July 25,1877, and recommended that an armed vessel be sent to Sitka without delay. He reported:
In a conversation had yesterday with Capt. Charles Thorne, master of the steamer California, he expressed to me grave fears of a general uprising of the Sitka Indians. * * * about one thousand are now absent en-
Íaged in fishing. “Sitka Jack,” a noted chief, informed laptain Thome that * * * when they returned they intended to seize all the government buildings and other valuable property at Sitka; that the country and everything in it belonged to his tribe.
Captain Thome further states the Indians, contrary to when Sitka was garrisoned by troops, thronged his vessel while at the dock, and were generally haughty, insolent, and overbearing in their manner; * * *. It is his opinion and that of the officers of his ship that an outbreak is not far distant, which will result in the destruction and plunder of private property; and if the whites make any demonstration of resistance a wholesale massacre will ensue. The Russian priest has already sent his family to Nanaimo in British Columbia, and general consternation and terror prevail amongst the whole white inhabitants.
By letter of November 4, 1877, the succeeding collector similarly wrote to the Secretary of the Treasury:
*401 The state of things in Sitka is just as bad and disgraceful a state as can be imagined; there is no law or order of any kind, and no means to enforce either.
* * * as the Indians are roaming at their leisure and pleasure all over the place night and day, the probabilities of some murderous outbreak, ending in a general massacre, are exceedingly great. * * *
There is no doubt whatever that on Sunday, 13th of October, one day previous to arrival of revenue cutter Wolcott, the Indians, by their act of tearing down fully four-fifths of the whole stockade, and of wantonly destroying the Russian grave yard, intended to provoke resistance on the part of the inhabitants.
‡ ‡ ‡ ‡
The Indians behave themselves as long as there is a vessel present and no longer. How, then, can “occasional visits” and cruising in those waters of Alaska once in a while by a man-of-war “afford all necessary protection ?”
❖ * % # H*
* * * The trembling inhabitants only desire the return of troops because of the constant apprehension they have to live under, regarding the Indians, who have it all their own way, who consider the actions of our government. in Alaska as a virtual abandonment of the country, and claim it as their own rightful property.
* * * I think I may safely venture to express the opinion that, in consideration of the circumstance that troops at Sitka will have no means of locomotion, while the Indians have their canoes always ready, it ought to be our Navy and not the Army to whose charge the holding and protecting of the Territory of Alaska shouldbe confided.
However, for various reasons, the Treasury Department did not send any revenue cutters to Alaska for permanent duty pursuant to these recommendations and, with the exception of the customs collector at Sitka, there was no United States military or other authority in Alaska after June 1877 until the Navy, as hereinafter set forth, took over authority two years later.
71. The pleas of the whites at Sitka for a United States war vessel for their protection against the Indians being left unfulfilled, they finally appealed to the British on Vancouver Island, British Columbia. In response, H. M. 8. Osprey arrived at Sitka on March 1, 1879. The captain of *402 this vessel reported finding “tbe inhabitants in a great state of anxiety and alarm” which was, however, dispelled upon his announcement that he would remain until an American vessel would relieve him. On March 22, the revenue cutter Oliver Wolcott arrived but it was agreed that the Osprey should remain until a warship came because the cutter could not offer sufficient protection. On April 3, 1879, the U. B. B. Alasha arrived. The Osprey then returned to British Columbia and the revenue cutter also left. The Alasha stayed until relieved by the U. B. B. Jamestown on June 14, 1879, when the Navy jurisdiction over Alaska commenced.
72. In the meantime, the year 1877 marked the first stirrings of new mining and fishing enterprises in southeast Alaska. In earlier years, placer gold in British Columbia had drawn miners up the Stikine Biver. Some of these miners had wintered at Wrangell. In May 1877, shortly before the Army withdrew from Alaska, a large party of miners left Sitka by chartered steamer to explore the interior by way of the headwaters of Lynn Canal. At a Chilkat village, the Indians so opposed the miners that they turned back. In the summer of the same year, the first fish cannery in southeast Alaska was constructed at Klawak, and commenced operating, as well as a second cannery at Sitka. Miners began working Schuck Creek at the head of Wynd-ham Bay and extended their prospecting more widely throughout the area. In 1879, an enterprise for the extraction of herring oil and the manufacture of fertilizer was commenced at Killisnoo. By 1879, the Secretary of the Treasury recommended to the United States Senate legislation for the protection of the inhabitants of Alaska and also “the necessity for some system of land records in that Territory by which titles to real estate may be perfected.”
The United States Navy — 1879-1881/..
73. In June 1879, Commander Beardslee, U. S. N., arrived in Sitka in command of the naval ship Jamestown. His arrival had been directed by the Secretary of the Navy in response to appeals from Sitka, as set forth in findings 70 and 71, for protection against a threat of an Indian uprising. Commander Beardslee had authority to act as he saw fit to establish and keep peace. From his arrival at Sitka until *403 the arrival of the first Governor of Alaska in September 1884, Commander Beardslee and his naval successors conducted, under this broad discretionary authority, a civil and military government in southeast Alaska.
74. The 1880 census reported a population for southeast Alaska of 7,225 Tlingit and Haida Indians, 230 creoles and 293 whites. The evidence strongly indicates, however, that the figures for whites and creoles were understatements by approximately 200. Of the 293 whites and 230 creoles reported in the official census, all but 34 were shown to be residents of Sitka or Wrangell. Up to that year, the fur trade had constituted the principal commerce between the Indians and the whites. The Indians took a substantial part of these furs to the Hudson’s Bay Company posts in British Columbia. Another part was traded at Sitka. The Indians sold most of the rest to American traders whose boats frequented the waterways of southeast Alaska during the summer months. Prior to 1880, except for this fur trade, Indian contacts with the whites were confined largely to the settlements at Sitka and Wrangell, to miners prospecting the country or traveling to the interior, and to the canneries at Klawak and Sitka. Up to that year, movements of white men into Tlingit and Plaida territory to use or occupy the area had been negligible.
75. The rich deposits of gold-bearing quartz at what is now Juneau were discovered late in 1880. By May 1881, the town of Rockwell (now Juneau), had attracted a population of about 150 miners. The following year the white population of southeast Alaska was between 1,000 and 1,500, the increase being largely due to the interest aroused by the gold discoveries. At the same time, the new fisheries at Klawak and Sitka attracted other fisheries, and by 1883, a fishing station was operating at Cape Fox, and two additional canneries at Pyramid Harbor. By 1883, the mineral and fish resources within southeast Alaska, and to a lesser degree the timber resources, were becoming more widely known and were attracting new enterprises into the area.
76. During the years 1879-1884, the Navy commanders maintained peace by a combination of force and diplomacy. Early in his administration, Commander Beardslee noted *404 that the Indian tribes recalled with apprehension the destruction of the Kake village in 1869 as punishment for the murder by the Kakes of two white men. This action served as a constant and effective reminder of the military superiority of the United States and as a warning to the Indians to comply with the Government’s demands. This warning was repeated in 1882 when the revenue cutter Gor-win cannoned and burned the winter village and a summer encampment of the Angoon tribe, who were holding two white men prisoners and demanding compensation for the accidental killing of a member of their tribe. However, on most occasions, the naval commanders were successful in keeping peace through negotiations with the chiefs and leaders of the tribes. Very shortly after his arrival at Sitka, Commander Beardslee appointed the two principal chiefs of the Sitka tribe his head policemen for keeping peace within the tribe and with Sitka townspeople. This Indian police force was staffed by other leading men in the tribe. The recognition and enhancement thus given the authority of the tribal chiefs proved to be an effective means of keeping peace. In later years, similar Indian police forces were established in other tribes. In 1880 Commander Beardslee obtained an agreement of the Chilkat chiefs to allow miners to pass through their territory to prospect. The prohibition of this tribe to the whites’ entering their territory, a prohibition which had theretofore always been strictly maintained, was thus removed. In a letter of May 20,1880, to the chiefs, Beardslee noted their “invitation to the white men to come and prospect your country.” Beardslee had attributed this policy of the Indians of preventing whites from penetrating into the interior as constituting one of the reasons why more whites did not come to Alaska. Beardslee also secured an agreement from the IToonah tribe that avoided a war against the Tsimshian Indians of British Columbia who had raided the Hoonah sea otter hunting reefs. In addition, he negotiated a peace between the Angoon and Stikine tribes. In March 1880, Commander Beardslee officially reported that “* * * the Indians throughout Alaska have kept their promises to me, and have remained on harmonious terms with each other and with the whites.”
*405 77. Commander Henry Glass succeeded Commander Beardslee. He continued the making of agreements with the chiefs of the various tribes for the purpose of keeping peace. These included settlements of long standing feuds between the Auk and Hoonah tribes, the Stikine and Hut-snuwu tribes, and the Stikine and Sitka tribes. In a formal treaty of peace between the Stikines and Hutsnuwus, dated March 26,1881, it was agreed that the natives of each tribe “shall be free to travel, hunt, or fish in the territories of either, and shall be under the protection of the head chiefs of the tribes.” Under his command the Indians were moved out of the area occupied by the new mining town of Rockwell, the Indians on this occasion being paid compensation which was described by the officer in charge of the removal operations as “indemnity money raised by the white men as ground damages.” These arrangements alone, however, were not considered sufficient to keep peace at Juneau, and a military post was established in the town. By these means, the naval commanders kept peace and overcame the opposition of the Indians to the intrusions of the new mining enterprises in southeast Alaska. In a formal report dated June 6, 1881 to the Secretary of the Navy, Glass noted changes in some of the Sitka Indians’ maimer of living. One change mentioned was “the breaking up of the communal system of living, practiced by all the Indians of Alaska. This is evidenced by the number of small houses that have been built by the Indians since March. There are now in the village, finished, or in course of construction seven houses, all smaller than the older ones, each new house being evidently intended for a single family, a condition of affairs which I am informed did not exist in former years.”
78. Except for the new mining enterprises at Rockwell, the fishing station at Cape Fox, and the two canneries at Pyramid Harbor, there were no significant new entries by the whites into southeast Alaska during the period of naval rule from 1879 to 1884. The only places of appreciable white population during these years were at Sitka, Rockwell (Juneau) and Wrangell. However, aside from these very limited areas, the Tlingit and Haida Indians continued during this period to use and occupy their remaining areas and *406 to exploit the resources of such areas in their accustomed manner without interference and without restriction. The Tenth Census of the United States taken in 1880, referred to in finding 74, reported 12 Tlingit tribes, and the Haidas, constituting the same tribes as are listed in finding 25 with the exception of the Kuiu, and comprising in all, 6,437 Tlingit and 788 Haida, living in over 40 settlements in various localities of southeast Alaska.
79. On his arrival at Sitka, Commander Beardslee found that one of the first services demanded of him was to represent to Washington the great need for a method by which the settlers, miners and others could acquire titles to their homes. No such method was at that time available. However, the Secretary of the Navy advised: “Whether parties whose claims are recorded by the collector get their titles hereafter must depend upon what Congress may do in regard to this matter.” The pressures upon the Congress to provide a system of law and of land titles gradually increased. However, no action was taken by Congress, and no significant change was made in the Government’s administration of Alaska, until enactment of the so-called Organic Act of May 17, 1884, providing an executive and a judicial branch of government for Alaska.
THE PERIOD SUBSEQUENT TO 1884

The Organic Act of May 17,1884/ the Establishment of an Executive and Judicial Branch of Government for Alasita.

80. In 1882, the House Committee on the Territories, 47th Congress, 1st Session, reported a bill, H. B,. 5900, to provide a limited form of government for Alaska. The committee report stated in part: “We cannot expect our people to go there [Alaska] and live and develop the country until we give them some law by which they can acquire and hold property, and which will protect them in their lives and liberty.” No final action was taken on this bill, which was the same fate that 25 bills of similar purport introduced since 1869 had met. However, S. 153 was enacted and approved on May 17,1884, and became the first Organic Law for Alaska. This act of May 17, 1884 (23 Stat. 24), entitled “An act *407 providing a civil government for Alaska”, and commonly referred to as the Organic Act, provided an executive and judicial branch of government for Alaska, with the temporary seat of the government established at Sitka. It made provision for appointment by the President of a governor, a district attorney, a marshal, a judge, a clerk and 4 court commissioners, and for 4 deputy marshals to be appointed by the marshal. It extended the laws of Oregon, insofar as not inconsistent with those of the United States, to Alaska. It established a land office and assigned to the clerk and commissioners duties of recording titles and other interests in real and personal property. The governor was made the executive head of the government with functions separate from the judicial branch. By these means, the Congress gave to Alaska an executive head, a judicial organization, a system of laws for the arrest and punishment of criminals and the enforcement of civil rights, and a mechanism whereby citizens of the United States were enabled to record, preserve and transfer their claims to land and other resources in southeast Alaska.
81. Section 8 of said Organic Act of May 17, 1884, provided :
seo. 8. That the said district of Alaska is hereby created a land district, and a United States land-office for said district is hereby located at Sitka. The commissioner provided for by this act to reside at Sitka shall be ex officio register of said land-office, and the clerk provided for by this act shall be ex officio receiver of public moneys and the marshal provided for by this act shall be ex officio surveyor-general of said district and the laws of the United States relating to mining claims, and the rights incident thereto, shall, from and after the passage of this act, be in full force and effect in said district, under the administration thereof herein provided for, subject to such regulations as may be made by the Secretary of the Interior, approved by the President: Provided, That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: And provided further, That parties who have located mines or mineral privi *408 leges therein under the laws of the United States applicable to the public domain, or who have occupied and improved or exercised acts of ownership over such claims, shall not be disturbed therein, but shall be allowed to perfect their title to such claims by payment as aforesaid: And provided also, That the land not exceeding six hundred and forty acres at any station now occupied as missionary stations among the Indian tribes in. said section, with the improvements thereon erected by or for such societies, shall be continued in the occupancy of the several religious societies to which said missionary stations respectively belong until action by Congress. But nothing contained in this act shall be construed to put in force in said district the general land laws of the United States.
Section 12 of the act provided:
sec. 12. That the Secretary of the Interior shall select two of the officers to be appointed under this act, who, together with the governor, shall constitute a commission to examine into and report upon the condition of the Indians residing in said Territory, what lands, if any, should be reserved for their use, what provision shall be made for their education what rights by occupation of settlers should be recognized, and all other facts that may be necessary to enable Congress to determine what limitations or conditions should be imposed when the land laws of the United States shall be extended to said district; and to defray the expenses of said commission the sum of two thousand dollars is hereby appropriated out of any moneys in the Treasury not otherwise appropriated.
Thereafter, in the subsequent administration of the act, the rulings of the United States Land Office permitted miners to locate, work, perfect and patent mining claims in areas which the Tlingit and Haida Indians aboriginally used and occupied. The Organic Act of May 17,1884, as well as subsequent acts of a similar nature, such as the act of June 6,1900, referred to below, was applied to protect and reserve from the extension of the mineral and other land laws only home or village sites, garden patches, and other similar locations actually and visually occupied or improved by one or more individual Indians.
Sections 26 and 27 of the act of June 6, 1900, 31 Stat. 321, 329-330, entitled “An Act Making further provision *409 for a civil goyernment for Alaska, and for other purposes,” provided as follows:
sec. 26. The laws of the United States relating to mining claims, mineral locations, and rights incident thereto are hereby extended to the District of Alaska: * * #
seo. 27. The Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands now actually in their use or occupation, * * *.
It is plaintiffs’ contention that the United States, by the Organic Act of May 17, 1884, gave to miners and mining enterprises the right to secure for their own use the precious metal resources within southeast Alaska; that the act gave legal validity to mining claims that had been earlier located and recorded in the customs house at Sitka and in the local records at Juneau; that it gave assurance of the establishment of a means for perfecting title to mining claims thereafter to be located and worked in southeast Alaska; that the extension of the mining laws to Alaska by the act was made subject to the limitation, among others, that the Indians were not to be disturbed in their possession of any lands “actually in their use or occupation or now claimed by them”, but that the administration of the act disregarded lands and waters over which the Indians held claims to possession arising out of aboriginal use or occupancy, giving protection only to lands in which there was visual and actual permanent occupancy; and that Congress, by the act of June 6, 1900, in removing from the Organic law provision applicable to mineral lands in Alaska the limitation that might have reserved land “now claimed” by the Indians from entry, finally confirmed and ratified the administrative construction of the Organic Act of May 17,1884.
82. In 1885, the mill at Juneau produced approximately $115,000 in gold bullion in the two months of July and August. By 1888, this mill, by then the largest of its kind in the world, had an output of approximately $150,000 in gold bullion each month. By that time, sales of gold mining properties in the Juneau area had been made to eastern and European investors, one such transfer being made for a consideration named in the deed of $1,500,000.
*410 83. After a civil government had been established in southeast Alaska under the Organic Act of May 17, 1884, a substantially larger number of persons established homes and businesses in southeast Alaska. In so doing, they staked, posted and recorded their claims to town lots, mineral, fishing and other commercial or business locations. These recorded squatters’ claims became the basis for various property and business interests. In the towns and settled areas, the population increased, as did the kinds and numbers of business establishments. By 1886, Juneau had a white and creole population of approximately 1,500, Sitka 600, Douglas Island 500, Wrangell 150, and Killisnoo 150. Governor Swineford, the second Governor of Alaska, described Juneau in 1887, as “a most active, prosperous town, with a dozen or more general merchandising establishments, churches, newspaper, theatre, water-works, etc.” The Governor reported the recording of large numbers of claims. These included squatters’ claims recorded by the canneries to secure their use of salmon streams. In his annual report of October 1, 1888, Governor Swineford reported:
* * * One party, for instance, ignoring in the first place any rights the natives might naturally claim, assumes to take complete and exclusive possession of a fishing station at the mouth of some river, on each side of which he stakes out and claims 80 acres, which claim he causes to be recorded. The object is, of course, to keep others away, notwithstanding it may be a stream in which the run of salmon is large enough to supply the raw material for several canneries. While the making and recording of such a claim does not, of course, invest the claimant with any legal title whatsoever, his right to possession can only be disputed by the Government, and the next person who comes along in quest of a location for a cannery, though he need not be told that the original claimant can not legally prevent him from taking possession of any part of the land in question not actually occupied, prefers to avoid possible trouble and moves along in search of some other stream, finding which, he, too, proceeds to claim, and, if possible, occupy enough of it to exclude all who may come after. * * *
The Governor urged the extension of the land laws to Alaska as a means of obtaining title to property. He stated:
*411 With the exception of the twenty-one fee-simple titles referred to, which were originally given to its employes by the Russian-American Company and afterward confirmed by the prococol [sic] executed by the commissioners of the two countries at the time of the transfer, and claims taken up and recorded under the provisions of the general mining laws, all settlers on public lands in Alaska are mere squatters, awaiting impatiently such legislation by Congress as will enable them to secure titles. There are now seventeen salmon canneries and as many more fish-salting establishments in the Territory, with many more in contemplation, an oil factory, sawmills, wharves, etc., all located or to be located on the public lands, while none of the many hundreds of actual settlers who have built homes for themselves in the several villages and settlements are able to obtain titles to the lots they have occupied and improved. Juneau City, a thriving town, with a dozen or more general stores, with schools, churches, newspapers, etc., presents an instance in this connection where hundreds of thousands of dollars have been expended in laying out and clearing up a town site and in building upon and improving grounds to which the occupants have no established title, and can not 'have any until Congress sees fit to extend to the Territory at least some of the provisions of the general land laws. In the matter of the occupation of fishing stations along the coast and on the islands, as well as in the laying out and building up of new towns, serious legal complications are certain to result from a further withholding of the means by which legal titles can be secured, the future adjustment of which will, with almost equal certainty, entail large expense both upon the Government and contesting claimants. I respectfully venture to suggest that while the rapid settlement of the public lands is not to be expected so long as the ways and means of obtaining titles are withheld by the Government, the continued withholding of the land laws is in other ways a hindrance to the settlement of Alaska and the consequent development of her resources. * * *
Governor Knapp, in his annual report dated October 1,1889, reported that 11 sawmills were in operation in southeast Alaska and that at least 36 salmon canneries were in operation, 19 of these canneries having been built and put into operation since the last season. The report of the 1890 census stated that fishing stations in southeast Alaska were *412 located at nearly every point that afforded a supply of fish sufficient to warrant the investment of capital. By that date the fishing stations in southeast Alaska represented a capital investment in plants and buildings of approximately $309,-000, and employed an estimated 1,000 men.
All these activities naturally had an effect on the natives and their ways of life. In his annual report of October 15, 1900, Governor Brady stated:
NATIVES
The third article of the treaty has this clause:
The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country.
It is now thirty-three years since Alaska was transferred under this treaty. These people have not been standing still. The missionaries have come among them and they have made great progress in the arts of peace. They are now and always have been and, if no unwise course is taken will continue to be, a self-supporting people. In no wise have they been a burden since our occupation began. Whole communities have pretty well abandoned the old style of living. Instead of the old communal house made of immense timbers and erected under prescribed rules and a costly ceremony, and which was to contain at times as many as ten or twelve families which were subject to the hit-sahtee or boss, they are now building frame houses, and most of them small ones, wherein a single family dwells.
The old-fashioned trader with his stock of blankets, Hudson Bay muskets, bullet molds, powder, flints, traps, red paint, etc., no longer exists. They wear clothes like the whites, and the younger people are generally well dressed. * * * They are on the upward tendency. They love to accumulate money and all have a natural ability to trade. The men engage in the hardest kind of labor. They become good miners, and very many of them follow this business. Others work in the canneries and in logging camps and in sawmills. * * * During the whole Russian regime they were very little interfered with and they lived under their own rules and customs, exacting an eye for an eye and a life for a life.
Under their tribal laws the whole country was divided between the different families for fishing and *413 hunting. Near the mouth of a stream they would build a lodge more or less substantial, where they would dry their fish and venison and pick berries and enjoy life during the summer and fall. Toward winter they would begin to gather in their villages, where their large communal houses were built. Here they spent their time in dancing and feasting in a truly barbaric manner. All this has largely changed and is changing rapidly. These people find the whites crowding into the country. They locate mining claims and build quartz mills. The bears and deer are frightened away. The fish men come in great ships. They erect immense structures which they fill with busy Chinamen. They start out steamboats and tugs and all kinds of craft with all kinds of gear to catch salmon. This is going on rapidly, and the native finds that the white man is greedy. He often does not care whether the native gets enough fish from his ancient stream for his winter food. They come to the civil and military officers and make complaint and want to know what their rights are. * * * They are becoming uneasy. The Chilcats once had a lucrative fur trade beyond the Chilcoot pass. It is gone. Skagway, Dyea, and Haines have sprung up, and the miners are tearing up the earth on the Porcupine beyond Cluckwan. Two canneries in their midst this year have put up 85,000 cases of salmon. They want to know whether they can take up mining claims and secure the lands near fishing streams; whether their young men can become steam engineers and pilots like white men. * * * The time has arrived for Congress to take action. It should remember that the reservation system has not worked well and has wrought mischief. It would not be good policy to introduce it into Alaska, where the people are self-supporting and of keen commercial instincts. * * *
It is plaintiffs’ contention that “squatters’ title” was legally valid against all adverse claimants except only the Government, that such title assisted the building of towns and related businesses and the development of the fishery resources of the area, and that in this manner, following establishment of civil government for Alaska under the Organic Act of May 17,1884, the officers and agents, and the regulations and procedures, of the government in Alaska assisted and encouraged citizens of the United States to use parts of the lands and resources in southeast Alaska without regard for any claim that any Indian tribe had, or might have had, to *414 such land and resources arising out of aboriginal use or occupancy.
84. The Commission created under section 12 of the Organic Act of May 11, 1884, the provisions of which are set forth in finding 81, with Governor Kinkead as its chairman, transmitted its report to the Secretary of the Interior under date of June 30, 1885. The Commission’s report covered only southeast Alaska. The report described the condition of the Tlingit and Haida Indians, their advance toward a civilized way of life, the means at hand for their government, and their needs for education and medical help. The portion of the report that related to the land claims of Indians and settlers was as follows:
The General Land Laws of the United States should be extended over the Territory as early as possible. The Natives claim only the land on which their houses are built and some garden patches near their villages; they ask or expect nothing more. A deed for their lots in severalty would be a very highly prized document by them. The fisheries occupied by them before the advent of the Whites should also be secured to them against encroachment. They ask only the same rights and protection given the White man.
The majority of the houses here (Sitka) and in other places owned and occupied for many years by Russians, Creoles and others, do not carry with them the fee to the land. The title in these cases we think should be perfected by the Government without cost to the owners. The lots are of little present value, the occupants generally very poor.
We believe it the interest of the General Government to encourage by liberal enactments the occupation of the country by bona-fide settlers that will open and develop its resources.
Timber lands should be open for sale in large tracts at a price not much above the cost of surveying. These lands are generally situate on high, precipitous mountains, expensive to utilize and a considerable portion of them useless for lumber.
Goal lands should also be sold at a low price. The difficulty and expense attending the development of this important industry needs every encouragement by the Government.
In brief “all limitations and conditions imposed by Congress, when the Land Laws of the United States *415 are extended to this District”, should be of the most liberal character.
85. The view indicated in the Kinkead report that there should be secured to the Indians, severally, as well as to resident whites, limited or improved tracts of land, such as house sites, garden patches, and fishing sites in their actual and visual occupancy, and that the remaining territory be opened to settlement to Indians and whites by extension of the general land laws of the United States and without regard to aboriginal Indian use and occupancy was, in substance, reiterated in the reports of each of the first three governors of Alaska. Each of these governors emphasized the necessity of extending to Alaska the general land laws of the United States as a prerequisite to the development of the territory and its resources. Governor Kinkead wrote in his first report dated October 1,1884:
At present there is no title to land in the District, and provision should at once be made that there should be. Timber tracts, building lots, agricultural areas, and mining claims should at once be subject to legal titles, that may be claimed, by the natives and the whites. Without such legal title to property, progress in the direction of advancement will be slow and very uncertain.
In addition to the statements set forth in finding 83, Governor Swineford (1885-1888) stated:
* * * Placed on the same plane with other Territories with * * * the public domain within her borders opened up to settlement through the operation of the general land laws, her natural resources will be rapidly developed and made to add immeasurably to the wealth of the nation; otherwise progress in that direction must necessarily be slow, tedious, and unsatisfactory.
Governor Knapp (1889-1895), in his first annual report, summarized his views on this matter as follows:
There should be provision for the extension of a modification of the land laws to Alaska, so that titles may be acquired by pre-emption, or otherwise, to homesteads, mill sites, small farms for agricultural and horticultural purposes, and to lots in town sites; also for the assignment in fee simple of lands, fishing grounds, and town lots, to the natives without purchase.
*416 The Aet of March ¿¡, 1891 — Townsites and Industrial Sites.
86. With respect to townsites, section 11 of the act of March 3,1891, 26 Stat. 1095, entitled “An act to repeal timber-culture laws, and for other purposes”, read as follows:
sec. n. That until otherwise ordered bj Congress lands in Alaska may be entered for town-site purposes, for the several use and benefit of the occupants of such town sites, by such trustee or trustees as may be named by the Secretary of the Interior for that purpose, such entries to be made under the provisions of section twenty-three hundred and eighty-seven of the Revised Statutes as near as may be; and when such entries shall have been made the Secretary of the Interior shall provide by regulation for the proper execution of the trust in favor of the inhabitants of the town site, including the survey of the land into lots, according to the spirit and intent of said section twenty-three hundred and eighty-seven of the Revised Statutes, whereby the same results would be reached as though the entry had been made by a county judge and the disposal of the lots in such town site and the proceeds of the sale thereof had been prescribed by the legislative authority of a State or Territory: Provided, That no more than six hundred and forty acres shall be embraced in one townsite entry.
It is plaintiffs’ contention that, by this provision, the United States extended to inhabitants of southeast Alaska the means for acquiring title to townsite lands in southeast Alaska; that, in extending this right, the United States did not protect or reserve from the application of this law any land claimed by any Indian tribe by reason of any right, title or interest arising from aboriginal use or occupancy, and that, instead, the law was made to apply to the settled lands in southeast Alaska in derogation of aboriginal Indian title.
87. Sections 12,13 and 14 of said act of March 3,1891, with respect to industrial sites in Alaska, read as follows:
sec. 12. That any citizen of the United States twenty-one years of age, and any association of such citizens, and any corporation incorporated under the laws of the United States, or of any State or Territory of the United States now authorized by law to hold lands in the Territories now or hereafter in possession of and occupying public lands in Alaska for the purpose of trade or manufactures, may purchase not exceeding one hundred and sixty acres to be taken as near as practi *417 cable in a square form, of such, land at two dollars and fifty cents per acre: Provided, That in case more than one person, association or corporation shall claim the same tract of land the person, association or corporation having the prior claim by reason of possession and continued occupation shall be entitled to purchase the same; but the entry of no person, association, or corporation shall include improvements made by or in possession of another prior to the passage of this act.
sec. 13. That it shall be the duty of any person, association, or corporation entitled to purchase land under this 'act to make an application to the United States marshal, ex officio surveyor-general of Alaska, for an estimate of the cost of making a survey of the lands occupied by such person, association, or corporation, and the cost of the clerical work necessary to be done in the office of the said United States marshal, ex-officio surveyor-general; and on the receipt of such estimate from the United States marshal? ex officio surveyor-general, the said person, association, or corporation shall deposit the amount in a United States depository, as is required by section numbered twenty-four hundred and one, Revised Statutes, relating to deposits for surveys.
That on the receipt by the United States marshal, ex-officio surveyor-general, of the said certificates of deposit, he shall employ a competent person to make such survey, under such rules and regulations as may be adopted by the Secretary of the Interior,, who shall make his return of his field notes and maps to the office of the said United States marshal, ex-officio surveyor-general; and the said United States marshal, ex officio surveyor-general, shall cause the said field notes and plats of such survey to be examined, and, if correct, approve the same, and shall transmit certified copies of such maps and plats to the office of the Commissioner of the General Land Office.
That when the said field notes and plats of said survey shall have been approved by the said Commissioner of the General Land Office, he shall notify such person, association, or corporation, who shall then, within six months after such notice, pay to the said United States marshal, ex officio surveyor-general, for such land, and patent shall issue for the same.
seo. 14. That none of the provisions of the last two preceding sections of this act shall be so construed as to warrant the sale of any lands belonging to the United States which shall contain coal or the precious *418 metals, or any town site, or which shall be occupied by the United States for public purposes, or which shall be reserved for such purposes, or to which the natives of Alaska have prior rights by virtue of actual occu-gation, or which shall be selected by the United States ommissioner of Fish and Fisheries on the island of Kadiak and Afognak for the purpose of establishing fish-culture stations. And all tracts of land not exceeding six hundred and forty acres in any one tract now occupied as missionary stations in said district of Alaska are hereby excepted from the operation of the last three preceding sections of this act. No portion of the islands of the Pribylov Group or the Seal Islands of Alaska shall be subject to sale under this act; and the United States reserves, and there shall be reserved in all patents issued under the provisions of the last two preceding sections the right of the United States to regulate the taking of salmon and to do all things necessary to protect and prevent the destruction of salmon in all the waters of the lands granted frequented by salmon.
The limitation contained in this law reserving lands “to which the natives of Alaska have prior rights by virtue of actual occupation,” as was true of the earlier Organic Act, has been consistently construed and applied by the officers and agents of the United States to reserve to the Indians in southeast Alaska only home or village sites, garden patches, and other similar locations actually and visually occupied by one or more individual Indians, and improved with buildings and structures, or cultivated.
It is plaintiffs’ contention that, by sections 12, 13, and 14 of said act of March 3, 1891, the United States extended to its citizens and to corporations organized under its laws and the laws of its territories the means of acquiring title to industrial sites in southeast Alaska, and that, in extending this right to its citizens and corporate entities, the United States did not protect or reserve from the application of this law any land or waters then or thereafter claimed by an Indian tribe by virtue of any right, title, or interest arising from aboriginal use or occupancy.

The Metlahahtla Reservation.

88. About 1860, William Duncan, an English missionary, established at Metlakahtla in British Columbia a Christian community of Tsimshian Indians. Under Duncan’s leader *419 ship, the community prospered. The Indians built individual homes and learned many arts and crafts of the white man’s civilization. The community established its own stores and industries and became a trading rival to the Hudson’s Bay Company. After 25 years, the success of the community at Metlakahtla was widely known among whites and Indians in British Columbia and southeast Alaska. At the same time, Duncan encountered increasing ecclesiastical difficulties as well as from government authorities in British Columbia. ITe came to the United States, and in 1887 visited Washington, seeking for his colony a home in southeast Alaska. He sought to purchase an area of land for this purpose, but ascertained that there was no law which authorized such a sale, no land laws having been as yet enacted for Alaska. In Washington, Duncan was advised by high officials in the executive branch of the Government, including the Secretary of the Interior and the Attorney General, that he and his people could go to Alaska and obtain, as individuals but not as a colony, squatters’ rights to the land. He was encouraged by various government officials to do this. Accordingly, in the spring and summer of 1887, the Met-lakahtla Indians emigrated from British Columbia and settled on one of the group of Annette Islands in the southern part of southeast Alaska. They numbered about 800 Indians and came under the guidance of Duncan and his missionary staff. By 1890, the colony, called Port Chester, and also “New Metlakahtla”, consisted of between 150 and 200 log and wood frame homes with a well-equipped store, a salmon canning plant, a sawmill, a trade school, and a mission church.
89. Section 15 of the abovementioned act of March 3,1891, (26 Stat. 1095, 1101), set apart the Annette Islands as a reservation for use of the Metlakahtla Indians “and such other Alaskan natives as may join them.” This section read as follows:
That until otherwise provided by law the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon’s entrance, be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla Indians, and those people known as Metlakahtlans who have re *420 cently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior.
It is plaintiffs’ contention that, in setting apart these islands for these Indians that had emigrated from British Columbia, the United States made no provision to protect or reserve any right, title, or interest that any Tlingit or Haida Indian tribe might have, or claim to have, to the Annette Islands by reason of aboriginal use or occupancy.

Timber.

90. Section 1 of the act of June 3, 1878 (20 Stat. 88), entitled, “An act authorizing the citizens of Colorado, Nevada, and the Territories to fell and remove timber on the public domain for mining and domestic purposes”, provided as follows:
* * * That all citizens of the United States and other persons, bona fide residents of the State of Colorado, or Nevada, or either of the Territories of New Mexico, Arizona, Utah, Wyoming, Dakota, Idaho, or Montana, and all other mineral districts of the United States, shall be, and are hereby, authorized and permitted to fell and remove, for building, agricultural, mining, or other domestic purposes, any timber or other trees growing or being on the public lands, said lands being mineral, and not subject to entry under existing laws of the United States, except for mineral entry, in either of said States, Territories, or districts of which such citizens or persons may be at the time bona-fide residents, subject to such rules and regulations as the Secretary of the Interior may prescribe for the protection of the timber and of the undergrowth growing upon such lands, and for other purposes: * * *
Under this act, as it was made applicable to Alaska by the Organic Act of May 17, 1884, the commercial cutting of timber for export purposes out of the territory was prohibited.
91. In his annual report dated October 1, 1886, Governor Swineford reported:
*421 The industries of Alaska are as yet principally confined to the fur-trade, mining, and the curing and canning of fish — salmon, cod, and halibut, though there are a few mills engaged in cutting lumber for the supply of the domestic markets. The manufacture of lumber would ere this have become an industry of considerable importance but for the fact that, the general land laws not having been extended over the Territory, the title to timber lands cannot be secured, and operators are not permitted to export any part of their cut to points outside the Territory. Two vessels, with cargoes aggregating somewhere between half and three-quarters of a million of valuable lumber, cut at the mills on Prince of Wales Island, were seized by the United States authorities at San Francisco last spring on the strength of information furnished to the Department of Justice by the marshal of this district, and since then the owners of all mills in the Territory have, so far as I have been able to ascertain, confined their operations strictly within the law and the order of the Department relating to the cutting of timber on public lands for domestic and other uses. There are five mills in the Territory, the total cut of which probably will not exceed 2,000,000 feet, in view of the restrictions imposed upon them by law and the rulings of the Department.
The reports of the governors of Alaska over the following years reflect the burdens and restrictions upon the few enterprises in southeast Alaska that attempted to cut timber for commercial purposes. In 1887, the Governor again reported:
Though there are immense forests of timber in Alaska, much of it of excellent quality for house and ship building and other purposes, I know of only five or six sawmills in the whole Territory, and they not of sufficient capacity to supply more than half the lumber the home market calls for. This dearth of mills can readily be accounted for. The general land laws not being in force in the Territory it is impossible to secure title to timber lands, and the manufacturers of lumber, not being permitted to export any part of their cut, do not care to comply with the stringent regulations promulgated by the Department in relation to the cutting of timber on public lands, by which they are compelled to rely solely upon a market altogether too limited to justify the undertaking of even a single enterprise of the kind on a large scale. Until the timber lands of Alaska are *422 brought into market the manufacture of lumber in the Territory is not likely to become a very important or profitable industry.
In 1888, he repeated:
* * * Under existing conditions very few persons care to invest their means in the erection of lumber mills, the regulations made by the Department relative to the cutting of timber from the public lands for the domestic supply of lumber prescribing conditions which they think too ironclad, and as a consequence by much the larger half of the lumber consumed in the Territory is imported from Oregon and Washington Territory. That the timber of Alaska will ultimately come into recognition as a natural resource of very large importance is not to be doubted; but as long as the lands upon which it stands are kept beyond the reach of purchasers, comparatively little of it is likely to be made into lumber, the domestic supply alone being taken into consideration.
In 1889, Governor Knapp reported:
But while the forests, next to the water, constitute the most prominent feature of the country, and while they are filled with timber of the finest quality, and furnish lumber equal, if not superior, to anything imported into the district, it is a noteworthy fact that a considerable portion, perhaps the larger portion, of the lumber used here, especially for building purposes, is brought in from other jurisdictions, and prices are regulated by the market prices in Oregon and Washington Territory, adding thereto the tremendous freight bills of a transportation company which has no competition.
I have already barely alluded to the embarrassment caused by the timber law which allows no white person to lawfully use wood and timber from the public lands, even for domestic or other local purposes. If there were any provision for acquiring titles to land by purchase the situation would not be quite so serious; because then the lumber manufacturer might purchase timber lands and carry on his business within the pale of law, and at least have a feeling of self-respect and a sense of safety which he can not have when he knows he is subject to penalties of a broken law and is dependent upon the possible caprices of official favor. As the matter now stands all the land belongs to the Government, and it is inalienable under existing laws. Then penalties are prescribed for using the wood and timber. * * *
*423 In 1891, be again reported:
* * * Tbe lumber business bas been harassed by tbe unfortunate conditions of land titles and most of tbe lumber used bas been imported from the States. Those who have endeavored to supply the demand for it from tbe Territory are now involved in suits for timber depredations. * * *
Tbe “depredations” referred to consisted of 18 proceedings against sawmills in southeast Alaska, involving timber seized of a value of over $250,000.
92. Section 8 of tbe aforementioned act of March 3, 1891, as amended by an act of the same date (26 Stat. 1093), provided that in any prosecution or action by the United States for trespass on public timber lands in Alaska, or to recover timber cut on said lands, a showing that tbe timber was cut or removed for use in Alaska “by a resident thereof for agricultural, mining, manufacturing or domestic purposes, under rules and regulations made and prescribed by tbe Secretary of the Interior, and bas not been transported out of tbe same” shall be a defense. It is plaintiffs’ contention that the Organic Act of May 17,1884, provided to citizens of tbe United States and to settlers in southeast Alaska a limited permission to cut and use timber in southeast Alaska free of charge; that the aforementioned provisions of the acts of March 3, 1891, extended to citizens and residents in southeast Alaska an enlarged permission to so cut timber; and that this permission was enacted without any provision being made in the acts (or regulations thereunder) to protect or preserve any right, title, or interest that any Indian tribe might have or claim to have in the lands by virtue of aboriginal use or occupancy.
93. Section 11 of the act of May 14, 1898, “An Act Extending the homestead laws and providing for right of way for railroads in the District of Alaska, and for other purposes” (30 Stat. 409), provided:
sec. n. That the Secretary of the Interior, under such rules and regulations as he may prescribe, may cause to be appraised the timber or any part thereof upon public lands in the District of Alaska, and may from time to time sell so much thereof as he may deem proper for not less than the appraised value thereof, in such quantities to each purchaser as he shall prescribe, to *424 be used in tbe District of Alaska, but not for export therefrom. And such sales shall at all times be limited to actual necessities for consumption in the District from year to year, and payments for such timber shall be made to the receiver of public moneys of the local land office of the land district in which said timber may be sold, under such rules and regulations as the Secretary of the Interior may prescribe, and the moneys arising therefrom shall be accounted for by the receiver of such land office to the Commissioner of the General Land Office in a separate account, and shall be covered into the Treasury. The Secretary of the Interior may permit, under regulations to be prescribed by him, the use of timber found upon the public lands in said District of Alaska by actual settlers, residents, individual miners, and prospectors for minerals, for firewood, fencing, buildings, mining, prospecting, and for domestic purposes, as may actually be needed by such persons for such purposes.
It is plaintiffs’ contention that this section (and the regulations issued thereunder) likewise contained no provision to protect or reserve any right, title, or interest that any Indian tribe might have, or claim to have, in the timber or lands specified therein by virtue of aboriginal use or occupancy.
94. Section 24 of the aforementioned act of March 3,1891, provided:
_ That the President of the United States may, from time to time, set apart 'and reserve, in any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations, and the President shall, by public proclamation, declare the establishment of such reservations and the limits thereof.
Pursuant to the authority vested by said act, the President, by proclamations issued August 20, 1902, September 10, 1907, and February 16, 1909, reserved and set apart as a public reservation the major part of southeast Alaska, designated as the Tongass National Forest. All of these proclamations contained the following proviso:
* * * that this proclamation shall not be so construed as to deprive any person of any valid right possessed under the Treaty for the cession of the Russian posses *425 sions in North America to the United States * * * or acquired under any act of Congress relating to the Territory of Alaska.
The purpose of creating the Tongass National Forest Reservation was to protect and preserve the timber and to regulate and control its use so as to prevent exhaustion by reckless cutting.
It is plaintiffs’ contention that the authority of section 24 of the act of March 3,1891, pursuant to which the Ton-gass National Forest was created, was extended to the President without any provision being made to protect or reserve any right, title, or interest that any Indian tribe might have, or claim to have, in the lands by reason of aboriginal use or occupancy. They further contend that the proclamations setting apart this national forest reserve contained no provision to protect or reserve any right of any person or group of persons to lands within the reserve except only a “valid right possessed under the Treaty for the cession” of Alaska to the United States, or “acquired under any Act of Congress relating to the Territory of Alaska”, and that in this manner, the Tongass National Forest, encompassing most of southeast Alaska, was 'authorized and set apart in derogation of the aboriginal Indian title of the Tlingit and Haida Indians.

Homesteads.

95. Section 1 of the aforesaid act of May 14,1898 (finding 93) provided:
* * * That the homestead land laws of the United States and the rights incident thereto, ¡including the right to enter surveyed or unsurveyed lands under provisions of law relating to the acquisition of title through soldiers’ additional homestead rights, are hereby extended to the District of Alaska, subject to such regulations as may be made by the Secretary of the Interior; and no indemnity, deficiency, or lieu lands pertaining to any land grant whatsoever originating outside of said District of Alaska shall be located within or taken from lands in said District: Provided, That no entry shall be allowed extending more than eighty rods along the shore of any navigable water, and along such shore space of at least eighty rods shall be reserved from entry between all such claims, and that nothing *426 herein contained shall be so construed as to authorize entries to be made, or title to be acquired,, to the shore of any navigable waters within said District: And it is further provided, That no homestead shall exceed eighty acres in extent.
Section 10 of said act, provided in part that
* * * the Secretary of the Interior shall reserve for the use of the natives of Alaska suitable tracts of land along the water front of any stream, inlet, bay, or sea shore for 'landing places for canoes and other craft used by such natives: * * *.
It is plaintiffs’ contention that section 1 of said act and the subsequent amendments thereto, extending the homestead laws to Alaska, contained no provision to protect or reserve any right, title or interest that any Indian tribe might have, or claim to have, in any lands or waters by reason of aboriginal use or occupancy, and that said section 10 of the act constitutes an implicit recognition of the prior loss by the Tlingit and Haida Indians of their rights arising from such use and occupancy.

Indian Protests.

96. As set forth in finding 66, at councils of tribal chiefs in southeast Alaska, shortly after the transfer of Alaska to the United States, proposals of the more warlike chiefs to adopt aggressive measures to drive the Americans out of southeast Alaska were overridden. As also set forth in findings 74 and 78, the movement of whites into southeast Alaska prior to 1884 was slow. Apart from the settlements at Sitka, Wrangell and Juneau, the mining operations in the vicinity of Juneau, and a small number of fishing stations and trading posts, the use made by the whites of territory which the Tlingits and Haidas considered to be theirs was minimal and the interference with Tlingit and Haáda use and occupancy in the customary manner of these natives was negligible prior to 1884. Accordingly, with the exception of sporadic threats such as were made by the Sitkas after the withdrawal of the troops from southeast Alaska, referred to in finding 70, there was little occasion for significant protest or complaint by the Tlingit and Haida Indians during this period. Indeed, the Indians were able *427 to realize some benefit from the white man’s activities as a result of increased trading opportunities and employment at the fishing stations, settlements and trading posts. Furthermore, during this initial period, the Indians often insisted upon and obtained payments and other benefits from various uses made by the white men of territory which the Indians considered to be theirs. For example, when mining prospectors and others sought to move into or through tribal territory, the Chilkat tribe sought payment for such privilege and also charged fees for portaging miners and other persons. As found in finding 77, payments were made by the miners to the Indians removes, from their village on the occasion of the discovery and opening of gold mines in the vicinity of Juneau. When the early white fisheries were established, arrangements were made with the Indians that the fish would be purchased from them. However, during the years after 1884, when the white man’s uses of the waters and lands of southeast Alaska grew steadily more substantial and interfered with Indian uses, the Indians increasingly protested, many of the protests being of a formal nature. Some examples are set forth in the findings immediately following.
97. In 1884, and again in 1889, a missionary stationed with the Haidas wrote to the Secretary of the Interior concerning Indian complaints against the white man’s invasion of the fishing, hunting, and timber lands which the Indians claimed belonged to them. He inquired whether the Indians could come to Washington for a hearing concerning the alleged taking of their lands. In a letter of September 6, 1889, the Secretary of the Interior replied:
Eeferring to your letter of the 10th ultimo, inquiring what can be done for the protection of the native population of Prince of Wales Archipelago, particularly as concerns their timber, game and fishing interests and whether they can have Dahl Island as a reserve for deer, salmon and timber — I have to inform you that these matters all lie outside of the control of this Department and would be proper subjects for the consideration of Congress. I would suggest further that the proper channel of communication with Congress with a view to needed legislation for Alaska is through the Governor of Alaska.
*428 98. In 1890, the tribes of southeast Alaska employed an attorney, Willoughby Clark of Wrangell, who wrote to the President setting forth Indian complaints as to the white man’s usurpation of Indian fishing grounds as well as other grievances. The letter dated January 21, 1890, stated in part:
I have the honor to respectfully represent to your Excellency, that the Indians of South Eastern Alaska have during the past Summer and Autumn held many meetings — to some of which I have been invited — the object of which was to discuss the inadequate and peculiar position in which they find themselves, as regards their political and social relations, with the white-man and his laws.
They have selected Shakes hereditary and titular chief of the “Stickeens” or Wrangell Indians as their spokesman and General Chief fro tern and he authoritatively represents the many and scattered tribes that have taken part in the discussions. I have been employed by them as their Attorney and Counsel, to conduct their correspondence, and any negotiations that may be entered into between them and the Government. * * *
The object of this communication is to respectfully represent to your Excellency, that the Indians of South Eastern Alaska feel that they are, and wish to [be] legally designated a separate and distinct race for political and judicial purposes, and I am instructed to say, that they do not desire to be made wards of, or in any way a burden to, or a tax on, the Government, but they consider that they have some vested hereditary rights which they now seek to have recognized, and they have been assured that the Genius and Spirit of this Government is to respect all rights, — in the most extended sense of the term.
Briefly they ask
1st. That they be separated from Politics, considered infants under the law, and exempted from the operation of fish, game, timber and general land laws.
2nd. That they may be legally authorized to make their own laws for governance of their own local, and domestic affairs, and the punishment of minor offences. *****
4th. That their titles to their villages and garden patches be confirmed to them in severalty in fee.
5th. That their rights to their fishing streams be recognized or that they severally receive a quid fro quo for their relinquishment.
*429 This latter item may perhaps need some explanation.
Tonr Excellency is no doubt .aware, that into the network of channels, or arms of the sea, that distinguishes the South Eastern Coast of Alaska, empty innumerable fresh water streams, most of which are frequented annually by large quantities of Salmon, of different varieties. By mutual understanding, each family has the exclusive control of one, or other, of these streams. The salmon caught in these streams have for centuries constituted their staple Winters food. Their manner of taking the fish, though crude, was effective but not sufficiently so to diminish the supply, which under their system, has never been known to fail, and scarcely to fluctuate.
They now complain, that these alleged rights, are being usurped by white men, that the streams _ are being “fenced” so as to prevent the fish from ascending to their spawning grounds, and that in consequence, they are rapidly becoming exterminated. They think that if they are prevented from fishing these streams, and so cut off from their food supply, they should be compensated. *****
The Indians of S. E. Alaska are self supporting, thrifty and intelligent, and Chief Shakes is perhaps the most reliable one, from whom to obtain information. He is present as I write, and desires me to add that he will go to Washington if ordered to do, and that in any case he prefers dealing directly with Washington as for obvious reasons the officials cannot have an extended knowledge of their wants.
The letter was referred by the President to the Secretary of the Interior, to whom Clark wrote another letter on August 14, 1890, but the record does not indicate any reply from the Secretary to Clark’s letters.
99. In December 1898, John G. Brady, Governor of Alaska, held a meeting at Juneau with various Tlingit chiefs at their request, to hear their complaints. The meeting was in part arranged by a special agent of the General Land Office. Eight chiefs addressed the Governor and their statements were translated by a Government interpreter and stenographically recorded.
Among other things, a Stikine tribe chief stated that, because of immemorial use, the country belonged to the Indians; that the Bussians had not entered the interior, but *430 merely traded with, the Indians on the coast, but the Americans had now entered the country, built canneries, and took the salmon waters and the fur-trapping grounds from them. He asked for the return of the “creeks and the hunting-grounds that white people have taken away from us.” He stated “We do not ask the whole of Alaska. We simply ask the President to give us a ground where we can raise vegetables and places where we can hunt and prepare fish.” A chief of the Taku tribe stated that AJaska belonged to the Indians who had been there from time immemorial, but “we are perfectly willing to give this country Alaska to you.” However, he too asked for the return of their fishing creeks and hunting grounds, and stated that “the Thlingit are getting poor because their ground is taken away from them. We ask you to give to the Thlingit the places that brought us food.” A Hoonah chief repeated the Indians’ belief that “Alaska belongs to us. In all this country longtime ago before we ever saw white men, our fathers and grand fathers told us we owned it.” He complained that they had always had possession of the rivers and creeks “and different places” but the white men had taken them from the Indians. “We make our living by trapping and fishing and hunting and white men take all those places away from us; they constantly interfere with us.” He too asked for a return of their waters and hunting grounds, but that if the white men “should like to take possession of any of those places, we should like to ask you to tell them to not take them for nothing, but to pay for them.” Another Taku chief complained that the Russians had not taken the Indians’ lands, as had the Americans. He said that the whites had interfered with the salmon run up the Taku River where his people had traditionally fished. “If I was living at Taku now I think I would starve * * *. The white men here sell our ground to other white people and we have a great deal of trouble about it.” A chief from Juneau stated that when the Treadwell Gold Mining Company on Douglas Island “want the ground they simply move us from one place to another. Now our people had several creeks around here where they used to prepare food for the winter. Now all the creeks are claimed by the company.” Another Juneau *431 chief stated that when the whites first came to Alaska “we were glad to see them. We knew they would give us work to do.” He stated, however, that although the whites employed them for a short time, “then all at once we find out that great many white people rushed here and took our work * * and that subsequently the whites even took their fishing and hunting grounds. He suggested that it might be best if the Indians were provided with reservations, such as the Metlakahtla Reservation at Port Chester.
Following the statements by the chiefs, Governor Brady made an address to the Indians wherein he stated, among other things, that under the treaty with Russia, it was provided that the Indians would be subject to the “land laws and regulations as the United States may choose to adopt”; that the United States had treated the Indians kindly, and that the condition of many of them were greatly improved over the savage state in which they had been under the Russians. “I know that the Thlingit are better off today than they ever were before in their lives.” The Governor further stated:
* * * Now the United States after it bought Alaska did not pass any laws for a number of years. They simply sent soldiers here. I often think a wrong was done to the Thlingit. It was not until 1884 that the United States made a civil law for Alaska but it was very careful in that law to say that any lands occupied by natives or claimed by them should not be disturbed in their possession. Now it is my duty; it is the duty of every Government official to see that that law is obeyed. But I am afraid that the Thlingit are entertaining wrong notions of how much land they own. Right here they need a little instruction. Koogh-see he has been down below and has seen fruit and vegetables growing. * * * Those places that he saw and admired so much is the result of a great deal of work. * * * Now if any Thlingit in this country goes and does like wise and by his labor makes fence, improves ground and builds a house, it is the duty of every official to see that he is undisturbed.
Now it is a different thing if there is a stream here and the ground around it. The Indian cannot claim the whole district. * * * The Government does not for a moment recognize all that ground his. The Government so far has sold very little ground in Alaska. The *432 laws remain yet to be made. We bare a mining law that has been in use in Alaska and any body can buy any placer or quartz mine. Any body can buy a mine. But the law of other kinds of land is not in force yet. And that is why it is important that we have an understanding with the Thlingit. The question is, Do you wish to be put on an island and not abandon your old customs? Do you wish to be citizens of the United States and have their protection? It is for you to say. Shall we, for instance, take a large island like Admiralty island * * *. Shall we take the different tribes and place them on the island and let them live by themselves and not be disturbed and have agents over them to keep them straight? Or do you wish to obey the white men’s laws; have all the privileges that he has. Which do you want?
It says in this law that the uncivilized natives will be under the laws of the uncivilized tribes in this country. The laws that will be passed by Congress will depend very much what Mr. Grygla, [the special General Land Office agent] myself and others will recommend. This is plain talk and I hope they have not misunderstood me. * * * I am satisfied that wrongs have been done by fishermen in canneries by darning [sic] up streams, but we could not get vessels to go around to them. They will be protected as far as the fish is concerned.
;Jc % sf: sfc
* * * Now I propose to help them [the Indians] all I can. They will get their rights and if any appropriates a piece of land I will see that he holds it. If they want to become citizens of the United States then I will advocate that. If they do not want that and want to be put off on some island by themselves I will do that. But the time has come; it is now the turning point in their lives as a people; * * *.
The transcript of the statements of the Tlingit chiefs and Governor Brady’s address to them were forwarded to the Commissioner of the General Land Office by the special agent. In forwarding the transcript, the agent reported that the Tlingits had been seriously restless and dissatisfied before the meeting but agreed to wait the “orders the Governor will bring them * * * from the President in answer to their grievances submitted herewith.” The Commissioner of the General Land Office forwarded the transcript to the Commissioner of Indian Affairs, who in turn referred the tran *433 script to the Secretary of Interior and stated, among other things, that his office “has never felt warranted in extending its jurisdiction over the Indians of Alaska, because there has been no specific authority for so doing and, further, because from its knowledge of the character and condition of said Indians there was not thought to be any occasion for such action;” that the “Indians of Alaska are now regarded as citizens the same as white residents of that Territory, and have been similarly treated and subject to its laws;” that “it would be a grave mistake and a backward step for the Indians to create reservations in Alaska, and to collect thereon the Indians of that Territory under the system of tutelage and dependence. The Alaska Indians * * * have proven their capacity and have clearly shown their ability to make a living alongside of their white neighbors * *
100. In 1899, the chiefs of certain of the tribes of southeastern Alaska selected Chief Johnson of the Taku tribe as their representative to go to Washington, D. C., and deliver a message on behalf of the Indians. The message was delivered to John M. Thurston, Chairman of the Senate Committee on Indian Affairs, who referred it to the Secretary of the Interior with a request for a report thereon. The message read in part as follows:
I have come a long ways from my home in Alaska to see you and tell you of the condition of my people. I was sent here by the Chiefs of the principal tribes to represent them, and have brought with me a petition signed by them.
We find our country Alaska over run by white men who have crowded or driven the Indians from their fishing grounds, hunting grounds, and the places where their fathers and grand fathers have lived and been buried.
Russia came and took possession of our land without consulting the natives of Alaska, the real owners of the country, and later on sold it to the United States. The Indians never knew anything about this sale until years afterwards, altho’ it was our land and country which was sold. We_ have never tried to make any trouble over it, and this is the first time we have ever brought the matter to the Washington Government to consider, altho’ Russia stole our country and sold it to the U. S.
We do not ask anything unreasonable of the U. S. government. We do not ask to be paid for the lands *434 which, were ours by rights. We do not ask that the whites be prevented from coming to Alaska.
We do ask and pray that the good white people who have true and kind and just hearts will listen to our words and assist us in protecting us by good laws, and requiring the same to be enforced.
There are four principal things which the Indians desire the help of the government viz:
1st. That the fishing and hunting grounds of their Fathers be reserved for them and their children, and that the whites who have driven them off of the same be ordered by the government to leave them. The Indians chief method of support is by fishing and hunting and that is the only way the most of them can live, as only a small number are educated sufficiently to go out in the towns of the land and compete with the whites.
2nd. The Indians of Alaska pray that the U. S. government will set apart certain reservations for them and their children where they and their children can each have a home alloted to them, the same privileges as the Indians of the United States enjoy. We ask this in return for all of Alaska which has passed into the hands of the whites, without a murmur from us. We have given up a great deal and now only ask the great and good Father at Washington to give us back a little of the land, in return for the much we gave him, and protect us from the encroachments of greedy white men who would drive us into the Sea in order to advance their own interests.
* ❖ * ❖ #
Therefore I have come to Washington to speak and to lay our case before the Congressmen of the government, to implore their aid in giving the Alaska Indians homes and schools, and protecting them by law from the encroachment of avaricious white men.
In his report to Senator Thurston, dated March 23, 1900, the Secretary of the Interior made no specific reference to the complaint of the tribes that the whites had driven the Indians from their fishing and hunting grounds. He stated that the Indians “are understood to be intelligent, industrious, and reasonably prosperous”, and that they “are subject to the same laws that have been enacted for the government of white people in that District, and have the same rights as the latter of applying to the courts to right their wrongs.” He further stated that in his judgment, “the ex *435 tension of the reservation system to tbe Alaskan Indians generally is undesirable and should not be inaugurated”.
101. The annual report of Governor Brady, dated October 18, 1899, sets forth certain extracts from a report of Navy Captain Jefferson F. Moser pertaining to the protests of the tribes of southeast Alaska. Captain Moser was detailed to be in command of the Albatross, a vessel of the United States Fish Commission. The report was originally published by the United States Commissioner of Fish and Fisheries, which was engaged in making a survey of Alaska salmon waters. Captain Moser, after warning that overfishing and the barricading of streams by the canneries was resulting in a depletion of the salmon resources, stated in part:
Whenever the Albatross anchored near any locality either permanently or temporarily inhabited by natives, a delegation of the older men or chiefs came on board and requested an audience. The powwows which followed invariably took the form of relating the oppression of the white man. At Klinkwan, Chacon, Klakas, Klawak, Metlakahtla, Kasaan, Karta Bay, and, in fact, everywhere, the Indians were greatly exercised over their condition, and notwithstanding that they were repeatedly informed that the Fish Commission party had nothing to do with the execution of the law and was merely in the country for the purpose of examining the fisheries, they insisted that, as we were Government officers we must hear them. * * *
They are essentially fish-eating Indians, depending upon the streams of the country for a large amount of food supply. These streams, under their own administration, for centuries have belonged to certain tribes or clans settled in the vicinity, and their rights in these streams have never been infringed upon until the advent of the whites. No Indians would fish in a stream not their own except by invitation, and they can not understand how those of a higher civilization should be — as they regard it — less honorable than their own savage kind. They claim the white man is crowding them from their homes, robbing them of their ancestral rights, taking away their fish by shiploads; that their streams must soon become exhausted; that the Indian will have no supply to maintain himself and family and that starvation must follow.
*436 * * * The Prince of Wales Indians also complained against the Metlakahtla community, stating that the latter are foreigners and come to their island, cut out the best timber, and carry it to their sawmills at Met-lakahtla. * * *
From the Indians’ standpoint, their complaints are undoubtedly well founded, * * *. My own sympathy is with the Indian, and I would gladly recommend, if the way were clear, the establishment of ownership in streams; but it is impracticable * * *.
102. In 1905, Governor Brady forwarded to the Secretary of the Interior a complaint from a native to the effect that a cannery was trapping all the salmon at the mouth of the Chilkat Eiver, thereby making it impossible for him to exercise his hereditary right to fish for salmon in the river. The Governor stated: “This is a sample of many complaints from these people * * The letter was referred by the Secretary of the Interior to the Department of Commerce and Labor. The Assistant Secretary of that Department replied, by a letter of May 27,1905, to the Secretary of the Interior as follows:
Keplying to your letter of May 19, transmitting a copy of a letter from the Governor of Alaska with enclosures from John Shar-awn, a native Alaskan, to his brother-in-law, alleging illegal trapping of salmon, I have the honor to say that this complaint is similar to many made by the Alaskan natives. They are due to the fact that the natives believe they possess proprietary rights to the fishing at streams where they fished prior to the coming of the white man, whereas no such rights exist and anyone is privileged to take fish where they may be had, subject to the restrictions of the law, and regulations for the protection of the salmon fisheries of Alaska. In many instances natives have even sold fishing privileges, based on these supposed rights, to other fishermen.
It is not alleged, and it is not believed to be probable, that the trap complained of by John Shar-awn is operated in violation of law. * * *
103. At the time of the passage of the jurisdictional act authorizing the filing of this suit, the old customs of ownership of territory by clan and, derivatively, by families, still largely prevailed, although the clan’s importance had diminished, ownership by families and the individuals thereof *437 becoming more emphasized. Some family and even individual ownership of fishing, hunting and berrying areas appears to have become recognized separate and apart from clan ownership or supervision. However, the idea of clan over-lordship of large areas still prevailed, and while the clan by that time had only nominal control over clan territories, it was still recognized as having a greater measure of control over inland hunting lands. The clan’s overlordship was also recognized so far as the question of inheritance is concerned, with title, according to the native custom, being permitted to pass only to clan members. Thus, the sanctity of the clan, the identification of the individual with the clan of the mother, the rules against intermarriage within the clan, the recognition of ancient clan rights to land, and the recognition of status based on such ownership, was still widely operative. However, as a practical matter, and due to depleted population in certain areas and of certain clans, some clan territories were being used only by single families. Consequently, because of modern influences, family holdings became larger. In addition, there have been shifts and changes in the claims of various territories as between clans. Extinction of certain local house and clan groups has resulted in the taking over of their properties by other groups.
104. The territorial governors, as well as other officials, did not feel that the policies of the United States with respect to the Indian tribes in the States as regards rights to areas arising out of aboriginal use and occupancy, should be extended to the Tlingit and Haida tribes, and for the most part no such protection was afforded. The policy of the government officials was to ignore the tribal claims of the Tlingit and Haida Indians arising from aboriginal use and occupancy, and to attempt to bring about the assimilation of the Tlingit and Haida Indians into the white man’s society and system of property ownership. As is illustrated by the views of the Secretary of the Interior in finding 100, the opinion was repeatedly expressed by Government officials that the Tlingit and Haida Indians were not like the Indians in the States, that they were industrious and able to support themselves from the natural resources of the region, and that they were amenable to the civilizing influences of the whites. For *438 this reason, they were generally opposed to the extension of the reservation system to the Indians of Alaska. The view was epitomized by Governor Knapp, in his annual report in 1891:
CONDITION OF THE NATIVES
The change of conditions from year to year is not so marked as to call for special comment, but in the settled portions of the country, that is, along the coast and upon the islands, there is constant progress in civilization and improved conditions of life. The agencies at work for the uplifting of these peoples are effective and doing much good, while business enterprises, employing them as laborers and earning in contact with them in a business way, infuse them with civilized ideas. * * *
* * * The Government certainly owes them this much of assistance [hospital treatment]. Otherwise they need none at present. They are self-supporting and will continue so if rightly treated and protected from the rapacity of unprincipled men.
* * * In the accessible portions of the Territory there is probably very little danger of further trouble in the matter of submission to properly constituted authority. The people are peaceable and kindly disposed, measurably honest, and have great respect for the Government. * * *
A DEFINITE POLICY NEEDED.
Our statesmen of a century ago were excusable for adopting a policy toward the aborigines of the country which made the Indian tribes little less than domestic nations and the individual members of those tribes quasi foreigners, or at least having a divided allegiance. The policy was adopted under the stress of circumstances, compelling the Government to seek peaceful relations with organized bands of savages who might be useful as allies, but dangerous as enemies. That policy once fully established could not be abandoned at will, and the system and its natural sequences have ever since been continued, a fruitful source of trouble and danger, and a most perplexing problem for the Government.
There is less excuse for errors of policy in dealing with the aborigines of Alaska. Their conditions are entirely different. Their habits of life are unlike the habits of the Indians of the plains. They are more intelligent, settled, and reliable. They live in fixed abodes and are accustomed to independent and self-sustaining ways.
*439 They have already made great strides toward the American civilization. The Government is not embarrassed by treaties with them or other precedents of recognition_of tribal relations, and it has a fair and open field for inaugurating a system which shall yield better results than the old one.
For nearly a quarter of a century of national responsibility for the welfare of the native peoples of Alaska we have neglected to fix upon a definite policy of treatment. But longer evasion is impossible. The time has come when a position must be taken.
The natives consider themselves the true owners of the country, with all its accompaniments of soil, forests, streams, and navigable waters. Its game, fish, and vegetable growths are their personal property. The white man is an invader to be tolerated as a matter of necessity, or perhaps as a matter of advantage. As a conquered people they bow to the inevitable and will accept such a place in the legal structure as shall be accorded them.
# íjc *
CONCLUSION OF LAW
Under the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover and judgment will be entered to that effect. The extent, if any, to which plaintiffs’ use and occupancy and Indian title to lands and waters in Alaska were abandoned or relinquished, the amount of recovery and the amount of offsets, if any, will be determined in further proceedings pursuant to the order of the court issued on February 29,1956 under Rule 38 (b).

 On April 8, 1964, Harry Douglas and 18 others described in their motion papers as chiefs and leaders of various clans of Tlingit Indians were permitted to intervene as parties plaintiff.

 Act of June 19, 1935, 49 Stat. 388, Ch. 275. Finding 1.

 A similar problem arose in the case of Clyde F. Thompson et al. v. United States, Indian Claims Commission Docket No. 31, and Ernest Rising et al., Docket No. 37, decided July 31, 1959, 8 Ind. ClS. Com. 1, 32, 33. The Commission stated:
“It is not necessary that the Indians prove that each of the 500 or more tribelets occupied and used every acre of the lands they claimed; * * *. It must be borne in mind that in aboriginal times these Indians obtained their subsistence from the natural products of the soil and waters of the areas they occupied. Such an economy did not require an Intensive cultivation of the soil for the Indians of necessity exploited the places which provided the necessaries of life. The resources the Indians relied upon for subsistence were not uniformly distributed; they were largely seasonal and in scattered .places, requiring travel of considerable distances in their gathering, fishing and hunting activities. Game animals moved from place to place in search of food and had to be followed. The importance of flora and fauna in all regions of the state cannot be gainsaid, and the search for such resources was continuous and covered areas that were unproductive as well as those that were, because of the variations in the production of the natural resources from year to year or even from season to season in many years.
“* * * It is no doubt true, as the Government contends, the higher elevations in the mountains and some large desert areas produced little of economic importance to the Indians, but such places had limited uses and were a part of the areas claimed and defended when necessary by the tribelet occupying it.”

 Section 2 of the special jurisdictional act authorizes the bringing of suit by the Tlingit and Haida Indians of Alaska on all “claims of whatever nature, legal or equitable, which the said Tlingit and Haida Indians of Alaska may have, or claim to have, against the united States, Jor lands or other tribal or community property rights, taken from them by the United States without compensation therefor * * [Italics supplied.]

 The Act provides :
“* * * That hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an Independent nation, tribe, or power with whom the United States may contract by treaty: * *

 See House Report No. 621, 74th Cong., 1st Sess., to accompany H.R. 2766, p. 3. The memorandum to the Commissioner of Indian Affairs by Mr. Paul E. Gordon, director of education for Alaska, transmitted by the Secretary of the Interior in a letter incorporated in the House Report, is in evidence as plaintiff’s exhibit 114.

 Section 8 of the jurisdictional act provides:
“The amount of any judgment in favor of said Tlingit and Haida Indians of Alaska, after payment of attorneys fees, shall be apportioned to the different Tlingit and Haida communities listed in the roll provided for in section 7 in direct proportion to the number of names on each roll, and shall become an asset thereof, and shall be deposited in the Treasury of the united States to the credit of each community, and such funds shall bear interest at the rate of 4 per centum per annum, and shall be expended from time to time upon requisition by the said communities by and with advice and consent of the Secretary of the Interior, and under regulations as he may prescribe, for the future economic security and stability of said Indian groups, through the acquisition or creation of productive economic instruments and resources of public benefit to such Indian communities: Provided, 'however, That the interest on such funds may be used for beneficial purposes such as the relief of distress, emergency relief and health: Provided further, That none of the funds above indicated or the interest thereon shall ever be used for per capita payments.”

 The appellation was derived from a Russian word indicating the name of the wooden ornament worn by the native women in the underlip.

 Their specific locations appear on the map in evidence as plaintiffs’ exhibit 169,